# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: INSULIN PRICING LITIGATION | Case No.: 2:23-md-03080 (BRM)(RLS) MDL No. 3080 |
| COUNTY OF WHITFIELD, GEORGIA, | JUDGE BRIAN R. MARTINOTTI |
| Plaintiff, | JUDGE RUKHSANAH L. SINGH |
| v. | DIRECT FILED COMPLAINT PURSUANT TO CASE MANAGEMENT ORDER NO. 9 |
| ELI LILLY AND COMPANY; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; EVERNORTH HEALTH, INC. (formerly EXPRESS SCRIPTS HOLDING COMPANY); EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; MEDCO HEALTH SOLUTIONS, INC.; ESI MAIL PHARMACY SERVICES, INC.; EXPRESS SCRIPTS PHARMACY, INC.; CVS HEALTH CORPORATION; CVS PHARMACY, INC; CAREMARK RX, LLC; CAREMARK PCS HEALTH, LLC; CAREMARK, LLC; UNITEDHEALTH GROUP, INC.; OPTUM, INC.; OPTUMRX INC.; OPTUMINSIGHT, INC., | Civil Action No. |
| Defendants. | |

## COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION ...............................................................................1

II.     PARTIES .........................................................................................13

    A. Plaintiff .......................................................................................13

    B. Manufacturer Defendants.............................................................15

    C. PBM Defendants ..........................................................................21

III.    JURISDICTION AND VENUE...................................................57

    A. Subject-Matter Jurisdiction.........................................................57

    B. Personal Jurisdiction ...................................................................57

    C. Venue ...........................................................................................59

IV.     ADDITIONAL FACTUAL ALLEGATIONS............................59

    A. Diabetes and Insulin Therapy ......................................................59

        • *The Diabetes Epidemic* .........................................................59

        • *Insulin: A Century-Old Drug* ...............................................61

        • *The Current Insulin Landscape*............................................65

        • *Insulin Adjuncts:  Type 2 Medications* ................................72

    B. The Dramatic Rise in the Price of Diabetes Medications in the
       U.S. ...............................................................................................80

        • *The Defendant Manufacturers Increased Prices in Lockstep* . ......85

    C. The Pharmaceutical Payment and Supply Chain ............................107

    D. The PBMs' Role in the Pharmaceutical Payment Chain.................110

        • *The Rise of the PBMs in the Pharmaceutical Supply Chain*........113

        • *The Insular Nature of the Pharmaceutical Industry* ...................115

    E. The Insulin Pricing Scheme.............................................................121

    F. The Manufacturers React to Threats of Formulary Exclusion by
       Increasing Rebates Offered to the PBMs .........................................128

G. Defendants Play Down the Insulin Pricing Scheme and Its Harms 136

H. All Defendants Profit from the Insulin Pricing Scheme ..................145

- *The PBMs Pocket a Substantial Share of the Manufacturers' Secret Payments* ..............................................146
- *The Insulin Pricing Scheme Allows the PBMs to Profit Off Pharmacies*..........................................154
- *The Insulin Pricing Scheme Increases PBM Mail-Order Profits* ............................................156

I. Plaintiff Purchased At-Issue Drugs Directly from Defendant Express Scripts...........................................................157

J. Defendants Deceived Plaintiff ...............................................159

- *The Manufacturer Defendants Deceived Plaintiff* .......................159
- *The PBM Defendants Deceived Plaintiff* ......................................162

K. The Insulin Pricing Scheme Has Damaged Plaintiff........................175

L. Defendants' Recent Efforts in Response to Rising Insulin Prices....178

V.    TOLLING OF THE STATUTES OF LIMITATIONS ...........................181

A. Discovery Rule ......................................................................181

B. Fraudulent Concealment ......................................................183

C. Equitable Estoppel & Equitable Tolling................................187

D. Continuing Violations............................................................188

VI.   CLAIMS FOR RELIEF ................................................................189

1.   Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1962(c) (Against All Defendants) ...............................................................189

A. Defendants Are Culpable "Persons" Under RICO ...........................189

B. The Manuacturer-PBM RICO Enterprises ......................................190

C. The Enterprises Misrepresent and Fail to Disclose Material Facts Furtherance of the Insulin Pricing Scheme ......................................196

D. Defendants' Use of the U.S. Mails and Interstates Wire Facilities ..198

E. Conduct of the Manufacturer-PBM Enterprises' Affairs ................ **201**

F. Defendants' Pattern of Racketeering Activity ................... **203**

G. The RICO Defendants' Motive ................. **205**

H. The Manufacturer-PBM Enterprises' Insulin Pricing Scheme

    Injured Plaintiff ................... **206**

2. **Violations of the RICO, 18 U.S.C. § 1962(d) By Conspiring To Violate 18 U.S.C. § 1962(c)** (Against All Defendants) ....................... **209**

3. **Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO") O.C.G.A. § 16-14-4(a)** (Against All Defendants) ................... **211**

4. **Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO") O.C.G.A. § 16-14-4(b)** (Against All Defendants) ................... **214**

5. **Violations of Georgia RICO, §16-14-4(c) By Conspiring to Violate § 16-14-4(a) and O.C.G.A §16-114-4(b)** (Against All Defendants) ................... **218**

6. **Violation of Georgia's Uniform Deceptive Trade Practices Act ("Georgia Deceptive Trade Practices Act")** (Against Defendants Eli Lilly, Novo Nordisk, Sanofi, and Express Scripts) ................ **220**

7. **Common Law Fraud** (Against Defendants Eli Lilly, Novo Nordisk, Sanofi, and Express Scripts) ................... **228**

8. **Civil Conspiracy** (Against All Defendants) ................ **232**

9. **Unjust Enrichment** (Against Defendants Eli Lilly, Novo Nordisk, Sanofi, and Express Scripts) ................... **235**

VII. **MOTION FOR INJUNCTION** ................... **238**

VIII. **PRAYER FOR RELIEF** ................... **239**

IX. **JURY DEMAND** ................... **240**

iv

## FIGURES & TABLES

Figure 1:   PBMs & PBM-Affiliated Insurers ..................................................................3

Figure 2:   Price Increase of Insulin vs. Selected Consumer Goods,
            1997-2018 ....................................................................................................6

Figure 3:   Average Annual Price Increase of Insulin Products 2013-2018 ........7

Figure 4:   List and net prices of GLP-1 agonists ..............................................76

Table 1:    Diabetes medications at issue in this case ........................................78

Figure 5:   Rising reported prices of Humulin R (500U/mL), 1997-2021..........81

Figure 6:   Rising list prices of Humalog vials and pens, 1996-2021 .................82

Figure 7:   Rising list prices of Levemir, 2006-2021 .........................................83

Figure 8:   Rising list prices of Novolog vials and pens, 2002-2021 .................83

Figure 9:   Rising list prices of Lantus vials and pens, 2001-2021 ...................84

Figure 10: Rising list prices of long-acting insulins ...........................................86

Figure 11: Rising list prices of rapid-acting insulins ..........................................87

Figure 12: Rising list price increases for human insulins ...................................87

Figure 13: Rising list prices of Type 2 drugs .....................................................88

Figure 14 and 15: Lockstep insulin price increases ..................................... 88-89

Figure 16: Sanofi price tracking.........................................................................91

Figure 17: Novo Nordisk pricing committee presentation..................................96

Figure 18: Novo Nordisk presentation on reduced lists prices .......................100

Figure 19: Eli Lilly internal email re: potential price reductions ..................102

Figure 20: Insulin exclusions by plan year .....................................................104

Figure 21: The pharmaceutical payment chain ...............................................109

Figure 22: Insulin distribution and payment chain..........................................110

Figure 23: PBM consolidation .........................................................................114

Figure 24: Sanofi memo on introduction of Basaglar .....................................129

**Figure 25: Sanofi memo on Basaglar pricing**....................................................**130**

**Figure 26: Sanofi memo on increased rebates for Lantus**...............................**131**

**Figure 27: Sanofi presentation on formulary threats to Lantus** ....................**133**

Plaintiff, the County of Whitfield, Georgia (hereinafter "Plaintiff," or "Whitfield County"), brings this action against the above-named Defendants and alleges as follows:

## I. INTRODUCTION

1. **Designated Forum.** Pursuant to Case Management Order No. 9 in Case No. 2:23-md-03080 (BRM)(RLS) MDL No. 3080, Plaintiff has filed this action directly in the multi district litigation proceeding. Plaintiff would have filed its case in the United States District Court of the Northern District Court of Georgia in the absence of the ability to file directly into this case.

2. The cost of diabetes medications has skyrocketed over the past 20 years. Over that time, the average cost of consumer goods and services has almost doubled. The cost of some diabetes medications has risen more than tenfold. These price increases are not due to the rising cost of goods, production costs, investment in research and development, or competitive market forces. These price increases have been engineered by Defendants to exponentially increase their profits at the expense of payors, like Plaintiff, and their plan members. It is a multibillion-dollar industry.

3. Diabetes is widespread. According to the American Diabetes Association, the total estimated cost of diabetes in the U.S. in 2022 was over $412 billion (including $306.6 billion in direct medical costs and $106.3 billion in direct costs)—up from $327 billion in 2017.

4.     In Georgia alone, diabetes costs an estimated $11 billion per year in direct medical expenses and more than one million Georgians—12.4% of the adult population— have diabetes. [1]

5.     Defendants Eli Lilly, Novo Nordisk, and Sanofi (collectively, the "Manufacturer Defendants" or "Manufacturers") manufacture most insulins and other diabetes medications available in the United States. In 2020—as in years past—the three Manufacturer Defendants controlled 92% (by volume) and 96% (by revenue) of the global market for diabetes drugs.

6.     Defendants CVS Caremark, Express Scripts, and OptumRx (collectively, the "PBM Defendants") are pharmacy benefit managers that work in concert with the Manufacturer Defendants to dictate the availability and price of the at-issue drugs for most of the U.S. market.[2] The PBM Defendants are, at once, (1) the three largest PBMs in the United States (controlling more than 80% of the PBM market)[3]; (2) the largest pharmacies in the United States (comprising three of the top

---

[1] *See* American Diabetes Association, *The Burden of Diabetes in Georgia* (Oct. 2021), https://www2.diabetes.org/sites/default/files/2021-10/ADV_2021_State_sheets_Georgia.pdf (last visited April 8, 2024).

[2] The "at-issue drugs" or "at-issue medications" are: Apidra, Basaglar, Humalog, Humulin N, Humulin R, Humulin R 500, Humulin 70/30, Lantus, Levemir, Novolin N, Novolin R, Novolin 70/30, Novolog, Ozempic, Soliqua, Toujeo, Tresiba, Trulicity, and Victoza.

[3] Adam J. Fein, *The Top Pharmacy Benefit Managers of 2021: The Big Get Even Bigger,* DRUG CHANNELS (Apr. 5, 2022), https://www.drugchannels.net/2022/04/the-top-pharmacy-benefit-managers-of.html#:~:text=We%20estimate%20that%20for%202021,OptumRx%20business%20of%20UnitedHealth%20Group (last visited May 6, 2024).

five dispensing pharmacies in the U.S.)[4]; and (3) housed within the same corporate families as three of the largest insurance companies in the United States—Aetna (CVS Health), Cigna (Express Scripts), and UnitedHealth Group, Inc. (OptumRx).

**Figure 1: PBMs & PBM-Affiliated Insurers**

| PBMs | PBM-Affiliated Insurer |
|---|---|
| CVS | Aetna |
| Express Scripts | Cigna |
| Optum | UnitedHealthcare |

7.    These Defendant corporate conglomerates sit at 10th (UnitedHealth Group), 11th (CVS Health), and 35th (Cigna) on the Fortune 500 list as of year-end 2023.[5]

8.    For transactions where the PBMs control the insurer, the PBM, and the pharmacy (e.g., Aetna–Caremark–CVS Pharmacy)—these middlemen capture as much as half of the money spent on each insulin prescription (up from 25% in 2014), even though they contribute nothing to the development, manufacture, or innovation of the drugs.

---

[4] Adam J. Fein, *The Top 15 U.S. Pharmacies of 2021: Market Shares and Revenues at the Biggest Companies,* DRUG CHANNELS (Mar. 8, 2022), https://www.drugchannels.net/2022/03/the-top-15-us-pharmacies-of-2021-market.html#:~:text=The%20top%20seven%20dispensing%20pharmacies,prescription%20dispensing%20revenues%20in%202021 (last visited May 6, 2024).
[5] Fortune, *Fortune 500 List of Companies,* https://fortune.com/ranking/global500/2023/search/?Name=unitedhealth+group (last visited April 8, 2024)

9.      The PBMs establish national formulary offerings (i.e., approved drug lists) that, among other things, set the baseline for which diabetes medications are covered and not covered by nearly every payor in the United States, including those in Whitfield County.

10.      The Manufacturers and PBMs understand that the PBMs' national formularies drive drug utilization. The more accessible a drug is on the PBMs' national formularies, the more that drug will be purchased throughout the United States. Conversely, exclusion of a drug from one or more of the PBMs' formularies can render the drug virtually inaccessible for millions of covered persons.

11.      Given the PBMs' market power and the crucial role their standard formularies play in the pharmaceutical pricing chain, both Defendant groups understand that the PBM Defendants wield enormous influence over drug prices and purchasing behavior.

12.      The unfair and deceptive conspiracy at the root of this Complaint—the "Insulin Pricing Scheme"—was borne from this mutual understanding.

13.      The Manufacturers set the initial list price (wholesale price) for their respective insulin medications. Over the last twenty years, list prices have sharply increased in lockstep, even though the cost to produce these drugs decreased during that period.

14.    The Manufacturer Defendants have in tandem increased the prices of their insulins up to 1000%, even though production costs decreased during that period.

15.    Insulins that today cost the Manufacturers as little as $2 per vial to produce were priced at $20 per vial in the 1990s, but now range in price from $300 to $700.[6]

16.    The Manufacturer Defendants have in tandem increased the prices of their insulins up to 1000%, taking the same increase down to the decimal point within a few days of one another and, according to a U.S. Senate Finance Committee investigation, "sometimes mirroring" one another in "days or even hours."[7] Figure 2 shows the rate at which Defendant Eli Lilly raised the list price of its analog insulin, Humalog, compared to the rate of inflation for other consumer goods and services from 1997-2018.

---

[6] *See* Dzintars Gotham, Melissa J. Barber, & Andrew Hill, *Production Costs and Potential Prices for Biosimilars Of Human Insulin and Insulin Analogues*, BMJ GLOBAL HEALTH (Sept. 25, 2018), https://gh.bmj.com/content/3/5/e000850 (last visited May 6, 2024); Table 1 of this Complaint.
[7] Charles E. Grassley & Ron Wyden, *Staff Report on Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug, Sen. Fin. Comm.*, at 6, 54, 55 (Jan. 2021), https://www.finance.senate.gov/imo/media/doc/Grassley-Wyden%20Insulin%20Report%20(FINAL%201).pdf (hereinafter "Grassley & Wyden" or "Senate Insulin Report").

**Figure 2: Price Increase of Insulin vs. Selected Consumer Goods. 1997–2018**



17.     Looking at the narrower timeframe between 2013 through 2018, prices for insulin products have increased at rates far exceeding inflation, as illustrated in the chart below from the Kaiser Family Foundation.

6

**Figure 3: Average Annual Price Increase of Insulin Products. 2013-2018**



18.     Today's exorbitant prices starkly contrast with insulin's origins. The inventors sold the original patent for $1 to ensure that the medication would remain affordable. Today, insulin is the poster child for skyrocketing pharmaceutical prices.

19.     Little about these medications has changed over the past hundred years; today's $350 insulin is the same product Defendants once sold for $20 in the 1990s.[8]

*How the Insulin Pricing Scheme Works*

20.     In the simplest terms, there are three important participants in the insulin medication chain.

---

[8] Indianapolis Bus. J., Lilly Insulin Prices Under Microscope, REPUBLIC (Sept. 3, 2017), http://www.therepublic.com/2017/09/03/lilly_insulin_prices_under_microscope/#:~:targetText=Lilly%20launched%20Humalog%20in%201996,month's%20supply%20for%20many%20patients.&targetText=Instead%2C%20the%20company%20said%2C%20they,negotiate%20drug%20prices%20for%20insurers; see also Table 1 of this Complaint.

a.    *Whitfield County, Georgia.* During the relevant period, Plaintiff operated health plans for its employees and their dependents. The plan includes pharmacy benefits; meaning Plaintiff purchased the at-issue drugs for its beneficiaries and for use in county run facilities. Operators of self-funded plans, like Plaintiff, may be referred to as payors or plan sponsors (or PBM "clients").

b.    *Pharmacy Benefit Managers.* Payors routinely engage pharmacy benefit managers to manage their prescription benefits, which includes negotiating prices with drug manufacturers and (ostensibly) helping payors manage drug spending. Each pharmacy benefit manager—including the three PBMs here—maintains a formulary—a list of covered medications. A pharmacy benefit manager's power to include or exclude a drug from its formulary theoretically should incentivize manufacturers to lower their list prices. Pharmacy benefit managers also contract with pharmacies to dispense medications purchased by the plan's beneficiaries. Pharmacy benefit managers are compensated by retaining a portion of what—again in theory—should be shared savings on the cost of medications.

c.    *The Manufacturers.* The Manufacturers produce the at-issue insulin

medications.[9] Each sets a list price for its products. The term "list price" often is used interchangeably with the Wholesale Acquisition Cost (WAC) (defined by federal law as the undiscounted list price for a drug or biologic to wholesalers or direct purchasers). The manufacturers self-report list prices to publishing compendiums such as First DataBank, Medi-Span, or Redbook, who then publish those prices.

21.     Given the PBMs' purchasing power and their control over formularies that govern the availability of drugs, their involvement should drive list prices down. Instead, to gain access to the PBMs' formularies, the Manufacturers artificially inflate their list prices and then pay a significant, but undisclosed, portion of the inflated price back to the PBMs (the "Manufacturer Payments").[10]  The Manufacturer Payments bear a variety of dubious labels—rebates, discounts, credits, inflation/price protection fees, administrative fees, etc. By whatever name,

---

[9] There are three types of insulin medications. First are *biologics,* which are manufactured insulins derived from living organisms. Second are *biosimilars*, which are "highly similar" copies of biologics. They are similar in concept to "generic" drugs; but in seeking approval they use biologics (rather than drugs) as comparators. Third, the confusingly-named *authorized generics* are not true generics—they are an approved brand-name drug marketed without the brand name on the label. FDA approved the original insulins as drug products rather than biologics, so although there was a regulatory pathway to introduce biosimilars generally (copies of biologics), companies could not introduce insulin biosimilars because their comparators were "drugs" rather than "biologics." In 2020, FDA moved insulin to the biologic regulatory pathway, thus opening the door to approval of biosimilars through an abbreviated approval process. Also see Appendix A to this Complaint (Glossary).
[10] In this Complaint, "Manufacturer Payments" is defined as all payments or financial benefits of any kind conferred by the Manufacturer Defendants to PBM Defendants (or a subsidiary, affiliated entity, or group purchasing organization or rebate aggregator acting on a PBM's behalf), either directly via contract or indirectly via Manufacturer-controlled intermediaries. Manufacturer Payments includes rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees and any other form of consideration exchanged.

the inflated list prices and resulting Manufacturer Payments are a quid pro quo for inclusion and favorable placement on the PBMs' formularies.[11]

22.    Contracts between PBM Defendants and payors like Plaintiff tie the definition of "rebates" to patient drug utilization. But the contracts between PBMs and Manufacturers define "rebates" and other Manufacturer Payments differently, e.g., calling rebates for formulary placement "administrative fees." Defendants thus profit from the "rebates" and other Manufacturer Payments, and the payments are beyond a payor's contractual audit right to verify the accuracy of "rebate" payments they receive.

23.    The PBMs' staggering revenues vastly exceed the fair market value of the services they provide. And specifically, the amount of Manufacturer Payments the PBMs receive in connection with the at-issue drugs vastly exceeds the fair market value of the services they provide with respect to those drugs.

24.    The Manufacturers' list prices are not the result of free-market competition for payors' business. The Manufacturers' list prices are so untethered from the net prices[12] that the Manufacturers ultimately realize that the Manufacturers

_____

[11] Favorable or preferred placement may, for example, involve placing a branded product in a lower cost-sharing tier or relaxing utilization controls (such as prior authorization requirements or quantity limits). Favorable placement of a relatively more expensive drug encourages use of that drug and leads to higher out-of-pocket costs for payors and co-payors.

[12] "Net price" refers to the price the manufacturer ultimately realizes, i.e., the list price less rebates, discounts, etc. (net sales divided by volume). At times, Defendants' representatives use "net price" to refer to the amount payors or plan members pay for medications. In this Complaint, "net price" refers to the

know the list price constitutes a false price. It does not reflect the Manufacturers' actual costs to produce the at-issue drugs or the fair market value of those drugs.

25.    The PBMs grant formulary status based upon the highest inflated price— which the PBMs know is false—and upon which diabetes medications generate the largest profits for themselves.

26.    The Insulin Pricing Scheme creates a "best of both worlds" scenario for Defendants. The Manufacturer Defendants buy formulary access and thereby increase their revenues while the PBM Defendants receive significant, undisclosed Manufacturer Payments.

27.    The PBM Defendants profit off the Insulin Pricing Scheme in numerous ways, including: (1) retaining a significant, but undisclosed, share of the Manufacturer Payments, either directly or through rebate aggregators, (2) using the price produced by the Insulin Pricing Scheme to generate unwarranted profits from pharmacies, and (3) relying on those same artificial list prices to drive up the PBMs' margins and pharmacy- related fees, including those relating to their mail-order pharmacies.

28.    As detailed below, although the PBM Defendants represent both publicly and to their client payors that they use their market power to drive down

---

former—the amount that the Defendant Manufacturers realize for the at-issue drugs, which is roughly the List Price less Manufacturer Payments.

prices for diabetes medications, these representations are false and deceptive. Instead, the PBMs intentionally incentivize the Manufacturers to inflate their list prices. The PBMs' "negotiations" intentionally drive up the price of the at-issue drugs and are directly responsible for the skyrocketing prices of diabetes medications, which confers unearned benefits upon the PBMs and Manufacturers alike.

29.     Because the purchase price of every at-issue diabetes medication flows from the false list prices generated by Defendants' unfair and deceptive scheme, every payor in the United States that purchases these life-sustaining drugs, including Plaintiff, has been directly harmed by the Insulin Pricing Scheme.

30.     Even if temporary reductions in Plaintiff's costs for the at-issue drugs occurred from time to time, those costs remained higher than those that would have resulted from a transparent exchange in a free and open market.

31.     As a payor for and purchaser of the at-issue drugs, Plaintiff has been overcharged substantial amounts of money during the relevant period as a direct result of the Insulin Pricing Scheme.

32.     Plaintiff seeks legal relief against the Defendants to protect its economic interests and to protect its Beneficiaries.

33.     Indeed, from 2011 to the present, Plaintiff has spent approximately one

million ($1,000,000.00) dollars per year on the at-issue diabetes medications. These costs are attributable to Defendants' inflated prices that did not arise from transparent or competitive market forces, but rather, artificially inflated costs due to the Insulin Pricing Scheme.

34.     This action alleges that Defendants violated the federal Racketeer Influenced and Corrupt Organizations Act, the Georgia Racketeer Influenced and Corrupt Organizations Act, the Georgia Uniform Deceptive Trade Practices Act, and Georgia common law by engaging in the Insulin Pricing Scheme. The Insulin Pricing Scheme directly and foreseeably caused, and continues to cause, harm to Plaintiff.

35.     This action seeks injunctive relief, restitution, disgorgement, actual damages, punitive damages, attorneys' fees and costs, and all other available relief to address and abate the harm caused by the Insulin Pricing Scheme.

36.     The "relevant period" alleged in this action is from 2003 to the present.

## II.  PARTIES

A.     **Plaintiff**

37.     **Plaintiff, Whitfield County, Georgia** is a political subdivision under the laws of the State of Georgia.

38.     Plaintiff, as a government entity, provides vital services including public safety, emergency management, and health services to more than one hundred

and three thousand (103,000) residents.

39.     Any increase in spending has a detrimental effect on Plaintiff's overall budget and, in turn, negatively impacts its ability to provide necessary services to the community.

40.     The Insulin Pricing Scheme has had such an effect.

41.     Additionally, as a government employer, Plaintiff provides health benefits to its employees, retirees, and their dependents ("Beneficiaries"). One of the benefits Plaintiff offers its Beneficiaries is paying a substantial share of the purchase price of their pharmaceutical drugs, including the at-issue diabetes medications. Plaintiff also purchases the at issue diabetes medications for use in county-run facilities such as the county jail.

42.     Plaintiff maintains self-insured health plans for its Beneficiaries. In recent years, Whitfield County's plan has covered approximately one thousand three hundred (1,300) members per year, many of whom carried coverage for immediate family.

43.     Exclusive of the costs associated with providing diabetes medications at county-run facilities, such as correctional facilities and nursing homes, Plaintiff's most significant prescription expense by therapeutic class was for antidiabetic drugs, with more than one million three hundred thousand dollars ($1,300,000.00) being

spent by Plaintiff per year on this class of drugs alone. Over the course of the relevant period—as prices continued to rise—Plaintiff spent significant amounts of public monies in overcharges to the detriment of its Beneficiaries and the public. Plaintiff has paid significantly more for insulin than it otherwise would have paid absent Defendants' conduct.

44.    Plaintiff seeks relief for the harm suffered by Defendants' misrepresentations and omissions regarding their illegal Insulin Pricing Scheme.

B.    **Manufacturer Defendants**

45.    **Defendant Eli Lilly and Company ("Eli Lilly")** is an Indiana corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

46.    Eli Lilly is and has since 1964 been registered to do business in the State of Georgia. Eli Lilly may be served through its registered agent: National Registered Agents, Inc., 289 S. Culver Street, Lawrenceville, Georgia, 30046-4805.

47.    In Georgia and nationally, Eli Lilly manufactures, promotes, and distributes several at-issue diabetes medications: Humulin N (first U.S. approval in 1982), Humulin R (first U.S. approval in 1982), Humalog (first U.S. approval in 1996), Trulicity (first U.S. approval in 2014), and Basaglar (first U.S. approval in 2015).

48.     Eli Lilly's domestic revenues from 2019 to 2021 were $11.9 billion from Trulicity, $4.48 billion from Humalog, $2.58 billion from Humulin, and $2.31 billion from Basaglar.[13]

49.     Eli Lilly's global revenues in 2018 were $3.2 billion from Trulicity, $2.99 billion from Humalog, $1.33 billion from Humulin, and $801 million from Basaglar.[14]

50.     Eli Lilly transacts business in Georgia, including in Whitfield County targeting these markets for its products, including the at-issue diabetes medications.

51.     Eli Lilly employs sales representatives throughout Georgia to promote and sell Humulin N, Humulin R, Humalog, Trulicity, and Basaglar, and it utilizes wholesalers (McKesson, AmeriSource Bergen, and Cardinal Health) to distribute the at-issue products to pharmacies and healthcare professionals within Georgia, including in Whitfield County.

52.     Eli Lilly also directs advertising and informational materials to Georgia and Whitfield County physicians and potential users of Eli Lilly's products.

53.     At all relevant times, in furtherance of the Insulin Pricing Scheme, Eli Lilly published its prices for the at-issue diabetes medications throughout Georgia with the express knowledge that payment and reimbursement by Plaintiff would be

---

[13] Eli Lilly Annual Report (Form 10-K) (FYE Dec. 31, 2021).
[14] Eli Lilly Annual Report (Form 10-K) (FYE Dec. 31, 2018).

based on those false list prices.

54.    Eli Lilly transacts business throughout Georgia employing sales representatives to promote and sell Humulin N, Humulin R, Humalog, Trulicity, and Basaglar.

55.    At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Eli Lilly published its prices for the at-issue diabetes medications throughout Georgia with the express knowledge that payment and reimbursement by Plaintiff would be based on those false list prices.

56.    During the relevant period, Plaintiff purchased Eli Lilly's at-issue drugs at prices based on false list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in county-run facilities.

57.    All of the Eli Lilly diabetes medications related to the at-issue transactions were paid for and/or reimbursed in Georgia based on the specific false and inflated prices Eli Lilly caused to be published in Georgia in furtherance of the Insulin Pricing Scheme.

58.    **Defendant Sanofi-Aventis U.S. LLC ("Sanofi")** is a Delaware limited liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807. It is a citizen of the State of Delaware and the State of New Jersey.

59.    Sanofi was registered to do business in the State of Georgia from 2006 to 2021. Sanofi may be served through its registered agent: Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

60.    Sanofi manufactures, promotes, and distributes pharmaceutical drugs both in Georgia and nationally, including several at-issue diabetes medications: Lantus (first U.S. approval in 2000), Apidra (first U.S. approval in April 2004), Toujeo (first U.S. marketing authorization in February 2015), and Soliqua (first U.S. approval in November 2016).

61.    Sanofi considers Lantus one of its "flagship products" and "one of Sanofi's leading products in 2021 with net sales of $2,494 million" ($2.95 billion) net sales of $2,661million ($3.04 billion) in 2020, representing 7.4% of the company's net sales for 2020.[15]

62.    Sanofi's U.S. net sales in 2019 were $1.29 billion from Lantus, $323.7 million from Toujeo, and $51.5 million from Apidra.[16]

63.    Sanofi transacted business in Georgia, including in Whitfield County, targeting these markets for its products, including the at-issue diabetes medications.

64.    Sanofi employed sales representatives throughout Georgia and in this

---

[15] Sanofi Annual Report (Form 20-F) (FYE Dec. 31, 2021); Sanofi Annual Report (Form 20-F) (FYE Dec. 31, 2020).
[16] Sanofi Annual Report (Form 20-F) (FYE Dec. 31, 2019).

District to promote and sell Lantus, Toujeo, Apidra, and Soliqua, and it utilizes wholesalers to distribute the at-issue products to pharmacies and healthcare professionals within Georgia, including in Whitfield County.

65.    Sanofi also directed advertising and informational materials to Georgia physicians and potential users of Sanofi's products for the specific purpose of selling the at-issue drugs in Georgia, including Whitfield County, and profiting from the Insulin Pricing Scheme.

66.    At all relevant times, in furtherance of the Insulin Pricing Scheme, Sanofi published its prices of its at-issue diabetes medications throughout Georgia for the purpose of payment and reimbursement by payors, including Plaintiff.

67.    During the relevant period, Plaintiff purchased Sanofi's at-issue drugs at prices based on false list prices generated by the Insulin Pricing Scheme through its employee health plans.

68.    All of the Sanofi diabetes medications related to the at-issue transactions were paid for and/or reimbursed in Georgia and Whitfield County based on the specific false and inflated prices Sanofi caused to be published in Georgia in furtherance of the Insulin Pricing Scheme.

69.    **Defendant Novo Nordisk Inc. ("Novo Nordisk")** is a Delaware corporation with its principal place of business at 800 Scudders Mill Road,

Plainsboro, New Jersey 08536. It is a citizen of the State of Delaware and the State of New Jersey.

70.    Novo Nordisk may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

71.    Novo Nordisk manufactures, promotes, and distributes pharmaceutical drugs both in Georgia and nationally, including at-issue diabetic medications: Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

72.    Novo Nordisk's combined net sales of these drugs in the United States from 2018 to 2020 totaled approximately $18.1 billion.[17]

73.    Novo Nordisk's global revenues for "total diabetes care" over that three-year period exceeded $41 billion.[18]

74.    During the relevant time period, Plaintiff purchased Novo Nordisk's at-issue diabetes medications at prices based on false list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in county-run facilities.

75.    All of the Novo Nordisk diabetes medications related to the at-issue

---

[17] Novo Nordisk, Annual Report (Form 20-F) (Dec. 31, 2019)
[18] *Id.*

transactions were paid for and/or reimbursed in Georgia based on the specific false and inflated prices Novo Nordisk caused to be published in Georgia in furtherance of the Insulin Pricing Scheme.

76.     As set forth above, Defendants Eli Lilly, Novo Nordisk, and Sanofi are referred to collectively as the "Manufacturer Defendants" or the "Manufacturers."

C.     **PBM Defendants**

77.     **Defendant CVS Health Corporation ("CVS Health")** is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.

78.     CVS Health transacts business through its subsidiaries which have locations throughout the United States and Georgia.

79.     CVS Health may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

80.     CVS Health—through its executives and employees, including its CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, Senior Vice Presidents, and Chief Communication Officers—is directly involved in creating and implementing company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs

involved in the Insulin Pricing Scheme.

81.    CVS Health's conduct had a direct effect in Georgia and damaged Plaintiff as a payor and purchaser.

82.    On a regular basis, CVS Health executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

83.    In each annual report for at least the last decade, CVS Health (or its predecessor) has repeatedly and explicitly stated that CVS Health:

- designs pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members;

- negotiates with pharmaceutical companies to obtain discounted acquisition costs for many of the products on CVS Health's drug lists, and these negotiated discounts enable CVS Health to offer reduced costs to clients; and

- utilizes an independent panel of doctors, pharmacists, and other medical experts, referred to as its Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on its drug lists.[19]

84.    CVS Health publicly represents that CVS Health lowers the cost of the at-issue drugs. For example, in 2016 CVS Health announced a new program to "reduce overall spending in diabetes" that is available in all states, including Georgia, stating:

---

[19] CVS Health Annual Report (Form 10-K) (FYE Dec. 31, 2009-2019).

> *CVS Health* introduced a new program available to help the company's pharmacy benefit management (PBM) clients to improve the health outcomes of their members, *lower pharmacy costs [for diabetes medications]* through aggressive trend management and decrease medical costs . . . [and that] participating clients could save between $3000 to $5000 per year for each member who successfully improves control of their diabetes." (emphasis added)[20]

85.    A 2017 CVS Health press release stated that "CVS Health pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year the lowest in five years. Despite manufacturer price increases of near 10 percent, CVS Health kept drug price growth at a minimal 0.2 percent."[21]

86.    In November 2018, CVS Health acquired Aetna for $69 billion and became the first combination of a major health insurer, PBM, and mail-order and retail pharmacy chain. CVS Health thus controls the health plan/insurer, the PBM, and the pharmacies utilized by approximately 40 million Aetna members in the United States, including Georgia. CVS Health controls the entire drug pricing chain for these 40 million Americans.

---

[20] PR NEWSWIRE, *CVS Health Introduces New "Transform Diabetes Care" Program to Improve Health Outcomes and Lower Overall Health Care Costs* (Dec. 13, 2016), https://www.prnewswire.com/news-releases/cvs-health-introduces-new-transform-diabetes-care-program-to-improve-health-outcomes-and-lower-overall-health-care-costs-300377101.html (last visited May 6, 2024).
[21] CVS HEALTH, *CVS Health Kept Drug Price Growth Nearly Flat and Improved Medication Adherence for PBM Clients in 2017* (Apr. 15, 2018), https://cvshealth.com/news-and-insights/press-releases/cvs-health-kept-drug-price-growth-nearly-flat-and-improved (last visited May 6, 2024).

87.    CVS Health is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout Georgia— including CVS Pharmacy, Inc., which is registered to do business in the state—that dispensed and received payment for the at-issue diabetes medications throughout the relevant period. According to a CVS Health's 2022 Form 10-K filed with the U.S. Securities and Exchange Commission, the company "maintains a national network of approximately 66,000 retail pharmacies, consisting of approximately 40,000 chain pharmacies (including CVS Pharmacy locations) and approximately 26,000 independent pharmacies, in the United States."[22]

88.    **Defendant CVS Pharmacy, Inc. ("CVS Pharmacy")** is a Rhode Island corporation whose principal place of business is at the same location as CVS Health.

89.    CVS Pharmacy—a wholly owned subsidiary of CVS Health—is and has since 1996 been registered to do business in the State of Georgia. It may be served through its registered agent The Corporation Company, 410 Peachtree Parkway Suite 4245, Cumming, GA 30041.

90.    CVS Pharmacy is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout Georgia and

---

[22] CVS Health Annual Report (Form 10-K) (FYE Dec. 31, 2022).

is directly involved in these pharmacies' dispensing and payment policies related to the at- issue diabetes medications.[23]

91.    CVS Pharmacy is also the immediate and direct parent of Defendant Caremark Rx, LLC.[24]

92.    CVS Pharmacy holds numerous pharmacy licenses in Whitfield County and throughout the State of Georgia.

93.    During the relevant period, CVS Pharmacy provided retail pharmacy services in Georgia that gave rise to and implemented the Insulin Pricing Scheme, which damaged payors, including Plaintiff.

94.    **Defendant Caremark Rx, LLC** is a Delaware limited liability company and an immediate or indirect parent of many subsidiaries, including pharmacy benefit management and mail-order subsidiaries that engaged in the activities in Georgia that gave rise to this action.

95.    Caremark Rx, LLC is a subsidiary of Defendant CVS Pharmacy, which is a wholly owned subsidiary of Defendant CVS Health and its principal place of business is at the same location as CVS Pharmacy and CVS Health.

96.    Caremark Rx, LLC may be served through its registered agent: The

---

[23] CVS Health, Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2023)
[24] *Id.*

Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

97.   During the relevant period, Caremark Rx, LLC provided PBM and mail- order pharmacy services in Georgia that gave rise to and implemented the Insulin Pricing Scheme and damaged payors in Georgia, including Plaintiff.

98.   **Defendant Caremark LLC** is a California limited liability company whose principal place of business is at the same location as CVS Health. Caremark, LLC is a subsidiary of Caremark Rx, LLC, which is a subsidiary of Defendant CVS Pharmacy, which is a wholly owned subsidiary of Defendant CVS Health.

99.   Caremark, LLC is and has since 2007 been registered to do business in Georgia.

100.  Caremark, LLC may be served through its registered agent The Corporation Company, 410 Peachtree Parkway Suite 4245, Cumming, GA 30041.

101.  Caremark, LLC holds numerous pharmacy and wholesaler licenses in Georgia.

102.  During the relevant period, Caremark, LLC provided PBM and mail-order pharmacy services in Georgia and in Whitfield County that gave rise to and implemented the Insulin Pricing Scheme, which damaged payors, including Plaintiff.

103.   **Defendant CaremarkPCS Health, LLC ("CaremarkPCS Health")** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health.

104.   CaremarkPCS Health is a subsidiary of CaremarkPCS, LLC, which is a subsidiary of Caremark Rx, LLC, which is a subsidiary of Defendant CVS Pharmacy, which is a wholly owned subsidiary of Defendant CVS Health.

105.   CaremarkPCS Health is and has since 2009 been registered to do business in Georgia. CaremarkPCS Health may be served through its registered agent: The Corporation Company, 410 Peachtree Parkway Suite 4245, Cumming, GA 30041.

106.   CaremarkPCS Health, doing business as CVS Caremark, provides pharmacy benefit management services.

107.   During the relevant period, CaremarkPCS Health provided PBM services in the State of Georgia, which gave rise to and implemented the Insulin Pricing Scheme, which damaged payors, including Plaintiff.

108.   During the relevant period, CaremarkPCS Health was directly involved in PBM and mail-order pharmacy services that gave rise to and implemented the Insulin Pricing Scheme, which damaged payors, including Plaintiff.

109.   Defendants CaremarkPCS Health and Caremark, LLC are agents

and/or alter egos of Caremark Rx, LLC, CVS Pharmacy, and CVS Health.

110. As a result of numerous interlocking directorships and shared executives, Caremark Rx, LLC, CVS Pharmacy, and CVS Health are directly involved in the conduct of and control CaremarkPCS Health's and Caremark, LLC's operations, management, and business decisions related to the at-issue formulary construction, Manufacturer Payments, and mail-order and retail pharmacy services to the ultimate detriment of Plaintiff. For example:

a. During the relevant period, these parent and subsidiaries have had common officers and directors, including:

- Thomas S. Moffatt, Vice President and Secretary of Caremark Rx, LLC, CaremarkPCS Health, and Caremark, LLC, also served as Vice President, Assistant Secretary, and Senior Legal Counsel at CVS Health and as Vice President, Secretary and Senior Legal Counsel of CVS Pharmacy;[25]
- Carol A. Denale, Senior Vice President and Treasurer of Caremark Rx, LLC, also served as Senior Vice President, Treasurer, and Chief Risk Officer at CVS Health;[26]
- John M. Conroy was VP of Finance at CVS Health in 2011 and President and Treasurer of Caremark, LLC and CaremarkPCS Health in 2019;[27]

---

[25] CVS HEALTH, *Thomas S. Moffatt,* https://investors.cvshealth.com/investors/corporate-governance/officers/person-details/default.aspx?ItemId=d69a2f14-70cb-47b3-9e3d-583e5408ddf3 (last visited May 6, 2024).; FLA. SEC'Y OF STATE ANNUAL REP , Divisions of Corporations Public Access System.

[26] CVS HEALTH, *Carol A. DeNale,* https://investors.cvshealth.com/investors/corporate-governance/officers/person-details/default.aspx?ItemId=1deaad66-090c-4c73-b82d-8d0163f9ce29 (last visited May 6, 2024); FLA. SEC'Y OF STATE ANNUAL REP , Divisions of Corporations Public Access System.

[27] John Conroy, LINKEDIN, https://www.linkedin.com/in/john-conroy-53aa372 (last visited May 6, 2024); FLA. SEC'Y OF STATE ANNUAL REP , Divisions of Corporations Public Access System.

- Sheelagh Beaulieu served as Senior Director of Income Tax at CVS Health while also acting as the Assistant Treasurer at CaremarkPCS Health and Caremark, LLC.[28]

b.  CVS Health owns all the stock of CVS Pharmacy, which owns all the stock of Caremark Rx, LLC, which owns all the stock of Caremark LLC. CVS Health directly or indirectly owns CaremarkPCS Health in its entirety.[29]

c.  CVS Health, as a corporate family, does not operate as separate entities. Its public filings, documents, and statements present its subsidiaries—including CVS Pharmacy, Caremark Rx, LLC, Caremark, LLC, and CaremarkPCS Health as divisions or departments of one unified "diversified health services company" that "works together across our disciplines" to "create unmatched human connections to transform the health care experience." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations discussed in this Complaint.[30]

d.  All executives of CaremarkPCS Health, Caremark, LLC, Caremark Rx, LLC, and CVS Pharmacy ultimately report to the executives at CVS Health,

---

[28] Sheelagh Beaulieu, LINKEDIN, https://www.linkedin.com/in/sheelaghbeaulieu (last visited May 6, 2024);FLA. SEC'Y OF STATE ANNUAL REP , Divisions of Corporations Public Access System.
[29] CVS Caremark/CVS Health, Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2019) (publicly available Current Organization Chart of CVS Health and its affiliates).
[30] CVS Health Annual Report (Form 10-K) (FY 2009-2019); CVS Health, *Our Purpose,* https://cvshealth.com/about-cvs-health/our-purpose (last visited May 6, 2024); CVS Health, *Quality of Care,* https://cvshealth.com/health-with-heart/improving-health-care/quality-of- care (last visited May 6, 2024).

including its President and CEO.

CVS Health's CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, Senior Vice Presidents, and Chief Communication Officers are directly involved in the policies and business decisions by Caremark, LLC and CaremarkPCS Health that give rise to Plaintiff's claims.

111.  Collectively, Defendants CVS Health, CVS Pharmacy, Caremark Rx, LLC, Caremark, LLC, and CaremarkPCS Health, including all predecessor and successor entities, are referred to as "CVS Caremark."

112.  CVS Caremark is named as a Defendant in its capacities as a PBM and as a mail-order pharmacy.

113.  In its capacity as a PBM, CVS Caremark coordinated with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on CVS Caremark's formularies.

114.  CVS Caremark has the largest PBM market share based on total prescription claims managed. Its pharmacy services segment provides, among other things, plan design offerings and administration, formulary management, retail pharmacy network management services, mail-order pharmacy, specialty pharmacy

and infusion services, clinical services, and medical spend management. In 2021, CVS Caremark's pharmacy services segment surpassed expectations and had a record selling season of nearly $9 billion in net new business wins for 2022. In all, it generated just over $153 billion in total revenues (on top of total 2019-2020 segment revenues exceeding $283 billion).[31]

115.   At all relevant times, CVS Caremark offered pharmacy benefit services nationwide and to Georgia payors, including Whitfield County, and derived substantial revenue therefrom. In doing so, it made misrepresentations while concealing the Insulin Pricing Scheme and utilized the false prices generated by the Insulin Pricing Scheme.

116.   At all relevant times, CVS Caremark offered PBM services nationwide and maintained standard formularies that were used nationwide, including in Georgia. Those formularies included the diabetes medications at issue here, and CVS Caremark participated in pricing these drugs based off the list prices it knew to be false.

117.   In its capacity as a retail pharmacy, CVS Caremark further and knowingly profited from the false list prices produced by the Insulin Pricing Scheme by pocketing the spread between acquisition cost for the at-issue drugs (an amount

---

[31] CVS Health Annual Report (Form 10-K) (FYE Dec. 31, 2021).

well below the list price generated by the Insulin Pricing Scheme), and the amounts it received from payors (which amounts were based on the false list prices and, in many cases, were set by CVS Caremark in its capacity as a PBM).

118.   During the relevant period, CVS Caremark provided mail-order and retail pharmacy services nationwide and within the State of Georgia and employed prices based on the false list prices generated by the Insulin Pricing Scheme.

119.   At all relevant times, CVS Caremark dispensed the at-issue medications nationwide and within the State of Georgia through its mail-order and retail pharmacies and it derived substantial revenue from these activities in Georgia.

120.   At all relevant times, CVS Caremark had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to CVS Caremark, as well as agreements related to the Manufacturers' at-issue drugs sold through CVS Caremark's mail-order pharmacies.

121.   **Defendant Evernorth Health, Inc. ("Evernorth")**, formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at One Express Way, St. Louis, Missouri 63121.[32]

---

[32] Until 2021, Evernorth Health, Inc. operated under the name Express Scripts Holding Company. In this Complaint "Evernorth" refers to Evernorth Health, Inc. and Express Scripts Holding Company.

122.   Evernorth may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

123.   Evernorth, through its executives and employees, including its CEO and Vice Presidents, is directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs, related to the Insulin Pricing Scheme.

124.   Evernorth's conduct had a direct effect in Georgia and on Plaintiff Whitfield County.

125.   Evernorth executives and employees regularly communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

126.   Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries operating in Georgia, who engaged in the activities that gave rise to this action.[33]

127.   In 2018, Evernorth merged with Cigna in a $67 billion deal to consolidate their businesses as a major health insurer, PBM, and mail-order pharmacy. The Evernorth corporate family thus controls the health plan/insurer, the PBM, and the mail-order pharmacies utilized by approximately 15 million Cigna members in

---

[33] Express Scripts Annual Report (Form 10-K, Exhibit 21) (FYE Dec. 31, 2018).

the United States, including Georgia. Evernorth controls the drug pricing chain for these 15 million Americans.

128.    Evernorth's annual reports over the past several years have repeatedly and explicitly:[34]

- Acknowledged it is directly involved in the company's PBM services, describing itself as "the largest stand-alone PBM company in the United States."

- Stated that Evernorth controls costs, including for example, that it: "provid[es] products and solutions that focus on improving patient outcomes and assist in controlling costs; evaluat[es] drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary; [and] offer[s] cost- effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors and better care for members."

129.  Even after the merger with Cigna, Evernorth "operates various group purchasing organizations that negotiate pricing for the purchase of pharmaceuticals and formulary rebates with pharmaceutical manufacturers on behalf of their participants" and operates the company's Pharmacy Rebate Program while its subsidiary Express Scripts provides "formulary management services" that ostensibly "assist customers and physicians in choosing clinically-appropriate, cost-effective drugs and prioritize access, safety and affordability." In 2021, Evernorth reported adjusted revenues of $131.9 billion (representing 75.8% of Cigna Corporation's

---

[34] Express Scripts Annual Reports (FY 2009-2019); Cigna Annual Report (Form 10-K) FYE 2020 & 2021.

revenues), which was up from $116.1 billion in 2020.[35]

130.   **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

131.   Express Scripts, Inc. is and has since 2004 been registered to do business in Georgia and may be served through its registered agent: CT Corporation System, 289 S Culver Street, Lawrenceville, GA 30046.

132.   Express Scripts, Inc. holds one or more pharmacy licenses in Georgia.

133.   In 2012, Express Scripts, Inc. acquired Medco Health Solutions, Inc. for $29 billion.

134.   Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Georgia that engaged in the Insulin Pricing Scheme. [36]

135.   During the relevant time period, Express Scripts, Inc. provided PBM services in the State of Georgia, which gave rise to the Insulin Pricing Scheme and damaged Plaintiff Whitfield County.

136.   Express Scripts, Inc. is named as a Defendant in its capacities as a PBM

---

[35] Cigna Annual Report (Form 10-K) (FYE Dec. 31, 2021).
[36] Express Scripts Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2018).

and pharmacy.

137.   In its capacity as a PBM, Express Scripts, Inc. coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications as well as for the placement of these firm's diabetes medication on Express Scripts, Inc.'s formularies.

138.   Express Scripts, Inc. provided pharmacy benefit services to Whitfield County from 2011 to 2019 based on Whitfield County's reliance upon Express Scripts, Inc.'s response to Whitfield County's request for proposals and upon other representations made in the formation and maintenance of a PBM relationship.

139.   During the relevant time period, Express Scripts, Inc. provided PBM services to Plaintiff and, in doing so, Express Scripts, Inc. set the price that Plaintiff paid for the at-issue drugs based on the false list prices generated by the Insulin Pricing Scheme and Plaintiff paid Express Scripts, Inc. for the at-issue drugs.

140.   In its capacity as a retail pharmacy, Express Scripts, Inc. further and knowingly profited from the false list prices produced by the Insulin Pricing Scheme by pocketing the spread between acquisition cost for the drugs at issue, and the amounts it received from payors which are based on false list prices set by Express Scripts, Inc.

141.   During the relevant time period, Express Scripts, Inc. provided mail

order and retail pharmacy services to Plaintiff and, in doing so, Plaintiff paid Express Scripts for the at-issue drugs at prices based on the false list prices generated by the Insulin Pricing Scheme.

142.   At all times relevant hereto, Express Scripts, Inc. dispensed the at-issue medications nationwide and directly to Plaintiff through its mail order and retail pharmacies and derived substantial revenue from these activities in Georgia.

143.   **Defendant Express Scripts Administrators, LLC,** doing business as Express Scripts and formerly known as Medco Health, LLC, is a Delaware limited liability company and is a wholly owned subsidiary of Defendant Evernorth. Its principal place of business is at One Express Way, Saint Louis, Missouri, 63121.

144.   Express Scripts Administrators, LLC is and has been since 2005 been registered to do business in Georgia and may be served through its registered agent: CT Corporation System, 289 S Culver Street, Lawrenceville, GA 30046-4805.

145.   During the relevant period, Express Scripts Administrators, LLC provided the PBM services in Georgia that gave rise to and implemented the Insulin Pricing Scheme that damaged payors, including Plaintiff.

146.   **Defendant Medco Health Solutions, Inc. ("Medco")** is a Delaware Corporation with its principal place of business located at the same address as Evernorth. Until its acquisition by Express Scripts, Medco's principal place of

business was in Franklin Lakes, New Jersey.

147.  Medco is and has since 2002 been registered to do business in Georgia. Medco may be served through its registered agent CT Corporation System 289 S Culver Street, Lawrenceville, GA 30046.

148.  In 2012, Express Scripts acquired Medco for $29 billion.

149.  Before the merger, Express Scripts and Medco were two of the largest PBMS in the United States and in Georgia.

150.  Before the merger, Medco provided the at-issue PBM and mail-order services, which gave rise to the Insulin Pricing Scheme and damaged payors, including Plaintiff, within Georgia.

151.  Following the merger, all of Medco's PBM and mail-order pharmacy functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's payor customers becoming Express Scripts' customers. The combined company covered over 155 million lives at the time of the merger.At the time of the merger, on December 6, 2011, in his testimony before the Senate Judiciary Committee, David Snow, then-CEO of Medco, publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to consumers. This is because our combined entity will achieve even greater

purchasing volume discounts [i.e., Manufacturer Payments] from drug manufacturers and other suppliers."[37]

152.  At the same time, the then-CEO of Express Scripts, George Paz, provided written testimony to the Senate Judiciary Committee's Subcommittee on Antitrust, Competition Policy and Consumer Rights, stating: "A combined Express Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines." First on Mr. Paz's list of "benefits of this merger" was "[g]enerating greater cost savings for patients and plan sponsors."[38]

153.  **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation  and is a wholly owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is at the same location as Evernorth.

154.  ESI Mail Pharmacy Service, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

155.  **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts

---

[37] Transcript available at https://www.judiciary.senate.gov/imo/media/doc/11-12-6SnowTestimony.pdf (last visited Apr. 5, 2024).
[38] Transcript available at https://www.judiciary.senate.gov/imo/media/doc/11-12-6PazTestimony.pdf (last visited Apr. 4, 2024).

Pharmacy, Inc.'s principal place of business is at the same location as Evernorth.

156.   Express Scripts Pharmacy, Inc. is and has been since 2021 registered to do business in the State of Georgia. Express Scripts Pharmacy, Inc. may be served through its registered agent: CT Corporation System, 289 S Culver Street, Lawrenceville GA, 30046.

157.   Express Scripts Pharmacy, Inc. holds one or more wholesaler licenses and holds several pharmacy licenses in Georgia.

158.   During the relevant period, Express Scripts Pharmacy, Inc. provided the mail-order pharmacy services in Georgia that gave rise to and implemented the Insulin Pricing Scheme, which damaged payors.

159.   As a result of numerous interlocking directorships and shared executives, Evernorth (f/k/a Express Scripts Holding Company, Inc.) and Express Scripts, Inc. control Express Scripts Administrators, LLC's, ESI Mail Pharmacy Service, Inc.'s, and Express Scripts Pharmacy, Inc.'s operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail- order pharmacy services to the ultimate detriment of Plaintiff. For example:

a.    During the relevant period, these parent and subsidiaries have had common officers and directors:

- Officers and/or directors shared between Express Scripts, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; David Queller, President; Jill Stadelman, Managing Counsel; Dave Anderson, VP of Strategy; Matt Perlberg, President of Pharmacy Businesses; Bill Spehr, SVP of Sales; and Scott Lambert, Treasury Manager Director;[39]

- Executives shared between Express Scripts Administrators, LLC and Evernorth include Bradley Phillips, Chief Financial Officer; and Priscilla Duncan, Associate Senior Counsel;[40]

- Officers and/or directors shared between ESI Mail Pharmacy Service, Inc. and Evernorth include Bradley Phillips, CFO; Priscilla Duncan, Associate Senior Counsel; and Joanne Hart, Treasury Director;[41] and

- Officers and/or directors shared between Express Scripts Pharmacy, Inc. and Evernorth include Bradley Phillips; Jill Stadelman, Managing Counsel; Scott Lambert, Treasury Manager Director; and Joanne Hart, Treasury Director.[42]

b.    Evernorth directly or indirectly owns all the stock of Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy

---

[39] Express Scripts, Inc., *2014-2020 Annual Report to the Missouri Secretary of State*, https://bsd.sos.mo.gov/e-commerce/company/search/315149; Division of Corporations, *ESI Mail Pharmacy Service, Inc., 2020 Annual Report to the Missouri Secretary of State*, FLA. DEP. OF STATE, http://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=ESIMAILPHARMACYSERVICE%20F100000021060&aggregateId=forp-f10000002106-1619960a-48df-4220-9c69-965d62015743&searchTerm=esi%20mail&listNameOrder=ESIMAILPHARMACYSERVICE%20F100000021060 (last visited Sept. 9, 2022); Express Scripts Pharmacy, Inc., *2020 Annual Report to the Missouri Secretary of State*, https://bsd.sos.mo.gov/e-commerce/company/search/704432; Cigna Newsworthy, *Cigna Announces Leadership Updates to Support Continued Growth in Health Services,* CIGNA (Feb. 11, 2020), https://newsroom.cigna.com/2020-02-11-Cigna-Announces-Leadership-Updates-to-Support-Continued-Growth-in-Health-Services; David Queller, LINKEDIN, https://www.linkedin.com/in/davidqueller/ (last visited May 6, 2024); EXPRESS SCRIPTS, *About Us*, https://www.express-scripts.com/corporate/index.php/experts/queller; Express Scripts Administrators, LLC, *2020 Annual Report to the Florida Secretary of State*.
[40] *Id.*
[41] *Id.*
[42] *Id.*

Service, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc.[43]

c.    The Evernorth corporate family does not operate as separate entities. Evernorth's public filings, documents, and statements present its subsidiaries, including Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. as divisions or departments of a single company that "unites businesses that have as many as 30+ years of experience . . . [to] tak[e] health services further with integrated data and analytics that help us deliver better care to more people." The day-to- day operations of this corporate family reflect these public statements. All of these entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint.[44]   All executives of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. ultimately report to the executives, including the CEO, of Evernorth.

d.    As stated above, Evernorth's CEO and other executives and officers are directly involved in the policies and business decisions of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. that

---

[43] Express Scripts Annual Report (Form 10-K, Exhibit 21) (FYE Dec. 31, 2018).
[44] Express Scripts Annual Reports; EVERNORTH, https://www.evernorth.com/ (last visited Sept. 9, 2022).

gave rise to Plaintiff's claims in this Complaint.

160.   Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to as "Express Scripts."

161.   Express Scripts is named as a Defendant in its capacities as a PBM and mail-order pharmacy.

162.   In its capacity as a PBM, Express Scripts coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on Express Scripts' formularies.

163.   Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States.[45]

164.   Express Scripts transacts business throughout the United States and Georgia.

165.   At all relevant times, Express Scripts derived substantial revenue from providing retail and mail-order pharmacy benefits in Georgia using prices based on the false list prices for the at-issue drugs.

---

[45] Express Scripts Annual Report (Form 10-K) (FYE Dec. 31, 2017).

166.   At all relevant times, and contrary to its express representations, Express Scripts knowingly insisted that its payor clients use the false list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

167.   At all relevant times, Express Scripts concealed its critical role in the generation of those false list prices.

168.   At all times relevant hereto, Express Scripts maintained standard formularies that are used nationwide, including in the State of Georgia. During the relevant period, those formularies included drugs produced by the Manufacturer Defendants, including the at-issue medications.

169.   During the relevant time period, Express Scripts provided PBM services to Plaintiff and, in doing so, Express Scripts set the price that Plaintiff paid for the at-issue drugs at prices based on the false list prices generated by the Insulin Pricing Scheme and Plaintiff paid Express Scripts for the at-issue drugs.

170.   In its capacity as a mail-order pharmacy, Express Scripts received payments from Georgia payors for, and set the out-of-pocket price paid for, the at-issue drugs based on the falsely inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Plaintiff.

171.   At all relevant times, Express Scripts offered pharmacy benefit

management services nationwide and maintained standard formularies that are used nationwide, including in Georgia. During the relevant time period, those formularies included diabetes medications, including all identified in this Complaint.

172.   Express Scripts purchases drugs directly from manufacturers for dispensing through its mail-order pharmacy network.

173.   At all times relevant hereto, Express Scripts dispensed the at-issue medications nationwide and directly to Plaintiff through its mail order pharmacies and derived substantial revenue from these activities in Georgia.

174.   During the relevant time period, in addition to its critical role in the Insulin Pricing Scheme, which detrimentally affected all payors and purchasers of the at issue drugs, Express Scripts also provided PBM services directly to Plaintiff.

175.   During certain years when large at-issue price increases occurred, including in 2013 and 2014, Express Scripts worked directly with OptumRx to negotiate Manufacturer Payments on behalf of OptumRx and its clients in exchange for preferred formulary placement. For example, in a February 2014 email released by the U.S. Senate in conjunction with its January 2021 report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug," Eli Lilly describes a "Russian nested doll situation" in which Express Scripts was negotiating rebates on behalf of OptumRx related to the at-issue drugs for Cigna (which later

became part of Express Scripts).[46]

176.  At all relevant times, Express Scripts had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to Express Scripts, as well as agreements related to the Manufacturers' at-issue drugs sold through Express Scripts' pharmacies.

177.  **Defendant UnitedHealth Group, Inc.** is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

178.  UnitedHealth Group, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

179.  UnitedHealth Group, Inc. is a diversified managed healthcare company. Its total revenues in 2021 exceeded $287 billion, which was up more than $30 billion from 2020. The company currently is ranked tenth on the Fortune 500 list.[47]

180.  UnitedHealth Group, Inc. offers a spectrum of products and services

---

[46] Grassley & Wyden *supra* 7; Letter from Joseph B. Kelley, Eli Lilly Vice President, Global Gov. Affairs, to Charles E. Grassley & Ron Wyden, S. Fin. Comm., https://www.finance.senate.gov/imo/media/doc/Eli%20Lilly_Redacted%20v1.pdf (last visited May 6, 2024).
[47] FORTUNE, UnitedHealth Group: 2023 Fortune 500,https://fortune.com/ranking/global500/2023/search/(last visited April 17, 2024).

including health insurance plans through its wholly owned subsidiaries and prescription drugs through its PBM, OptumRx.

181.  Over one-third of the overall revenues of UnitedHealth Group come from OptumRx, which operates a network of more than 67,000 pharmacies. [48]

182.  UnitedHealth Group, through its executives and employees, is directly involved in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme. For example, UnitedHealth Group executives structure, analyze, and direct the company's overarching policies, including with respect to PBM and mail-order services, as a means of maximizing profitability across the corporate family.

183.  UnitedHealth Group's Sustainability Report states that "OptumRx works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies – or drug lists – to ensure people get the right medications. [UnitedHealth Group] then negotiate[s] with pharmacies to lower costs at the point of sale . . . [UnitedHealth Group] also operate[s] [mail order pharmacies] . . . . [UnitedHealth Group] work[s] directly with drug wholesalers and distributors to ensure consistency of the brand and generic

---

[48] *Id.*

drug supply, and a reliance on that drug supply."[49]

184.   In addition to being a PBM and a mail-order pharmacy, UnitedHealth Group owns and controls a major health insurance company, UnitedHealthcare, Inc. As a result, UnitedHealth Group controls the health plan/insurer, the PBM, and the mail-order pharmacies utilized by more than 26 million UnitedHealthcare members in the United States, including in Georgia. UnitedHealth Group controls the entire drug-pricing chain for these 26 million Americans.

185.   UnitedHealth Group's conduct had a direct effect in Georgia and damaged Plaintiff.

186.   UnitedHealth Group states in its annual reports that UnitedHealth Group "utilizes Optum's capabilities to help coordinate patient care, improve affordability of medical care, analyze cost trends, manage pharmacy benefits, work with care providers more effectively and create a simpler consumer experience." Its 2022  annual report states plainly that it is "involved in establishing the prices charged by retail pharmacies, determining which drugs will be included in formulary listings and selecting which retail pharmacies will be included in the network offered to plan sponsors' members …." As of December 31, 2021, "total pharmaceutical manufacturer rebates receivable included in other receivables in the Consolidated

---

[49] UnitedHealth Group Sustainability Report: Fulfilling Our Mission, 2020, p. 51, https://www.unitedhealthgroup.com/content/dam/UHG/PDF/sustainability/final/2020_SustainabilityRepo rt.pdf (last visited April 17, 2024).

Balance Sheets amounted to $7.2 billion [2021] and $6.3 billion [2020]."[50]

187.   **Defendant Optum, Inc.** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. Optum, Inc. is a health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc.[51]

188.   Optum, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

189.   Optum, Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme, which had a direct effect in Georgia and damaged Plaintiff.

190.   For example, according to Optum Inc.'s press releases, Optum, Inc. is "UnitedHealth Group's information and technology-enabled health services business platform serving the broad healthcare marketplace, including care providers, plan sponsors, payors, life sciences companies and consumers."[52] In this

---

[50] UnitedHealth Group Annual Report (Form 10-K) (FYE Dec. 31, 2018); UnitedHealth Group Annual Report (Form 10-K, Exhibit 21) (FYE Dec. 31, 2021).
[51] UnitedHealth Group Annual Report (Form 10-K, Exhibit 21) (FYE Dec. 31, 2018).
[52] UNITEDHEALTH GROUP, *Larry Renfro Named CEO of Optum*, https://www.sec.gov/Archives/edgar/data/731766/000119312511182325/dex991.htm#:~:text=MINNETO NKA%2C%20MN%2C%20July%206%2C,lead%20a%20private%20equity%20fund. (last visited on

role, Optum, Inc. is directly responsible for the "business units – OptumInsight, OptumHealth and OptumRx"[53] and the CEOs of all these companies report directly to Optum, Inc. regarding their policies, including those that inform the at-issue formulary construction and mail- order activities.

191.    Defendant **OptumRx, Inc.** is a California corporation with its principal place of business at 11000 Optum Circle, Eden Prairie, Minnesota, 55344.

192.    OptumRx, Inc. operates as a subsidiary of OptumRx Holdings, LLC, which in turn operates as a subsidiary of Defendant Optum, Inc.

193.    OptumRx, Inc. is and has since 2011 been registered to do business in the State of Georgia. OptumRx, Inc. has a registered agent that may be served at C T Corporation System, 289 S Culver Street, Lawrenceville, GA 30046.

194.    OptumRx, Inc. holds at least two pharmacy licenses in Georgia.

195.    During the relevant period, OptumRx, Inc. provided the PBM and mail-order pharmacy services in Georgia that gave rise to and implemented the Insulin Pricing Scheme, which damaged payors.

---

May 6, 2024); *UnitedHealth Group Announces "Optum" Master Brand for Its Health Services Businesses,* FIERCE HEALTHCARE (Apr. 11, 2011, 9:21 AM), https://www.fiercehealthcare.com/healthcare/unitedhealth-group-announces-optum-master-brand-for-its-health-services-businesses
[53] *Id.*

196. **Defendant OptumInsight, Inc. ("OptumInsight")** is a Delaware corporation with its principal place of business located at 11000 Optum Circle, Eden Prairie, Minnesota, 55344.

197. OptumInsight, Inc. is and has since 1997 been registered to do business in Georgia. OptumInsight, Inc. may be served through its registered agent: CT Corporation System, 289 S Culver Street, Lawrenceville, GA 30046.

198. OptumInsight is an integral part of the Insulin Pricing Scheme and, during the relevant period, coordinated directly with the Manufacturer Defendants in furtherance of the conspiracy. OptumInsight analyzed data and other information from the Manufacturer Defendants to advise the other Defendants with regard to the profitability of the Insulin Pricing Scheme to the benefit of all Defendants.

199. As a result of numerous interlocking directorships and shared executives, UnitedHealth Group, OptumRx Holdings, LLC and Optum, Inc. are directly involved in the conduct of and control OptumInsight's and OptumRx's operations, management and business decisions related to the at-issue formulary construction, negotiations, and mail- order pharmacy services. For example:

a.    These parent and subsidiaries have common officers and directors, including:

- Andrew Witty is the CEO and on the Board of Directors for UnitedHealth Group and previously served as CEO of Optum,

Inc.;[54]

- John Rex has been an Executive Vice President and CFO of UnitedHealth Group Inc. since 2016 and previously served in the same roles at Optum beginning in 2012;[55]

- Dan Schumacher is Chief Strategy and Growth Officer at UnitedHealth Group Inc. and was CEO of Optum Insight, having previously served as CEO of Optum, Inc.;[56]

- Terry Clark is Chief Marketing and Customer Officer at UnitedHealth Group since 2014 while also serving as EVP and Chief Marketing Officer for Optum;[57]

- Heather Lang was Deputy General Counsel, Subsidiary Governance at UnitedHealth Group, Inc. and also Assistant Secretary at OptumRx, Inc.;[58]

- Tom Roos has served since 2015 as SVP and Chief Accounting Officer for UnitedHealth Group Inc. and previously served as SVP and Chief Accounting Officer for Optum, Inc.;[59]

- Heather Cianfrocco joined UnitedHealth Group in 2008 and has held numerous leadership positions within the company. Today, she is CEO of OptumRx;[60]

---

[54] UNITEDHEALTH GROUP, *Meet Our Leaders*, https://www.unitedhealthgroup.com/people-and-businesses/our-leaders.html (last visited April 17, 2024); Andrew Witty, UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/people-and-businesses/our-leaders/andrew-witty.html (last visited April 17, 2024).

[55] John Rex, UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/people-and-businesses/our-leaders/john-rex.html (last visited April 17, 2024).

[56] Dan Schumacher, UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/people-and-businesses/our-leaders/dan-schumacher.html (last visited April 17, 2024).

[57] Terry Clark, UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/people-and-businesses/our-leaders/terry-clark.html (last visited April 17, 2024); *Leadership*, OPTUM, https://www.optum.com/en/about-us/leadership.html (last visited April 17, 2024).

[58] UnitedHealth Group, Inc. Form 10-K for fiscal year ended 2020, filed Mar. 1, 2021, Exhibit 21.

[59] Tom Roos, UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/people-and-businesses/our-leaders/tom-roos.html (last visited April 17, 2024).

[60] Heather Cianfrocco, UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/people-and-businesses/our-leaders/heather-cianfrocco.html (last visited April 17, 2024); *Leadership*, OPTUM, https://www.optum.com/en/about-us/leadership.html (last visited April 17, 2024).

- Peter Gill has served as SVP and Treasurer for UnitedHealth Group, Inc. and also as Treasurer at OptumRx, Inc.;[61]

- John Santelli led Optum Technology, the technology division of Optum, Inc., serving the broad customer base of Optum and UnitedHealthcare and also served as UnitedHealth Group's Chief Information Officer;[62]

- Eric Murphy, now retired, was the Chief Growth and Commercial Officer for Optum, Inc. and also CEO of OptumInsight beginning in 2017.[63]

b.    UnitedHealth Group directly or indirectly owns all the stock of Optum, Inc., OptumRx, Inc., and OptumInsight, Inc.[64]

c.    The UnitedHealth Group corporate family does not operate as separate entities. The public filings, documents, and statements of UnitedHealth Group present its subsidiaries, including Optum, Inc., OptumRx, Inc., and OptumInsight as divisions, departments or "segments" of a single company that is "a diversified family of businesses" that "leverages core competencies" to "help[] people live healthier lives and helping make the health system work better for everyone." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint.[65]

---

[61] UnitedHealth Group, Inc. Form 10-K for fiscal year ended 2020, filed Mar. 1, 2021, Exhibit 21.
[62] *Id.*
[63] *Id.*
[64] UnitedHealth Group, Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2018).
[65] UnitedHealth Group, Quarterly Report (Form 10-Q) (Mar. 31, 2017).

d.      All the executives of Optum, Inc., OptumRx, Inc., and OptumInsight ultimately report to the executives, including the CEO, of UnitedHealth Group.

e.      As stated above, UnitedHealth Group's executives and officers are directly involved in the policies and business decisions of Optum, Inc., OptumRx, Inc., and OptumInsight that gave rise to Plaintiff's claims.

200.   Collectively, Defendants UnitedHealth Group, Inc., OptumRx, Inc., OptumInsight, and Optum, Inc., including all predecessor and successor entities, are referred to as "OptumRx."

201.   OptumRx is named as a Defendant in its capacities as a PBM and mail-order pharmacy.

202.   OptumRx is a pharmacy benefit manager and, as such, coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on OptumRx's drug formularies.

203.   OptumRx provides pharmacy care services to more than 65 million people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities. It is one of UnitedHealth Group Inc.'s "four reportable segments" (along with UnitedHealthcare, Optum Health, and Optum Insight). In

2022, OptumRx managed $124 billion in pharmaceutical spending.[66]

204.   For the years 2018-2022, OptumRx managed $91 billion, $105 billion, $112 billion, and $124 billion in pharmaceutical spending, respectively. [67]

205.   In 2019, OptumRx managed more than $96 billion in pharmaceutical spending, with revenue of $74 billion. By 2022, it had risen to more than $99 billion.[68]

206.   At all relevant times, OptumRx derived substantial revenue providing pharmacy benefits in Georgia.

207. At all relevant times, OptumRx offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in Georgia. Those formularies included diabetes medications, including those at issue in this action. OptumRx purchased drugs directly from manufacturers for dispensing through its pharmacy network.

208.   At all relevant times, and contrary to its express representations, OptumRx knowingly insisted that its payor clients use the false list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

209.   At all relevant times, OptumRx concealed its critical role in the

---

[66] UnitedHealth Group Annual Report (Form 10-K) (FYE Dec. 31, 2022).
[67] *Id.*
[68] *Id.*

generation of those false list prices.

210.   In its capacity as a mail-order pharmacy with a contracted network of retail pharmacies, OptumRx received payments from payors for, and set the out-of-pocket price paid for, the at-issue drugs based on the falsely inflated prices produced by the Insulin Pricing Scheme, and, as a result, damaged Plaintiff.

211.   At all relevant times, OptumRx dispensed the at-issue medications nationwide including in Georgia through its mail-order and retail pharmacies and derived substantial revenue from these activities in Georgia.

212.   OptumRx purchases drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications, for dispensing through its mail-order pharmacies and network of retail pharmacies.

213.   At all relevant times, OptumRx had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to OptumRx, as well as agreements related to the Manufacturers' at-issue drugs sold through OptumRx's mail order pharmacies.

214.   As set forth above, CVS Caremark, OptumRx, and Express Scripts are referred to collectively as the "PBM Defendants."

## III.  JURISDICTION AND VENUE

### A.  Subject-Matter Jurisdiction

215.   This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and pursuant to 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

### B.  Personal Jurisdiction

216.   This Court has personal jurisdiction over each Defendant. Each Defendant: (1) transacts business and/or is admitted to do business within Georgia; (2) maintains substantial contacts in Georgia, and (3) committed the violations of Georgia statutes, federal statutes, and common law at issue in this action in whole or part within the State of Georgia. This action arises out of and relates to each Defendant's contacts with this forum.

217.   The Insulin Pricing Scheme has been directed at Georgia and has had the foreseeable and intended effect of causing injury to persons residing in, located in, or doing business in Georgia, including Plaintiff. All transactions at issue occurred in the State of Georgia and/or involved Georgia residents.

218.   Each Defendant purposefully availed itself of the privilege of doing business within Georgia and each derived substantial financial gain from doing so.

These continuous, systematic, and case-related business contacts—including the tortious acts described herein—are such that each Defendant should reasonably have anticipated being brought into this Court.

219.  Each Defendant submitted itself to jurisdiction through pervasive marketing; encouraging the use of its services; and its purposeful cultivation of profitable relationships in the State of Georgia and within this forum. Each had direct interactions with Plaintiff concerning drug pricing.

220.   In short, each Defendant has systematically served a market in Georgia relating to the Insulin Pricing Scheme and has caused injury in Georgia such that there is a strong relationship among Defendants, this forum, and the litigation.

221.   This Court has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Georgia.

222.   This Court also has personal jurisdiction over all Defendants under 18 U.S.C.§ 1965(b). This Court may exercise nationwide jurisdiction over the named Defendants where the "ends of justice" require national service and Plaintiff demonstrates national contacts. The interests of justice require that Plaintiff be allowed to bring all members of the nationwide RICO enterprise before the Court in a single action for a single trial.

C.    **Venue**

223.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), because each Defendant transacts business in, is found in, and/or has agents in this District, and because a substantial part of the events or omissions giving rise to this action took place, or had their ultimate injurious impact, within this District. In particular, at all times during the relevant period, Defendants provided pharmacy benefit services, provided mail-order pharmacy services, employed sales representatives, promoted and sold diabetes medications and published prices of the at issue drugs in this District and caused injury to Plaintiff in this District.

224.   Venue is proper in this District pursuant to 18 U.S.C. § 1965, because all Defendants reside, are found, have an agent, or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

## IV.  ADDITIONAL FACTUAL ALLEGATIONS

A.    **Diabetes and Insulin Therapy**

*The Diabetes Epidemic*

225.   Diabetes is a disease that occurs when a person's blood glucose is too high. For a non-diabetic person, the pancreas secretes the hormone insulin, which controls the rate at which food is converted to blood glucose. When insulin is lacking or when cells stop responding to insulin, blood sugar stays in the bloodstream. Over

time, this can cause serious health problems, including heart disease, blindness, and kidney disease and ultimately lead to premature death.[69]

226.   There are two basic types of diabetes—Type 1 and Type 2. Roughly 90-95% of diabetics have Type 2 diabetes, which develops when one does not produce enough insulin or has become resistant to the insulin one produces.[70] While Type 2 patients can initially be treated with tablets, in the long term most patients must switch to insulin injections.[71]

227.   Type 1 diabetes occurs when a patient completely ceases insulin production. In contrast to Type 2 patients, people with Type 1 diabetes do not produce any insulin and, without regular injections of insulin, they will die.[72]

228.   Insulin treatments are a necessary part of life for those who have diabetes, and interruptions to a diabetic's insulin regimen can have severe consequences. Missed or inadequate insulin therapy can trigger hyperglycemia and then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to loss of consciousness and death within days.[73]

229.   Diabetes has been on the rise for decades. In 1958, only 1.6 million

---

[69] CDC, *What is Diabetes?*, https://www.cdc.gov/diabetes/basics/diabetes.html (last visited May 6, 2024).
[70] *Id.*
[71] *Id.*
[72] *Id.*; NATIONAL INST. OF HEALTH, *What is Diabetes* (Nov. 2016), https://www.niddk.nih.gov/health-information/diabetes/overview/what-is-diabetes (last visited May 6, 2024).
[73] *Id.*

Americans had diabetes. By the turn of the century, however, that number had grown to over ten million. Fourteen years later, the number had tripled. Today, more than 37 million Americans—approximately 11% of the country—live with the disease.[74]

230.   The prevalence of diabetes in Georgia has increased as well. More than one million Georgians—or 12.4%—have been diagnosed as diabetic.[75] Another 2 million Georgians have prediabetes.[76]

*Insulin: A Century-Old Drug*

231.   Despite its potential lethality, diabetes is highly treatable. Patients able to follow a prescribed treatment plan consistently avoid severe health complications associated with the disease.

232.   Unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

233.   In 1922, Frederick Banting and Charles Best, while working at the University of Toronto, pioneered a technique for removing insulin from an animal pancreas that could then be used to treat diabetes. Banting and Best obtained a patent and then sold it to the University of Toronto for $1 (equivalent to $18 today),

---

[74] CDC, *National Diabetes Statistics Report 2020,*
https://www.cdc.gov/diabetes/pdfs/data/statistics/national-diabetes-statistics-report.pdf (last visited May 6, 2024); CDC, *Long-Term Trends in Diabetes* (Apr.2017),
https://stacks.cdc.gov/view/cdc/42550/cdc_42550_DS1 (last visited May 6, 2024).
[75] Georgia Department of Public Health, *Diabetes*, https://dph.georgia.gov/chronic-disease-prevention/diabetes (last visited April 17, 2024).
[76] *Id.*

explaining that "[w]hen the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."[77]

234.   After purchasing the patent, the University of Toronto contracted with Defendants Eli Lilly and Novo Nordisk to scale its production. Under this arrangement, Eli Lilly and Novo Nordisk were allowed to apply for patents on variations to the manufacturing process.[78]

235.   The earliest insulin was derived from animals and, until the 1980s, was the only treatment for diabetes.[79] While effective, animal-derived insulin can be allergenic. In 1982, synthetic insulin—known as human insulin because it mimics the insulin humans make—was developed by Defendant Eli Lilly. Eli Lilly marketed this insulin as Humulin. The development of human insulin benefited heavily from government and non-profit funding through the National Institutes of Health and the American Cancer Society.[80]

236.   In the mid-1990s, Eli Lilly introduced the first analog insulin—a

---

[77] M. Bliss, *The Discovery of Insulin* (2013); Jessica DiGiacinto & Valencia Higuera, *Everything You Need to Know About Insulin*, HEALTHLINE (Oct. 5, 2021), http://www.healthline.com/health/type-2-diabetes/insulin (last visited May 7, 2024).
[78] *Id.*
[79] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. ENG. J. MED. 1171, 1172 (2015).
[80] *Id.;* Celeste C. Quianzon & Issam Cheikh, *History of Insulin,* J. CMTY. HOSP. INTERNAL MED. PERSP. (July 16, 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3714061/ (last visited May 7, 2024).

laboratory- grown and genetically altered insulin. Analogs are slight variations on human insulin that make the injected treatment act more like the insulin naturally produced and regulated by the body and more quickly lower blood sugar. Eli Lilly released this analog in 1996 under the brand name Humalog at a cost of $21 per vial (equivalent to $40 in 2022).[81]

237.   Other rapid-acting analogs include Novo Nordisk's Novolog and Sanofi's Apidra, which have similar profiles. Rapid-acting insulins are used in combination with longer-acting insulins, such as Sanofi's Lantus and Novo Nordisk's Levemir.

238.   Manufacturer Defendants introduced these rapid-acting and long-acting analog insulins between 1996 and 2007.

239.   In 2015, Sanofi introduced Toujeo, another long-acting insulin also similar to Lantus; Toujeo, however, is highly concentrated, reducing injection volume as compared to Lantus.[82]

240.   In December 2015, Eli Lilly introduced Basaglar—a long-acting insulin that is biologically similar to Sanofi's Lantus.[83]

---

[81] *Id.*
[82] Sanofi-Aventis, *Sanofi Receives FDA Approval of Once-Daily Basal Insulin Toujeo,* (Feb. 25, 2015), https://www.news.sanofi.us/2015-02-25-Sanofi-Receives-FDA-Approval-of-Once-Daily-Basal-Insulin-Toujeo (last visited May 7, 2024).
[83] DIATRIBE, *FDA Approves New Insulin Glargine Basaglar – The Frist "Biosimilar" Insulin in the US (Jan. 11, 2016)* https://diatribe.org/fda-approves-new-insulin-glargine-basaglar-%E2%80%93-first-%E2%80%9Cbiosimilar%E2%80%9D-insulin-us (last visited May 7, 2024).

241.  Even though insulin was first extracted 100 years ago, and despite its profitability, only Defendants Eli Lilly, Novo Nordisk, and Sanofi manufacture insulin for the United States market. This did not occur by chance.

242. Many of the at-issue medications are now off-patent. The Manufacturers maintain market domination through patent "evergreening." Drugs usually face generic competition when their twenty-year patents expire. While original insulin formulas may technically be available for generic use, the Manufacturers "stack" patents around the original formulas, making new competition exceedingly costly and risky. For example, Sanofi has filed more than seventy patents on Lantus—more than 95% were filed after the drug was approved by the FDA—potentially providing more than three additional decades of patent "protection" for the drug. The market thus remains concentrated.

243.  In 2021, the U.S. House of Representatives Committee on Oversight and Reform issued a report following its investigation into drug pricing ("Drug Pricing Investigation").[84] It expressly included inquiry into the Manufacturer Defendants' insulin pricing strategies, [85] and concluded: "Every company in the Committee's investigation engaged in one or more strategies to suppress competition

---

[84] *Drug Pricing Investigation: Majority Staff Report*, Comm. on Oversight and Reform, U.S. H.R., Dec. 2021, https://oversightdemocrats.house.gov/sites/evosubsites/ democrats-oversight.house.gov/files/DRUG%20PRICING%20REPORT% 20WITH%20APPENDIX%20v3.pdf (last visited Apr. 24, 2024).
[85] *Id*. at 4, n. 5.

from generics or biosimilars, and keep prices high."[86] It continued:

> Insulin manufacturers have also used secondary patents to extend their market monopolies. A 2020 study by the State of Colorado found, "Many insulin products have received additional patents, exclusivities, and extensions, adding decades of protection and monopoly prices." According to this study, secondary patents enabled Eli Lilly to add 17 years of protection for Humalog, Novo Nordisk to add 27 years of protection for NovoLog, and Sanofi to add 28 years of protection for Lantus.[87]

*The Current Insulin Landscape*

244.   While insulin today is generally safer and more convenient to use than when originally developed in 1922, there remain questions about whether the overall efficacy of insulin has significantly improved over the last twenty years.

245.   For example, while long-acting analogs may have certain advantages over human insulins, such as affording more flexibility around mealtime planning, it has yet to be shown that analogs lead to better long-term outcomes. Recent work suggests that older human insulins may work just as well as newer analog insulins for patients with Type 2 diabetes.

246.   Moreover, all insulins at issue in this case have either been available in the same form since the late 1990s/early 2000s or are biologically equivalent to insulins that were available then.

---

[86] *Id.* at 13.
[87] *Id.* at 103.

247.   As Dr. Kasia Lipska, a Yale researcher, explained in the Journal of the American Medical Association:

> We're not even talking about rising prices for better products here. I want to make it clear that we're talking about rising prices for the same product . . . there's nothing that's changed about Humalog. It's the same insulin that's just gone up in price and now costs ten times more.[88]

248.   Production costs have decreased in recent years. In fact, in the last ten years, the production costs of insulin have decreased as manufacturers simplified and optimized processes. A September 2018 study in BMJ Global Health calculated that, based on production costs, a reasonable and profitable price for a year's supply of human insulin is between $48 and $71 per person (and between $78 and $133 for analog insulins).[89] Another recent study found that the Manufacturers could be profitable charging as little as $2 per vial.[90] A third study, based on data collected through 2023, concluded that sustainable cost-based prices "for treatment with insulin in a reusable pen device could cost as little as $96 (human insulin) or $111 (insulin analogues) per year for a basal-bolus regimen, $61 per year using twice-daily injections of mixed human insulin, and $50 (human insulin) or $72 (insulin

---

[88] Natalie Shure, *The Insulin Racket,* American Prospect (June 24, 2019), https://prospect.org/health/insulin-racket/ (last visited May 7, 2024).
[89] *See* Dzintars Gotham, Melissa J. Barber, & Andrew Hill, *Production Costs and Potential Prices for Biosimilars Of Human Insulin And Insulin Analogues*, BMJ GLOBAL HEALTH, https://gh.bmj.com/content/3/5/e000850 (last visited May 7, 2024).
[90] Gotham D, Barber MJ, Hill A., Production costs and potential prices for biosimilars of human insulin and insulin analogues. BMJ GLOBAL HEALTH 2018;3:e000850.

analogues) per year for a once-daily basal insulin injection (for type 2 diabetes), including the cost of injection devices and needles."[91]

249.   According to a 2020 RAND report, the 2018 list price per vial across all forms of insulin was just $14.40 in Japan, $12.00 in Canada, $11.00 in Germany, $9.08 in France, $7.52 in the United Kingdom, and less than $7.00 in Australia. In the U.S. it was $98.70.[92]

250.   RAND issued an updated report in 2024 using 2022 data. In its report, RAND explained that the gross (or list) price of insulin in the United States had "increased dramatically since the early 2010s in the United States."[93]pointed to studies showing that "manufacturer gross prices increased annually by an average of 13 percent from 2007 to 2018," which was "far above general inflation over the same periods."[94]

251.   The RAND report also found that insulin prices in the United States far exceeded insulin prices abroad. RAND found that U.S. manufacturer gross prices were 971 percent (or 9.71 times) higher than in the thirty-three countries who belong

---

[91] Melissa J. Barber, *et al.*, *Estimated Sustainable Cost-Based Prices for Diabetes Medicines*, JAMA NETWORK: OPEN, Mar. 27, 2024.
[92] Andrew W. Mulcahy, Daniel Schwarm, & Nathaniel Edenfield, *Comparing Insulin Prices in the United States to Other Countries: Results from a Price Index Analysis*, Rand Research Report at 10, (Oct. 6, 2020), https://www.rand.org/pubs/research_reports/RRA788-1.html (last visited May 7, 2024).
[93] *The Astronomical Price of Insulin Hurts American Families*, RAND (Jan. 6, 2021), https://www.rand.org/blog/rand-review/2021/01/the-astronomical-price-of-insulinhurts-american-families.html (last visited Apr. 24, 2024).
[94] Mulcahy, Schwarm, & Edenfield, *supra* note 95, at 1.

to the Organization of Economic Co-operation and Development (OECD) combined.[95] In other words, insulin in the United States was more than nine times higher than in thirty-three middle-to high income comparison countries.[96] Once rebates and other discounts were applied, net prices in the United States remained 2.33 times higher than in the OECD countries.[97] The gross price is the price paid by patients who are uninsured, in the deductible phase of their plan, or otherwise paying out-of-pocket for insulin.[98]

252.   While research and development costs often contribute significantly to the price of a drug, the initial basic insulin research—original drug discovery and patient trials—occurred 100 years ago. Even more recent costs like developing a recombinant DNA fermentation process and creating insulin analogs, were incurred decades ago. In recent years, most R&D costs have been incurred in connection with the development of new insulin-related devices and equipment, not in connection with the drug formulations themselves.

253.   The House Committee on Oversight and Reform also found that research and development (also known as "R&D") costs "d[id] not justify price increases." According to the committee, "when drug companies did invest in R&D,

---

[95] *Id.* at v, 22, 30.
[96] *Id.*
[97] *Id.* at v, 28, 30.
[98] *Id.* at vi.

those expenditures often went to research designed to protect existing market monopolies." The committee also found that "drug companies often invested in development only after other research—much of it federally funded—demonstrated a high likelihood of financial success." The Manufacturer Defendants recently announced limited pricing changes and out-of-pocket limits.

254.  On March 1, 2023, Eli Lilly announced that it would reduce the prices of some insulin medications, capping those prices at $35 per month, with additional reductions to follow later in the year. Eli Lilly promised to list its Lispro injection at $25 per vial effective May 1, 2023, and reduce the price of Humalog and Humulin injections by 70% starting in the fourth quarter of 2023. The price reductions are limited to these medications. These price cuts suggest that prices before March 2023 were not tied to costs of research and development or other necessary and unavoidable expenses.[99]

255.  On March 14, 2023, Novo Nordisk announced that it would lower the U.S. list prices of several insulin products by up to 75%—specifically, Levemir, Novolin, NovoLog, and NovoLog Mix 70/30. Novo Nordisk will also reduce the list price of unbranded biologics. The price reductions are limited to these

---

[99] Lilly, *Lilly Cuts Insulin Prices by 70% and Caps Patient Insulin Out-of-Pocket Costs at $35 Per Month*, (March 1, 2023), https://investor.lilly.com/news-releases/news-release-details/lilly-cuts-insulin-prices-70-and-caps-patient-insulin-out-pocket#:~:text=INDIANAPOLIS%20%2C%20March%201%2C%202023%20%2F,%2435%20or%20less%20per%20month (last visited April 17, 2024).

medications and do not apply to other Novo Nordisk diabetes medications. These changes will go into effect on January 1, 2024, and suggest that previous prices for these medications were not tied to costs of research and development or other necessary and unavoidable expenses.[100]

256.   On March 16, 2023, Sanofi announced that it would cap the out-of-pocket cost of its most popular insulin, Lantus, at $35 per month for people with private insurance, effective January 1, 2024, and lower the list price of Lantus by 78% and Apidra, its short-acting insulin, by 70%. Sanofi had already capped the price of Lantus at $35 for patients without insurance. The price reductions to date are limited to these medications and do not apply to other Sanofi diabetes medications.[101] Sanofi's reductions, like Eli Lilly's and Novo Nordisk's, suggest that the earlier prices of Sanofi's medications were not tied to costs of research and development or other necessary and unavoidable expenses.

257.   These three announcements (the "Price Cuts") are prospective and do not mitigate damages already incurred by payors like Plaintiff.

258.   The Price Cuts are limited and do not encompass all at-issue

---

[100] Novo Nordisk, *Novo Nordisk to lower U.S. prices of several pre-filled insulin pens and vials up to 75% for people living with diabetes in January 2024*, (March 14, 2023); https://www.novonordisk.com/news-and-media/latest-news/lowering-us-list-prices-of-several-products-.html (last visited April 17, 2024).
[101] Sanofi, *Press Release: Sanofi cuts U.S. list price of Lantus®, its most prescribed insulin, by 78% and caps out-of-pocket Lantus costs at $35 for all patients with commercial insurance*, (March 16, 2023), https://www.sanofi.com/en/media-room/press-releases/2023/2023-03-16-20-06-43-2629188 (last visited April 17, 2023)

medications. As part of the Insulin Pricing Scheme, the PBMs provide preferred formulary placement to the most expensive insulins based on list prices. Accordingly, the Insulin Pricing Scheme will proceed, with the PBMs continuing to target the most expensive at-issue medications, which will likely be the at-issue medications not included in the Price Cuts.

259.  The Price Cuts are insufficient. An Eli Lilly spokeswoman has represented that the current list price for a 10-milliliter vial of the fast-acting, mealtime insulin Humalog will drop to $66.40 from $274.70, and a 10-milliliter vial of Humulin will fall from $148.70 to $44.61.[102] These prices far exceed the Manufacturers' costs and remain significantly higher than the prices for the same and similar drugs in other countries.

260.  To make matters worse, on November 8, 2023, before the 65% price cut for its long-acting insulin Levemir had taken effect, Novo Nordisk announced that it would be discontinuing Levemir in the United States, citing manufacturing constraints, formulary-placement issues, and "alternative treatments" for patients. Levemir is the only branded, long-acting insulin product for which Novo Nordisk announced a list price reduction and the only long-acting insulin FDA-approved for pregnancy. Yet, Novo Nordisk is discontinuing Levemir—before allowing the price

---

[102] Tom Murphy, *Lilly plans to slash some insulin prices, expand cost cap*, AP News, (Mar. 2, 2023) https://apnews.com/article/insulin-diabetes-humalog-humulin- prescription-drugs-eli-lilly-lantus-419db92bfe554894bdc9c7463f2f3183 (last visited May 7, 2024).

reduction to take effect—with supply disruptions beginning in early 2024, followed by formal discontinuation of the Levemir FlexPen vial by the end of 2024.

*Insulin Adjuncts: Type 2 Medications*

261.   Over the past fifteen years, the Manufacturer Defendants released a number of non-insulin medications that help control insulin levels.

262.   In 2010, Novo Nordisk released Victoza, and over the next seven years Eli Lilly released Trulicity, and Sanofi released Soliqua,.[103]  Novo Nordisk further expanded their GLP-1 patent portfolio with the approval of Xultophy and Ozempic. [104]In 2022, Eli Lilly received approval for another GLP-1, Mounjaro. Each of these drugs can be used in conjunction with insulins to control diabetes.

263.   The Manufacturers negotiate rebates and other fees with the PBMs for "bundles" of insulin and GLP-1 receptor agoinst (GLP-1) medications, packaging them as a single class of diabetes medications. This practice is known as "bundling."

264.   The Manufacturer Defendants bundle medications to gain formulary access for multiple drugs in exchange for increased manufacturer payments to the PBMs.

---

[103] Victoza, Trulicity, and Ozempic are glucagon-like peptide-1 receptor agonists ("GLP-1") and mimic the GLP-1 hormone produced in the body. Soliqua is a combination long-acting insulin and GLP-1 drug.
[104] Victoza, Trulicity, Ozempic, and Mounjaro are glucagon-like peptide-1 receptor agonists ("GLP-1") and mimic the GLP-1 hormone produced in the body. Soliqua and Xultophy are combination long-acting insulin and GLP-1 drugs.

265.  In 2013, Novo Nordisk tied its "exclusive" rebates for insulin to formulary access for GLP-1 medication Victoza. The exclusive rebates of 57.5% for Novolin, Novolog, and Novolog Mix 70/30 were more than three times higher than the 18% rebate for plans that included two insulin products on their formulary. In order to qualify for the exclusive rebate, the plans would also need to list Victoza on their formulary, exclude all competing insulin products, and ensure existing patients switch from competitor diabetes medications. [105]

266.  Upon information and belief, all Manufacturer Defendants negotiate the prices of insulin and GLP-1 medications through bundling.

267.  The first GLP-1 was approved by the FDA in 2005 and was indicated for the treatment of Type 2 diabetes. Currently, the GLP-1 market is consolidated among a limited number of patent-holding entities, with Manufacturer Defendants Eli Lilly, Novo Nordisk, and Sanofi controlling much of this market.

268.  Through extensive patents and regulatory exclusivities, the Manufacturer Defendants have effectively barricaded competition from the GLP-1 market, giving them the ability to exercise comprehensive control over the price of GLP-1 medications.

269.  To date, no generic alternative exists for any GLP-1 medication. The

---

[105] Senate Insulin Report at 78, 79.

Manufacturer Defendants will continue to enjoy patent protection of their respective GLP-1 agonist molecules through at least 2030, if not later. [106]

270.   Novo Nordisk developed and sells three GLP-1 drugs indicated for Type 2 diabetes: Victoza (liraglutide), Xultophy (insulin degludec/liraglutide), and Ozempic (semaglutide). Novo Nordisk holds sixty-two patents related to semaglutide and liragutide, forty-six of which are device patents unrelated to the therapeutic molecule of the GLP-1. [107]

271.   Eli Lilly developed and sells two GLP-1 drugs indicated for Type 2 diabetes: Trulicity (dulaglutide) and Mounjaro (tirzepatide/GIP). Eli Lilly holds eighteen patents related to dulaglutide and tirzepatide. Of the four patents related to tirezepatide, two are device patents unrelated to the therapeutic molecule of the GLP-1. Eli Lilly has appliced for seventy-eight patents related to dulaglutide, seventeen of which have been granted to date. [108]

272.   Sanofi developed Adylxin (lixisenatide) and Soliqua (insulin glargine/lixisenatide) but currently only sells Soliqua in the United States. Sanofi holds forty-two patents related to lixisenatide, twenty-nine of which are device

---

[106] Rasha Alhiary, *et al.*, *Patents and Regulatory Exclusivities on GLP-1 Receptor Agonists*, J. OF THE AM. MED. ASS'N, Vol. 33o, at 650-57 (2023).
[107] Rasha Alhiary, *et al.*, *Delivery Device Patents on GLP-1 Receptor Agonists*, J. OF THE AM. MED. ASS'N, Vol. 331, at 794-796 (2024).
[108] *Id.*

patents unrelated to the therapeutic molecule of the GLP-1.[109]

273.   This patent stacking and evergreening ensures that generic and other branded GLP-1 cannot enter the market and gives Novo Nordisk, Eli Lilly, and Sanofi disproportionate pricing power over GLP-1 medications.

274.   In addition to the limited competition in the GLP-1 landscape, the Manufacturer and PBM Defendants use this disproportionate pricing power to inflate the prices of GLP-1s, consistent with the broader Insulin Pricing Scheme.

---

[109] *Id.*

**Figure 4: List and net prices of GLP-1 agonists**



275.  As shown above, counterintuitively, list and net prices increased as more GLP-1 medications were approved and introduced. Between 2007 and 2017, the average list price of GLP-1s rose 15% per year despite the introduction of competing brands. The net price increased an average of 10% per year during the same time period.[110]

---

[110] Ameet Sarpatwari, *et al.*, *Diabetes Drugs: List Price Increases Were Not Always Reflected In Net Price; Impact Of Brand Competition Unclear*, HEALTH AFFAIRS, Vol. 40, at 772-78 (2021).

276.   The PBM Defendants are also central to these untethered price increases. As shown in the chart above, the growing disconnect between the list and net prices of these drugs further reflects the PBM Defendants' ill-gotten gains through identical methods to those employed in the Insulin Pricing Scheme.

277.   The absence of generics in the GLP-1 market allows manufacturers to keep prices artificially high. PBMs then realize the benefit of these artificially high prices through manufacturer payments in exchange for formulary placement. PBMs and manufacturers are thus incentivized to increase prices or maintain high, untethered prices for GLP-1s.

278.   GLP-1s are significantly more expensive in the United States than in other countries, indicating that the increasing price of GLP-1s are untethered to any legal, competitive, or fair market price. For example, in 2023, the list price for a one-month supply of Ozempic was about $936 in the United States, $147 in Canada, $103 in Germany, $93 in the United Kingdom, $87 in Australia, and $83 in France.

279.   In 2018, Victoza's list price in the United States was more than double its average list price in eleven comparable countries and Trulicity's list price in the United States was more than six times its average list price in eleven comparable countries. One study found that drug companies could profitably sell certain GLP-1s, including Ozempic, for $0.89-$4.73 per month.

280.  In March 2024, PBM Defendant Evernorth entered into a financial guarantee agreement for GLP-1 spend with Manufacturer Defendants Novo Nordisk and Eli Lilly to limit the annual cost increase of GLP-1s to 15%.[111]

281.  Like the caps put in place for insulins, Evernorth, Eli Lilly, and Novo Nordisk's agreement suggests that the prices of GLP-1s before March 2024 were not raised to cover costs of research and development, manufacture, distribution, or any other necessary expense. Such cost caps and savings guarantees indicate that the increasing price of GLP-1s were untethered to any legal, competitive, or fair market price. Further, this agreement is prospective and does not mitigate damages already incurred by payors like Plaintiff.

282.  The following is a list of diabetes medications at issue in this lawsuit:

### Table 1: Diabetes medications at issue in this case

| Insulin Type | Action | Name | Mfr. | FDA Appr. | Current/Recent List Price |
|---|---|---|---|---|---|
| **Human** | *Rapid-Acting* | Humulin R | Eli Lilly | 1982 | $178 (vial) |
| | | Humulin R 500 | Eli Lilly | 1982 | $1784 (vial) $689 (pens) |
| | | Novolin R | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | *Intermediate* | Humulin N | Eli Lilly | 1982 | $178 (vial) $566 (pens) |

[111] Evernorth Health Services, Mar. 7, 2024, https://www.evernorth.com/articles/evernorth-announces-industry-first-financial-guarantee-glp-1-spend (last visited July 15, 2024).

| | | | Company | Year | Price |
|---|---|---|---|---|---|
| | | Humulin 70/30 | Eli Lilly | 1989 | $178 (vial) $566 (pens) |
| | | Novolin N | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | | Novolin 70/30 | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| Analog | Rapid-Acting | Humalog | Eli Lilly | 1996 | $342 (vial) $636 (pens) |
| | | Novolog | Novo Nordisk | 2000 | $347 (vial) $671 (pens) |
| | | Apidra | Sanofi | 2004 | $341 (vial) $658 (pens) |
| | Pre-mixed | Humalog 50/50 | Eli Lilly | 1999 | $93 (vial) $180 (pens) |
| | | Humalog 75/25 | Eli Lilly | 1999 | $99 (vial) $140 (pens) |
| | | Novolog 70/30 | Novo Nordisk | 2001 | $203 (vial) $246 (pens) |
| | Long-Acting | Lantus | Sanofi | 2000 | $340 (vial) $510 (pens) |
| | | Levemir | Novo Nordisk | 2005 | $370 (vial) $555 (pens) |
| | | Basaglar (Kwikpen) | Eli Lilly | 2015 | $392 (pens) |
| | | Toujeo (Solostar) | Sanofi | 2015 | $466 (pens) $622 (max pens) |
| | | Tresiba | Novo Nordisk | 2015 | $407 (vial) $610 (pens – 100u) $732 (pens – 200u) |

79

| Type 2 Medications | GLP-1 | Trulicity (Dulaglutide) | Eli Lilly | 2014 | $1013 (pens) |
|---|---|---|---|---|---|
| | | Mounjaro (Tirzepatide/GIP) | Eli Lilly | 2022 | $1068(pens) |
| | | Victoza (Liraglutide) | Novo Nordisk | 2010 | $813 (2 pens) $1220 (3 pens) |
| | | Xultophy (insulin degludec/liraglutide) | Novo Nordisk | 2016 | $1295 (pens) |
| | | Ozempic (Semaglutide) | Novo Nordisk | 2017 | $1022 (pens) |
| | | Rybelsus (semaglutide tablets) | Novo Nordisk | 2019 | $1029 (30 day supply) |
| | | Adylxin (lixisenatide) | Sanofi | 2016 | Discontinued 2023 |
| | | Soliqua (insulin glargine/lixisenatide) | Sanofi | 2016 | $928 (pens) |

**B.      The Dramatic Rise in the Price of Diabetes Medications in the U.S.**

283.  In the past twenty-five years, the list price of certain insulins has increased in some cases by more than 1000% (10x).

284.  According to the U.S. Bureau of Labor Statistics, $165 worth of consumer goods and services in 1997 dollars would, in 2021, have cost around $289

(1.75x).[112]

285.  Since 1997, Eli Lilly has raised the list price of a vial of Humulin

R (500U/mL) from $165 to $1784 in 2021 (10.8x). (Fig. 5.)

**Figure 5: Rising reported prices of Humulin R (500U/mL), 1997-2021**



286.  Since 1996, Eli Lilly has raised the price for a package of pens of

Humalog from under $100 to $663 (6.6x) and from less than $50 for a vial to $342

(6.8x). (Fig. 6.)

---

[112] https://data.bls.gov/cgi-bin/cpicalc.pl (last visited May 7, 2024). The Consumer Price Index (CPI) measures "the average change over time in the prices paid by urban consumers for a market basket of consumer goods and services." (https://www.bls.gov/cpi/).

**Figure 6: Rising list prices of Humalog vials and pens, 1996-2021**



287.   From 2006 to 2020, Novo Nordisk's Levemir rose from $162 to $555 (3.4x) for pens and from under $100 to $370 per vial (3.7x). (Fig. 7.)

**Figure 7: Rising list prices of Levemir, 2006-2021**



288.   From 2002 to 2021, Novo Nordisk raised the list price of Novolog from $108 to $671 (6.2x) for a pack of pens and from under $50 to $347 (6.9x) for a vial. (Fig. 8.)

**Figure 8: Rising list prices of Novolog vials and pens, 2002-2021**



289.   Defendant Sanofi kept pace as well. It manufactures a top-selling analog insulin—Lantus—which has been and remains a flagship brand for Sanofi. It has been widely prescribed nationally and within the State of Georgia, including to Plaintiff's Beneficiaries. Prices for Lantus have risen from less than $200 in 2006, to over $500 in 2020 (2.5x) for a package of pens and from less than $50 to $340 for a vial (6.8x). (Fig. 9.)

**Figure 9: Rising list prices of Lantus vials and pens, 2001-2021**



290.   The Defendant Manufacturers' non-insulin diabetes medications have experienced similar recent price increases.

291.   Driven by these price hikes, payors' and diabetics' spending on these

drugs has steadily increased with totals in the tens of billions of dollars.[113]

*The Defendant Manufacturers Increased Prices in Lockstep*

292.   The timing of the price increases reveals that each Manufacturer Defendant not only dramatically increased prices for the at-issue diabetes treatments, but they did so in lockstep.

293.   Between 2009 and 2015, for example, Sanofi and Novo Nordisk raised the list prices of their insulins in tandem thirteen times, taking the same price increase down to the decimal point within days of each other, and sometimes within a few hours.[114]

294.   This is known as "shadow pricing," which communicates between competitors their intention not to price-compete against one another.

295.   In 2016, Novo Nordisk and Sanofi's lockstep increases for the at-issue drugs represented the highest drug price increases in the pharmaceutical industry.

296.   Eli Lilly and Novo Nordisk have engaged in the same lockstep behavior with respect to their rapid-acting analog insulins, Humalog and Novolog. Figure 10 demonstrates this collusive behavior with respect to Lantus and Levemir. Figure 11

---

[113] Carolyn Y. Johnson, *Why Treating Diabetes Keeps Getting More Expensive*, WASH. POST (Oct.31, 2016), https://www.washingtonpost.com/news/wonk/wp/2016/10/31/why-insulin-prices-have-kept-rising-for-95-years/ (last visited May 7, 2024).
[114] Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, BLOOMBERG (May 6, 2015), https://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lockstep (last visited May 7, 2024); Grassley & Wyden, *supra* note 7.

demonstrates this behavior with respect to Novolog and Humalog.

**Figure 10: Rising list prices of long-acting insulins**



**Figure 11: Rising list prices of rapid-acting insulins**



297.   Figure 12 demonstrates this behavior with respect to the human insulins—Eli Lilly's Humulin and Novo Nordisk's Novolin.

**Figure 12: Rising list price increases for human insulins**



298.     Figure  13  below  demonstrates  Defendants'  lockstep  price increases for their Type 2 drugs Trulicity, Victoza, and Ozempic.

**Figure 13: Rising list prices of Type 2 drugs**



299.     Figures  14  and  15  below  shows  how,  collectively,  the Manufacturer Defendants have exponentially raised the prices of insulin products in near-perfect unison.

**Figure 14 and 15: Lockstep insulin price increases**



300.   There is clear evidence that these lockstep price increases were carefully coordinated to preserve formulary placement for the at-issue medications and to allow greater rebates to the PBMs, and further illustrate the perverse economics of competing by increasing prices in lockstep.

301.   Eli Lilly was not inclined to lower prices of its insulin products to compete with the other drug makers. Documents produced to the House Committee on Oversight and Reform[115] show that Eli Lilly regularly monitored competitors' pricing activity and viewed competitors' price increases as justification to raise the prices of their own products. On May 30, 2014, a senior vice president at Eli Lilly sent a proposal to Enrique Conterno—then-President of Lilly Diabetes—for June

---

[115] Drug Pricing Investigation at 162.

2014 price increases for Humalog and Humulin. The executive reported that Novo Nordisk had just executed a 9.9% price increase across its insulin portfolio. Mr. Conterno remarked, "While the list price increase is higher than we had planned, I believe it makes sense from a competitive perspective." Eli Lilly took a 9.9% price increase shortly thereafter, on June 5, 2014.

302.   Six months later, on November 19, 2014, Mr. Conterno reported to then- CEO John Lechleiter that Novo Nordisk had taken another 9.9% price increase on NovoLog—the direct competitor to Eli Lilly's Humalog. Mr. Conterno wrote, "[a]s you are aware, we have assumed as part of our business plan a price increase of 9.9% for Humalog before the end of the year." The following Monday—six days after Mr. Conterno's initial email to the CEO—Eli Lilly took price increases of 9.9% on all Humalog and Humulin products.

303.   Sanofi also closely monitored competitors' pricing activity and planned its own pricing decisions around Eli Lilly's and Novo Nordisk's price increases. Executives were aware that Sanofi's long-acting insulin competitors—particularly Novo Nordisk—would likely match its pricing actions on long-acting insulin. In internal documents, Sanofi leaders welcomed competitors' price increases because they allowed Sanofi to claim it was maintaining pricing "parity" with competitors.

304.   Sanofi had no incentive or intention to compete to lower its insulin pricing. For example, on November 7, 2014, Sanofi executed a price increase of

approximately 12% across its family of Lantus products. The following week, a Sanofi senior vice president sent an email asking, "[d]id Novo increase the price of Levemir following our price increase on Lantus last week? I just want to confirm we can still say that Lantus and Levemir are still priced at parity on a WAC [wholesale acquisition cost] basis." The head of Sanofi pricing responded that Novo Nordisk had not yet taken the price increase, but noted, "[o]ver the past four price increases on Lantus they have typically followed within 1 month." Novo Nordisk raised the price of Levemir by 12% the following week.

305.   An internal Sanofi chart shows that, between April 2013 and November 2014, each time Sanofi raised the price of Lantus, Novo Nordisk followed suit for Levemir:

**Figure 16: Sanofi price-tracking**



**Basal Insulin Price Evolution**

Current WAC per Common Unit

| | |
|---|---|
| Tresiba | $29.6 |
| Levemir | $26.9 |
| Toujeo | $24.9 |
| Lantus | $24.9 |

| | Lantus | | | Levemir | |
|---|---|---|---|---|---|
| Date | % Incr Vial | % Incr Pen | Date | % Incr Vial | % Incr Pen |
| | | | 08/25/15 | 8.2% | 8.2% |
| 11/07/14 | 11.9% | 11.9% | 11/18/14 | 11.9% | 11.9% |
| 05/30/14 | 16.1% | 9.9% | 05/31/14 | 16.1% | 9.9% |
| 12/13/13 | 14.9% | 9.9% | 12/19/13 | 14.9% | 9.9% |
| 08/02/13 | 14.9% | 9.9% | 08/27/13 | 12.1% | 10.5% |
| 04/26/13 | 9.9% | 9.9% | 05/03/13 | 9.9% | 9.9% |

* No price increases for Toujeo & Tresiba since launching

- Parity was obtained on the 5/30/14 price increase for Lantus Vial & Pen
- Tresiba currently at 19% premium and to Sanofi Glargine
- Levemir currently at 8% premium to Sanofi Glargine

SANOFI

306.   The Manufacturers often used their competitors' price increases as justification for their own increases. For example, before taking price increases on Lantus, Sanofi compared the new list price to the prices of competitor products. In an April 2018 email exchange about accelerating and increasing previously planned price increases for Lantus and Toujeo (from July to April, and from 3% on Lantus to 5.3%), one senior director requested, "[p]lease confirm how the new WAC of Lantus/Toujeo would compare with the WAC of Levemir/Tresiba." In reply, another senior Sanofi leader provided a chart comparing Sanofi prices to those of its competition.

307.   Sanofi also engaged in shadow pricing with its rapid-acting insulin products, including Apidra. Sanofi was not the market leader in the fast-acting insulin space and typically did not act first to raise prices. But when its competitors raised prices on their fast-acting insulins, Sanofi quickly followed suit. As a Sanofi slide deck explained: "Over the past three years, we have executed a 'fast follower' strategy for Apidra and have executed price increases only after a price increase was announced."

308.   In December 2018, Sanofi's director of strategic pricing and planning emailed diabetes and cardiovascular pricing committee members seeking approval for across-the-board price increases for its rapid- and long-acting insulin products, including Lantus, Toujeo, and Apidra. The then-Senior Vice President and Head of

Sanofi's North America General Medicines group forwarded the proposal to the then- Senior Vice President and Head of Sanofi's External Affairs and inquired, "[p]rior to my approval, just confirming that we are still on for these." The Head of Sanofi's External Affairs wrote back, "Yes. As of now I don't see any alternative. Not taking an increase won't solve the broader policy/political issues, and based on intel, believe many other manufacturers plan to take increases next year as well." He added, "[s]o while doing it comes with high political risk, I don't see any political upside to not doing it."

309.   Although Sanofi generally led price increases in the long-acting insulin market with its pricing for Lantus, Novo Nordisk often led in the rapid-acting market with NovoLog. On May 8, 2017, Novo Nordisk CEO Lars Jorgenson learned that Eli Lilly had raised U.S. list prices by approximately 8% across its injectable diabetes drug portfolio. Mr. Jorgenson emailed this information to a Novo Nordisk executive and asked, "[w]hat is our price increase strategy?" The executive responded, "[Eli Lilly] followed our increase on NovoLog, so we're at parity here, so no action from us. They led with Trulicity and based on our strategy, we will follow which will likely be on June or July 1st."

310.   Further illustrating the anticompetitive scheme between the Manufacturers, rather than compete by lowering prices, Sanofi raised Lantus's list price to respond to rebate and discount competition from Novo Nordisk. Novo

Nordisk manufactures two long-acting insulins called Levemir and Tresiba, as well as two rapid-acting insulins, NovoLog and Fiasp. In the long-acting insulin category, Sanofi's Lantus and Novo Nordisk's Levemir often compete to win the same accounts. According to internal memoranda, in 2013, Sanofi believed that Novo Nordisk was attempting to minimize the clinical difference between Lantus and Levemir and was offering "increased rebates and/or portfolio offers for the sole purpose of removing Lantus from favorable formulary access." According to an internal Sanofi memo, "the strategy to close the price differential between the Lantus vial and pen before the LOE [loss of exclusivity] period was believed to be critical to the overall long-term success of the franchise."

311.  At the time, Sanofi faced increased pressure from its payor and PBM clients to offer more generous rebates and price protection terms or face exclusion from formularies, developments that were described as "high risk for our business" that had "quickly become a reality." This market environment created an enormous challenge for Lantus and, in order to protect its flagship diabetes franchise, Sanofi increased Lantus's list price so that it could improve its rebate and discount offering to payors while maintaining net sales.

312.  Sanofi understood the risk of its decision and "went into 2013 with eyes wide open that the significant price increases planned would inflame [its] customers," and that its aggressive pricing would cause a quick reaction from Novo

94

Nordisk. But Sanofi sought to make up for "shortfalls with Lantus demand generation and global profit shortfalls," which it said "put pressure on the US to continue with the price increases to cover gaps." The company conceded that it was "difficult to determine whether we would face these risks anyway if we hadn't taken the price increases."

313.   Novo Nordisk also engaged in shadow pricing with its long-acting insulin, Levemir, increasing Levemir's list price in lockstep with Lantus in a continued effort to offer increased rebates and discounts to payors and displace Lantus from preferred formulary placement. Novo Nordisk typically did not act first to raise prices. However, when its competitors raised prices, Novo Nordisk followed suit. A March 2015 Novo Nordisk pricing committee presentation slide articulated this strategy: "Levemir price strategy is to follow market leader."

314.   On May 19, 2014, Novo Nordisk's pricing committee discussed how to price Levemir in response to Sanofi's 2013 pricing actions. Based on an internal presentation created for this meeting, Novo Nordisk's pricing committee discussed whether it should be a follower in the market in relation to Sanofi, and considered external factors like press coverage, payor reactions, profits, and performance. In each case, the company's strategic recommendation was to follow Sanofi's moves, rather than lead. Of note, the presentation shows that the pricing committee considered Levemir's performance, which was ahead of 2014's annual budgeting by

$89 million, but that "overall company performance [was] behind." The presentation recommends following Sanofi's pricing actions if the brand's performance is the priority, and to lead if the company's performance is the priority. An excerpt of Novo Nordisk's presentation is shown below:

**Figure 17: Novo Nordisk pricing committee presentation**



315.   In alignment with this strategy, Novo Nordisk's pricing committee debated potential pricing scenarios based on Sanofi's actions, which they projected with a great deal of specificity. The presentation provided options regarding whether the company should follow Sanofi—and increase list price in July—or lead with a 9.9% increase in August which it considered "optically less aggressive." Based on internal memoranda, Novo Nordisk's pricing committee decided to revisit the issue with specific recommendations once Sanofi took action.

316.  Less than two weeks later, on May 30, 2014, Farruq Jafery, Vice President of Pricing, Contract Operations and Reimbursement, emailed Novo Nordisk's pricing committee to inform them that "Sanofi took a price increase on Lantus effective today: 16.1% vial and 9.9% pen." He further wrote that the pricing committee had "agreed that the best strategy for Levemir is to observe the market and maintain list price parity to competitors." Mr. Jafery then requested that Novo Nordisk's committee vote "ASAP" to raise the list price of Levemir effective May 31, 2014 (the next day) from $191.28 to $222.08 for vials and from $303.12 to $333.12 for pens. Only a few hours after Sanofi took its list price increase, members of the pricing committee approved Mr. Jafery's request and Novo Nordisk moved forward with a 16.1% increase on Levemir vial, and a 9.9% increase on Levemir FlexPen and FlexTouch.

317.  Another series of emails shows that Novo Nordisk again shadowed Sanofi's price increase in November 2014, increasing Levemir's list price immediately after Sanofi increased Lantus vials and pens by 11.9%. On the morning of November 7, 2014, Novo Nordisk's pricing committee learned that Sanofi increased Lantus's list price overnight. And, by the afternoon they were asked to approve the same exact price increase for Levemir, which was approved hours later.

318.  The speed with which Novo Nordisk reacted to Sanofi's price changes is striking. Within twenty-five minutes of learning of Sanofi's price increase, Rich

DeNunzio, Senior Director of Novo Nordisk's Strategic Pricing, emailed Novo Nordisk's pricing committee to alert them of the change and promise a recommendation the same afternoon after reviewing the financial impact of any move. By late afternoon, Mr. DeNunzio had requested Novo Nordisk's pricing committee to again "follow [Sanofi's] 11.9% [list price increase] on November 18th" and vote to increase Levemir's list price, which was promptly approved by Novo Nordisk's Chief Financial Officer for U.S. operations, Lars Green.

319.  Novo Nordisk's pricing strategy for other diabetes products even became the subject of humorous exchanges among senior analysts within the company. After a Novo Nordisk analyst shared news of an Eli Lilly price increase for a diabetes product on December 24, 2015, a senior director of national accounts wrote, "[m]aybe Sanofi will wait until tomorrow morning to announce their price increase .. . that's all I want for Christmas." The first analyst responded, "I actually started a drinking game—I have to take a shot for every response that says 'what about Sanofi,'" and then said, "[m]y poor liver. . . .'" The senior director responded, "Ho Ho Ho!!!"

320.  The back-and-forth between Novo Nordisk officials underscores how closely it was monitoring Sanofi's actions and appears to mirror the approach laid out in a January 27, 2014 presentation regarding the company's bidding strategy that hinged on CVS Caremark's business. Novo Nordisk described its bids for the CVS

Caremark business as "pivotal," and laid out a game of cat-and-mouse across different accounts in which company officials sought to have Levemir be the only therapeutic option on different PBM formularies. Novo Nordisk recognized that offering "attractive exclusive rebates to large, receptive customers" would "encourage a stronger response from Sanofi." However, Novo Nordisk was willing to take this risk because it would result in "immediate volume and value" for the company and could lead to an exclusive deal for CVS's commercial formulary.

321.   The agreements the Manufacturers had with the PBM Defendants deterred competition on lowering prices. For example, following its April 2018 list price increase, Novo Nordisk began to face pressure from payors, the media, and Congress to reduce the prices of its insulin drugs. On May 29, 2018, Novo Nordisk's U.S. Pricing Committee debated whether it should reduce the list price of its insulin drugs by 50% after a string of news reports detailed how patients were struggling to afford their medications. Novo Nordisk understood that a 50% cut would be a meaningful reduction to patients, significantly narrow the list-to-net gap, head off negative press attention, and reduce "pressure" from Congressional hearings. However, Novo Nordisk was concerned that a list price reduction would pose significant financial risk to the company.

322.   The company's primary concerns were retributive action from other entities in the pharmaceutical supply chain, many of which derive payments that are

based on a percentage of a drug's WAC price. A PowerPoint slide created for this meeting suggests that the reasons not to lower prices were that "many in the supply will be negatively affected ($) and may retaliate" and that its "[c]ompetitors may not follow putting [Novo Nordisk] at a disadvantage":

**Figure 18: Novo Nordisk presentation on reduced list prices**



323.   Despite these concerns, internal memoranda suggest that Novo Nordisk was still prepared to lower its list price by 2019 or 2020 if its "must haves" were met, which included an agreement from the PBMs that they would not retaliate against them by changing their formulary placement and would accept lower rebate percentages.

324.   According to internal memoranda, Novo Nordisk's board of directors

voted against this strategy in June 2018 and recommended that the company continue its reactive posture. The rationale for this decision was the "$33 million downside identified (NovoLog only)," "risk of payor [PBM] backlash or demand for current rebate on new NDC," and "high likelihood of immediate pressure to take similar action on other products." Following the decision by its board of directors, on August 30, 2018, Novo Nordisk decided to continue its strategy to "monitor the market . . . to determine if other major pharma companies are taking list price [increases]."

325.    Following years of rebate and list-price increases, the Manufacturers faced increased pressure from patients, payors, and the federal government to decrease insulin's list price. However, internal memoranda and correspondence suggest that the downstream impact of lowering the list prices presented hurdles for pharmaceutical companies.

326.   There is also evidence of direct communications between the Manufacturers and the PBM Defendants regarding lowering the prices of insulins. For example, a June 23, 2018 email memorializes a conversation Eli Lilly's President of the Diabetes Unit, Enrique Conterno, had with the CEO of OptumRx, who allegedly "re-stated that [OptumRx] would be fully supportive of Lilly pursuing a lower list price option," but indicated that OptumRx would encounter challenges, namely, "the difficulty of persuading many of their customers to update contracts

without offering a lower net cost to them."

327.    In response, an Eli Lilly executive noted, "we wouldn't be able to lower our list price without impacting our net price," and counseled waiting until early 2020 to reduce prices. Two weeks before this email, Eli Lilly executives had raised the possibility that PBMs would object to a list price reset because it would (a) result in a reduction in administrative fees for PBMs, (b) reduce rebates, which would impact PBMs' ability to satisfy rebate guarantees with some clients, and (c) impair their clients' ability to lower premiums for patients, thereby impacting their market competitiveness. An excerpt of this email is shown below:

**Figure 19: Eli Lilly internal email re: potential price reductions**



328.    Insulin price increases were driven, in part, by tactics the PBMs employed in the early 2010s. At that time, the PBMs began to aggressively pressure

the Manufacturers to raise list prices by implementing formulary exclusions in the insulin therapeutic class. When a drug is excluded, it means that it will not be covered by the insurer. Formulary exclusions effectively stop manufacturers from reaching large blocks of patients and require patients to either switch to a new product or pay significantly more to stay on their preferred medication. This tactic boosted the size of rebates and catalyzed the upward march of list prices. The Manufacturers responded to these formulary exclusion threats by raising list prices aggressively— increases that often were closely timed with price changes by competitors.

329.   Internal memoranda and correspondence confirm that PBM formulary exclusion lists have contributed to higher rebates in the insulin therapeutic class. The Manufacturers have increased rebates in response to formulary exclusion threats, in order to preserve their revenue and market share through patient access. In addition, increases in rebates are associated with increased list prices, such that the PBM Defendants' demands for increased rebates directly contributed to rising insulin prices. As Eli Lilly's CEO, David Ricks, has explained, Eli Lilly agreed to raise list prices to fund higher rebates and fees for the PBMs:

> Getting on [a] formulary is the best way to ensure most people can access our medicines affordably—once again, that's how insurance is supposed to work. But that requires manufacturers to pay ever-increasing rebates and fees, which can place upward pressure on medicines' list prices. If we cannot offer competitive rebates, our

103

medicines may be excluded from formularies, and people cannot access them. Last year alone, to ensure our medicines were covered, Lilly paid more than $12 billion in rebates for all our medicines, and $1 billion in fees. Last year, about eighty cents of every dollar spent on our insulins went to pay rebates and fees.

330.   Insulin was among the first classes of drugs to face PBM formulary exclusions, and the number of insulins excluded has increased over time.[116] In 2014, Express Scripts and CVS Caremark excluded six and seven insulins, respectively. OptumRx excluded four insulins in 2016, its first year with an exclusion list. As of 2022, insulins have faced 193 total plan-years of exclusion across the PBMs since 2014:

**Figure 20: Insulin exclusions by plan year**



331.   The Manufacturers have also made price-increase decisions due to

---

[116] Xcenda, *Skyrocketing growth in PBM formulary exclusions continues to raise concerns about patient access* (May 2022), available at https://www.xcenda.com//media/ assets/xcenda/english/content-assets/white-papers- issue-briefs-studies-pdf/ xcenda_pbm_exclusion_may_2022.pdf.

countervailing pressures in their relationships with the PBMs. A higher list-price increases the dollar value of rebates, discounts, and other fees that a Manufacturer can offer to a PBM—all of which are based on a percentage of the list price. Internal documents show that the Manufacturers were sensitive not only to their own bottom lines, but also to the bottom lines of PBMs that set formularies, without which a Manufacturer's product would likely lose significant market share.

332.   Exclusions, driven in part by perverse PBM incentives, have had a significant impact on patients' access to insulin. Lower list-priced insulins have been available since 2016—including follow-on insulins[117] (Admelog, Basaglar, Lyumjev, Fiasp), "authorized generic" insulins (Lispro, Insulin Aspart),[118] and, more recently, biosimilar insulins. PBMs, however, often exclude these insulins from their formularies in favor of products with *higher* list prices and larger rebates. For example, two of the three PBM Defendants have excluded the two insulin authorized generics since 2020, instead favoring the higher list-priced equivalents.

---

[117] The term "follow-on biologic" is a broad, overarching term. The designation of "biosimilarity" is a regulatory designation. "Follow-on biologics" are copies of originator innovator biologics. Those approved via the Biologics License Application (BLA) regulatory pathway (Public Health Service Act) are referred to as "biosimilars." Those approved via the New Drug Application (NDA) regulatory pathway (Food, Drug, and Cosmetic Act) retain the designation "follow-on" biologics. *See* Richard Dolinar, *et al.*, *A Guide to Follow-on Biologics and Biosimilars with a Focus on Insulin*, 24 Endocrine Practice 195-204 (Feb. 2018), https://www.sciencedirect.com/science/article/abs/pii/S1530891X20353982#:~:text= Follow%2Don%20biologics%20are%20copies,regulations%20involving%20biologi cs%20are%20complex (last visited Jan. 5, 2024).

[118] An authorized generic medicine is a "brand name drug that is marketed without the brand name on its label." Additionally, "even though it is the same as the brand name product, a company may choose to sell the authorized generic at a lower cost than the brand name drug." *See Food and Drug Administration. FDA listing of authorized generics,* https://www.fda.gov/media/77725/download (last visited Jan. 5, 2024).

Remarkably, those PBM Defendants did so even though the list prices for these authorized generic insulins can be half the list price of the brand.[119]

333.   In addition to the exclusions of authorized generic insulins, lower list-priced biosimilar insulins have also faced PBM formulary exclusions. The first biosimilar insulin was launched in 2021. Due to prevailing market dynamics, two identical versions of the product were simultaneously introduced—one with a higher list price and large rebates, and one with a lower list price and limited rebates—giving payors the option of which to cover. All three PBMs excluded the lower list-priced version in 2022, instead choosing to include the identical product with the higher list price.[120]

334. Excluding lower list-priced medicines from formularies can substantially increase out-of-pocket costs for patients in plans using deductibles or coinsurance, where cost-sharing is typically determined based on the medicine's full list price.[121] This trend of favoring higher list-priced products has dramatically affected patient affordability and access to insulins.

---

[119] Tori Marsh, *Can't access generic Humalog? There's an even cheaper insulin option available*, GOODRX. (Aug. 26, 2019), https://www.goodrx.com/blog/admelog-now-cheaper-than-generic-humalog (last visited Jan. 5, 2024).

[120] Adam Fein, *Five takeaways from the big three PBMs' 2022 formulary exclusions* (Jan. 19, 2022), available at https://www.drugchannels.net/2022/01/five-takeaways- from-big-three-pbms-2022.html

[121] Adam Fein, *Express Scripts vs. CVS Health: five lessons from the 2020 formulary exclusions and some thoughts on patient impact* (Jan. 2020), available at https:// www.drugchannels.net/2020/01/express-scripts-vs-cvs-health-five.html.

335.   The PBM Defendants and the Manufacturers are complicit in this. There has been little, if any, attempt by the PBM Defendants to discourage the Manufacturers from increasing the list price of their products. Instead, the PBMs used their size and aggressive negotiating tactics, such as the threat of excluding drugs from formularies, to extract even more generous rebates, discounts, and fees from the Manufacturers, who have increased their insulin list prices in lockstep.

336.   The PBMS thus had every incentive to encourage the Manufacturers to raise list prices, since the rebates, discounts, and fees the PBMs negotiate are based on a percentage of a drug's list price—and the PBMs retain a large portion of what they negotiate. In fact, the Manufacturers have been dissuaded from decreasing list prices for their products, which would have lowered out-of-pocket costs for patients, due to concerns that the PBMs and health plans would react negatively.

337.   Diabetes medications have become unaffordable for many diabetics because of the Manufacturer and PBM Defendants' collusive price increases.

C.    **The Pharmaceutical Payment and Supply Chain**

338.   The prescription drug industry is comprised of a deliberately opaque network of entities engaged in multiple distribution and payment structures. These entities include manufacturers, wholesalers, pharmacies, payors, PBMs, and patients.

339.   Given the complexities of the different parties involved in the pharmaceutical industry, pharmaceuticals are distributed in many ways. Generally speaking, branded prescription drugs, such as the at-issue diabetes medications, often are distributed in one of three ways: (1) from manufacturer to wholesaler (distributor), wholesaler to pharmacy, and pharmacy to patient, or (2) from manufacturer to mail-order pharmacy to patient; and (3) from manufacturer to mail-order pharmacy, mail-order pharmacy to self-insured payor, and then self-insured payor to patient.

340.   The pharmaceutical industry, however, is unique in that the pricing chain is distinct from the distribution chain. The prices for the drugs distributed in the pharmaceutical chain are different for each participating entity: different actors pay different prices set by different entities for the same drugs. The unifying factor is that the price that each entity in the pharmaceutical chain pays for a drug is tied inexorably to the price set by the manufacturer. The pricing chain includes self-insured payors like Plaintiff paying PBMs directly. Defendant Express Scripts routinely invoiced Plaintiff for the at- issue diabetes medications. Here is how the payment chain often works:[122]

---

[122] *See* Karen Van Nuys, *et al.*, *Estimation of the Share of Net Expenditures on Insulin Captured by US Manufacturers, Wholesalers, Pharmacy Benefit Managers, Pharmacies, and Health Plans From 2014 to 2018*, JAMA HEALTH FORUM (Nov. 5, 2021), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2785932.

**Figure 21: The pharmaceutical payment chain**



341.  The payment chain includes self-insured payors like Plaintiff paying PBMs directly. Defendant Express Scripts invoiced Plaintiff for its purchases of the at-issue diabetes medications.

342.  But there is no transparency in this pricing system. Typically, only a brand drug's list price—also known as its Average Wholesale Price (AWP) or the mathematically- related Wholesale Acquisition Cost (WAC)—is available.

343.  Manufacturers self-report AWP or other prices upon which AWP is based to publishing compendiums such as First DataBank, who then publish those prices.

344.   As a direct result of the PBMs' conduct, AWP persists as the most commonly and continuously used list price in reimbursement and payment calculations and negotiations for both payors and patients.

D.    **The PBMs' Role in the Pharmaceutical Payment Chain**

345.   The PBMs are at the center of the convoluted pharmaceutical payment chain, as illustrated in Figure 22 below.

**Figure 22: Insulin distribution and payment chain**



346.   The PBM Defendants develop drug formularies, process claims, create a network of retail pharmacies, set the prices in coordination with the Manufacturers that the payor will pay for prescription drugs, and are paid by the payor to reimburse pharmacies for the drugs utilized by the payor's beneficiaries.

347.  The PBMs also contract with a network of retail pharmacies. Pharmacies agree to dispense drugs to patients and pay fees back to the PBMs. The PBMs reimburse pharmacies for the drugs dispensed.

348.  The PBM Defendants also own mail-order and specialty pharmacies, which purchase and take possession of prescription drugs, including those at issue here, and directly supply those drugs to patients by mail.

349.  Often—including for the at-issue drugs—the PBM Defendants purchase drugs directly from the Manufacturers and distribute them directly to the patients.

350.  Even where PBM-Defendant mail-order pharmacies purchase drugs from wholesalers, their costs are set by direct contracts with the manufacturers.

351.  In addition, and of particular significance here, the PBM Defendants contract with drug manufacturers, including the Manufacturer Defendants. The PBMs extract from the Manufacturers rebates, fees, and other consideration that is paid back to the PBM, including the Manufacturer Payments related to the at-issue drugs.

352.  Manufacturers also interact with the PBMs related to other services outside the scope of the Insulin Pricing Scheme, such as health and educational programs and patient and prescriber outreach with respect to drugs not at-issue in

this Complaint.

353.   These relationships place PBMs at the center of the flow of pharmaceutical money and allow them to exert tremendous influence over what drugs are available nationwide, including in Whitfield County and throughout Georgia, on what terms, and at what prices.

354.   Historically and today, PBMs:

- negotiate the price that payors pay for prescription drugs (based on prices generated by the Insulin Pricing Scheme);

- separately negotiate a different (and often lower) price that pharmacies in their networks receive for the same drug;

- set the amount in fees that the pharmacy pays back to the PBM for each drug sold (based on prices generated by the Insulin Pricing Scheme);

- set the price paid for each drug sold through their mail-order pharmacies (based on prices generated by the Insulin Pricing Scheme); and

- negotiate the amount that the Manufacturers pay back to the PBM for each drug sold (based on prices generated by the Insulin Pricing Scheme).

355.   Yet, for the majority of these transactions, only the PBMs are privy to the amount that any other entity in this supply chain is paying or receiving for the same drugs. This lack of transparency affords Defendants the opportunity to extract billions of dollars from this payment and supply chain without detection.

356.   In every interaction that the PBMs have within the pharmaceutical pricing chain, they stand to profit from the prices generated by the Insulin Pricing

112

Scheme.

*The Rise of the PBMs in the Pharmaceutical Supply Chain*

357.   At first, in the 1960s, PBMs functioned largely as claims processors. Over time, however, they have taken on an ever-expanding role as participants in pharmaceutical pricing and distribution chains.

358.   One of the roles PBMs took on, as discussed above, was negotiating with drug manufacturers—ostensibly on behalf of payors. In doing so, PBMs affirmatively represented that they were using their leverage to drive down drug prices.

359.   In the early 2000s, PBMs started buying pharmacies, thereby creating an additional incentive to collude with manufacturers to keep certain prices high.[123]

360.   These perverse incentives still exist today with respect to both retail and mail-order pharmacies housed within the PBMs' corporate families. Further recent consolidation in the industry has given PBMs disproportionate market power.

361.   Nearly forty PBM entities combined into what are now the PBM Defendants, each of which now is affiliated with another significant player in the pharmaceutical chain, e.g., Express Scripts merged with Cigna;[124] CVS bought

---

[123] Brian S. Feldman, *Big Pharmacies Are Dismantling the Industry That Keeps US Drug Costs Even Sort-Of Under Control*, QUARTZ (Mar. 17, 2016), https://qz.com/636823/big-pharmacies-aredismantlingthe-industry-that-keeps-us-drug-costs-even-sort-of-under-control/ (last visited May 7, 2024).

[124] Peter High, *A View From Inside Cigna's $67 Billion Acquisition of Express Scripts,* FORBES (Jul. 8, 2019), https://www.forbes.com/sites/peterhigh/2019/07/08/a-view-from-inside-cignas-67-billion-acquisition-of-express-scripts/?sh=22eae0234fd0 (last visited May 7, 2024).

Caremark,[125] which now also owns Aetna;[126] and UnitedHealth Group acquired OptumRx.[127]

362.   Figure 23 depicts this consolidation within the PBM market.

## Figure 23: PBM consolidation



363.   After merging with or acquiring all their competitors, and now backed by multibillion-dollar corporations, the PBM Defendants have taken over the market in the past decade, controlling more than 80% of the market and managing pharmacy

---

[125] Andre Ross Sorkin, *CVS to Buy Caremark in All-Stock Deal,* N.Y. TIMES (Nov. 1, 2006), https://www.nytimes.com/2006/11/01/business/01cnd-drug.html (last visited May 7, 2024).
[126] Angelica LaVito, *CVS Creates New Health-Care Giant as $69 Billion Merger with Aetna Officially Closes,* CNBC (Nov. 28, 2019, 12:19 PM), https://www.cnbc.com/2018/11/28/cvs-creates-new-health-care-giant-as-69-billion-aetna-merger-closes.html (last visited May 7, 2024).
[127] UNITEDHEALTH GROUP, *Catamaran and OptumRx to Combine* (Mar. 30, 2015), https://www.unitedhealthgroup.com/newsroom/2015/0330optumrxcatamaran.print.html (last visited May 7, 2024).

benefits for more than 270 million Americans.[128]

364.   Together, the PBM Defendants report more than $300 billion in annual revenue.[129]

365.   The PBMs use this market consolidation and the resulting purchasing power as leverage when negotiating with other entities in the pharmaceutical pricing chain.

*The Insular Nature of the Pharmaceutical Industry*

366.   The insular nature of the pharmaceutical industry has provided Defendants with ample opportunity for contact and communication with their competitors, as well as with the other PBM and Manufacturer Defendants, in order to devise and agree to the Insulin Pricing Scheme.

367.   Each Manufacturer Defendant is a member of the industry-funded Pharmaceutical Research and Manufacturers of America ("PhRMA") and has routinely communicated through PhRMA meetings and platforms in furtherance of the Insulin Pricing Scheme. According to PhRMA's 2019 IRS Form 990, it received more than $515 million in "membership dues." All members are pharmaceutical

---

[128] Adam J. Fein, *The 2018 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers*, DRUG CHANNELS INSTITUTE (Feb. 27, 2018), https://www.drugchannels.net/2018/02/new-2018-economic-report-on-us.html (last visited May 7, 2024).
[129] *Id.*

companies.[130]

368.   David Ricks (CEO of Eli Lilly), Paul Hudson (CEO of Sanofi), and Douglas Langa (President of Novo Nordisk and EVP of North American Operations), currently serve or previously served on the PhRMA Board of Directors and/or are part of the PhRMA executive leadership team.[131]

369.   The PBM Defendants also routinely communicate through direct interaction with their competitors and the Manufacturers at trade associations and industry conferences.

370.   Each year during the relevant period, the main PBM trade association, the industry-funded Pharmaceutical Care Management Association ("PCMA"), held several yearly conferences, including its Annual Meeting and its Business Forum conferences.[132]

371.   The PCMA is governed by PBM executives. As of January 2023, the board of the PCMA included Alan Lotvin (Executive Vice President of PBM Defendant CVS Health and President of CVS Caremark); Amy Bricker (then-

---

[130] PhRMA 2019 Form 990, https://projects.propublica.org/nonprofits/organizations/530241211/202043189349300519/full (last visited May 7, 2024) ; PhRMA, About PhRMA, https://phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/A-C/About-PhRMA2.pdf (last visited May 7, 2024).
[131] PHRMA, *Our Mission,* https://www.phrma.org/About (last visited Sept. 9, 2022).
[132] The PCMA's industry funding in the form of "membership dues" is set out in its 2019 Form 990, https://projects.propublica.org/nonprofits/organizations/383676760/2020429693493 01134/full (last visited May 7, 2024).

President of PBM Defendant Express Scripts; now with CVS); and Heather Cianfrocco (CEO of PBM Defendant OptumRx). As of May 2024, the PCMA board includes PBM-affiliated members Adam Kautzner (President of Express Scripts); David Joyner (EVP at CVS Health), and Dr. Patrick Conway (CEO of OptumRx).[133]

372.  All PBM Defendants are members of—and due to their leadership positions, have substantial control over—the PCMA.

373.  The Manufacturer Defendants are affiliate members of the PCMA.

374.  Every year, high-level representatives and corporate officers from both the PBM and Manufacturer Defendants attend these conferences to meet in person and engage in discussions, including those in furtherance of the Insulin Pricing Scheme.

375.  In fact, for at least the last nine years, all Manufacturer Defendants have been "Partners," "Platinum Sponsors," or "Presidential Sponsors" of these PBM conferences.[134]

376.  Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For

---

[133] PCMA, *Board of Directors,* https://www.pcmanet.org/about/board-of-directors/ (last visited May 7, 2024).

[134] PCMA, *Thank You to All of Our Sponsors,* https://www.pcmanet.org/pcma-event/annual-meeting-2020/sponsors/; https://www.pcmanet.org/pcma-event/annual-meeting-2019/ (last visited May 7, 2024); PCMA, *PCMA Annual Meeting 2018,* https://www.pcmanet.org/events/past-events/annual-meeting-2018/ (last visited May 7, 2024); SPCMA, *Business Forum 2015,* https://www.pcmanet.org/wp-content/uploads/2016/10/2015_sPCMA-Business-Forum_Program-Book.pdf.

example,  as Presidential Sponsors of these conferences, the Manufacturer Defendants each hosted "private meeting rooms" that offer "excellent opportunities for . . . one-on-one interactions between PBM and pharma executives."[135]

377.   Representatives from each Manufacturer Defendant have routinely met privately with representatives from each PBM Defendant during the Annual Meetings and Business Forum conferences that the PCMA holds (and the manufacturers sponsor) each year.

378.   In addition, all PCMA members, affiliates and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community."[136]

379.   As PCMA members, the PBM and Manufacturer Defendants clearly utilized both PCMA-Connect, as well as the private meetings at the PCMA conferences, to exchange information and to reach agreements in furtherance of the Insulin Pricing Scheme.

380.   Notably, key at-issue lockstep price increases occurred shortly after the Defendants were together at PCMA meetings. For example, on September 26 and

---

[135] PCMA, *The PCMA Annual Meeting 2021 Will Take Place at the Broadmoor in Colorado Springs, CO September 20 and 21*, https://www.pcmanet.org/pcma-event/annual-meeting- 2021/ (an event "tailored specifically for senior executives from PBMs and their affiliated business partners" with "private reception rooms" and "interactions between PBM members, drug manufacturers, and other industry partners") (last visited May 7, 2024).
[136] PCMA, PCMA-Connect, https://www.pcmanet.org/contact/pcma-connect/ (last visited May 7, 2024).

27, 2017, the PCMA held its annual meeting where each of the Manufacturer Defendants hosted private rooms and executives from each Defendant engaged in several meetings throughout the conference. Mere days after the conference, on October 1, 2017, Sanofi increased Lantus's list price by 3% and Toujeo's list by 5.4%. Novo Nordisk also recommended that their company make a 4% list price increase effective on January 1, 2018, to match the Sanofi increase.[137]

381.   Likewise, on May 30, 2014, Novo Nordisk raised the list price of Levemir several hours after Sanofi made its list price increase on Lantus. This occurred only a few weeks after the 2014 PCMA spring conference in Washington, D.C. attended by representatives from all PBM Defendants.[138]

382.   The PBMs control the PCMA and have weaponized it to further their interests and to conceal the Insulin Pricing Scheme. The PCMA has brought numerous lawsuits and lobbying campaigns aimed at blocking drug-pricing transparency efforts, including recently suing the Department of Health and Human Services (HHS) to block the finalized HHS "rebate rule," which would eliminate anti-kickback safe harbors for Manufacturer Payments and instead offer them as

---

[137] Grassley & Wyden, *supra* note 7; Letter from Raphael A. Prober, Counsel for Novo Nordisk Inc., to Charles E. Grassley & Ron Wyden, S. Fin. Comm. (Mar. 8, 2019), https://www.finance.senate.gov/imo/media/doc/Novo_Redacted.pdf (last visited May 7, 2024); Letter from Jeffery L. Handwerker, Counsel for Sanofi US, to Charles E. Grassley & Ron Wyden, S. Fin. Comm. (Mar. 8, 2019), https://www.finance.senate.gov/imo/media/doc/Sanofi_Redacted.pdf (last visited May 7, 2024).
[138] *Id.*

direct-to-consumer discounts.[139]

383.   Notably, the PCMA's 2019, 2020, and 2021 tax returns reports annual revenue for more than a million dollars in revenue for "litigation support." Prior tax returns available at ProPublica show millions of dollars in revenue for "litigation support" (and tens of millions in revenue for "industry relations") year after year.[140]

384.   Communications among the PBM Defendants are facilitated by the fluidity and frequency with which executives move from one PBM Defendant to another. For example:

- Mark Thierer worked as an executive at Caremark Rx (now CVS Caremark) prior to becoming the CEO of OptumRx in 2016 (he also served as Chairman of the Board for PCMA starting in 2012);[141]

- Bill Wolfe was the President of the PBM Catalyst Rx (now OptumRx) prior to becoming the President of Aetna Rx in 2015 (he also served as a PCMA board member from 2015-2017 while with Aetna Rx);[142]

- Derica Rice, former EVP for CVS Health and President of CVS Caremark previously served as EVP and CFO for Eli Lilly;[143]

- Duane Barnes was the Vice President of Medco (now Express Scripts) before becoming division President of Aetna Rx in

---

[139] Paige Minemyer, *PCMA Sues Trump Administration Over Rebate Rule,* FIERCE HEALTHCARE (Jan. 12, 2021, 11:00 AM), https://www.fiercehealthcare.com/payer/pcma-sues-trump-administration-over-rebate-rule (last visited May 7, 2024).
[140] See, e.g., PCMA 2019-2021 Form 990s, *supra* note 103 and prior years' returns on ProPublica.
[141] Mark Thierer, LINKEDIN, https://www.linkedin.com/in/mark-thierer-b417095 (last visited May 7, 2024).
[142] Bill Wolfe, LINKEDIN, https://www.linkedin.com/in/bill-wolfe-5725775/ (last visited May 7, 2024).
[143] Derica Rice, LINKEDIN, https://www.linkedin.com/in/derica-rice/ (last visited May 7, 2024).

2006 (he also served as a PCMA board member);[144]

- Everett Neville was the division President of Aetna Rx before becoming Senior Vice President of Express Scripts;[145]

- Albert Thigpen was a Senior Vice President at CVS Caremark for eleven years before becoming a senior vice president at OptumRx in 2011;[146]

- Harry Travis was the Chief Operating Officer at Medco (now Express Scripts) before becoming a vice president at Aetna Rx in 2008; he also served as SVP Member Services Operations for CVS Caremark from 2020-2022;[147] and

- Bill Kiefer was a Vice President of Express Scripts for fourteen years before becoming Senior Vice President of Strategy at OptumRx in 2013.[148]

## E.   The Insulin Pricing Scheme

385.   The market for the at-issue diabetes medications is unique in that it is highly concentrated with no true generics and few biosimilar options. The drugs and biosimilars have similar efficacy and risk profiles.

386.   This affords the PBMs great leverage that theoretically could be used in negotiating with the Manufacturer Defendants to drive *down* list prices for the at-

---

[144] Duane H. Barnes, LINKEDIN, https://www.linkedin.com/in/duanehbarnes76 (last visited May 7, 2024).

[145] Everett Neville, LINKEDIN, https://www.linkedin.com/in/everett-neville1 (last visited May 7, 2024).

[146] Albert Thigpen, LINKEDIN, https://www.linkedin.com/in/albert-thigpen-3483335 (last visited May 7, 2024).

[147] Harry Travis, LINKEDIN, https://www.linkedin.com/in/hjtravis (last visited May 7, 2024).

[148] Bill Kiefer, LINKEDIN, https://www.linkedin.com/in/billkiefer (last visited May 7, 2024).

issue drugs through open competition.

387.   But the PBMs do not want the prices for diabetes medications to go down. A 2022 report by the Community Oncology Alliance put it this way:

> Among the different sources of revenue, the most prolific by far is in the form of rebates from pharmaceutical manufacturers that PBMs extract in exchange for placing the manufacturer's product drug on a plan sponsor's formulary or encouraging utilization of the manufacturer's drugs…[T]he growing number and scale of rebates is the primary fuel of today's high drug prices. The truth is that PBMs have a vested interest to have drug prices remain high, and to extract rebates off of these higher prices. PBM formularies tend to favor drugs that offer higher rebates over similar drugs with lower net costs and lower rebates.[149]

388.   The Manufacturer Defendants understand that PBM Defendants make more money as prices increase. This is confirmed by the Senate Insulin Report after review of internal documents produced by the Manufacturers:

> [B]oth Eli Lilly and Novo Nordisk executives, when considering lower list prices, were sensitive to the fact that PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price.[150]

389.   The documents eventually released by the Senate also show how the Manufacturers' pricing strategy focuses on the PBMs' profitability. In an internal August 6, 2015, email, Novo Nordisk executives debated delaying increasing the

---

[149] Community Oncology Alliance & Frier Levitt, Pharmacy Benefit Manager Exposé: How PBMs Adversely Impact Cancer Care While Profiting at the Expense of Patients, Providers, Employers, and Taxpayers (Feb. 2022), https://communityoncology.org/wp-content/uploads/2022/02/COA_FL_PBM_Expose_2-2022.pdf (last visited May 7, 2024).
[150] Grassley & Wyden, supra note 7 at 88-89.

price of an at-issue drug to make the increase more profitable for CVS Caremark,

stating:

> Should we take 8/18 [for a price increase], as agreed to by our [pricing
> committee], or do we recommend pushing back due to the recent CVS
> concerns on how we take price? . . . We know CVS has stated their
> disappointment with our price increase strategy (ie taking just after the
> 45th day) and how it essentially results in a lower price protection,
> admin fee and rebate payment for that quarter/time after our increase .
> . . it has been costing CVS a good amount of money.[151]

390.   The Manufacturer Defendants also understand that because of the

PBMs' market dominance, most payors, including in Whitfield County, accept the

baseline national formularies offered by the PBMs with respect to the at-issue drugs.

391.   The Insulin Pricing Scheme was born from these understandings. Both

sets of Defendants realized that if the Manufacturers artificially inflate their list

prices while paying large, undisclosed Manufacturer Payments back to the PBMs,

both the PBMs and Manufacturers would generate billions of unearned dollars. The

plan worked.

392.   Over the past several years the Manufacturers have raised prices in

unison and have paid correspondingly larger Manufacturer Payments to the PBMs.

393.   In exchange for the Manufacturers artificially inflating their prices and

---

[151] Letter from Raphael A. Prober at 145, Counsel for Novo Nordisk Inc., to Charles E. Grassley & Ron
Wyden, S. Fin. Comm. (Mar. 8, 2019),
https://www.finance.senate.gov/imo/media/doc/Novo_Redacted.pdf (last visited May 7, 2024).

paying the PBMs substantial amounts in Manufacturer Payments, the PBM Defendants grant the Manufacturer Defendants' diabetes medications elevated prices and preferred status on their national formularies. During the relevant period, the rebate amounts (as a proportion of the list price) grew year-over-year while list prices themselves increased.

394.   Beyond increased rebate demands, the PBM Defendants have also sought and received larger and larger administrative fees from the Manufacturers during the relevant period.

395.   A recent study by the Pew Charitable Trust estimated that, between 2012 and 2016, the amount of administrative and other fees that the PBMs requested and received from the Manufacturers tripled, reaching more than $16 billion. The study observed that although rebates were sent to payors during this period, PBMs retained the same volume of rebates in pure dollars, given the overall growth in rebate volume while administrative fees and spread pricing (charging a client payor more for a drug than the PBM pays the pharmacy) further offset reductions in retained rebate volumes.[152]

396.   Thus—and   contrary   to   their   public   representations—the   PBM Defendants' negotiations and agreements with the Manufacturer Defendants (and the

---

[152] PEW, *The Prescription Drug Landscape, Explore* (Mar. 8, 2019), https://www.pewtrusts.org/en/research-and-analysis/reports/2019/03/08/the-prescription-drug-landscape-explored (last visited May 7, 2024).

formularies that result from these agreements) have caused and continue to cause precipitous price increases for the at-issue drugs.

397.   As a result of the Insulin Pricing Scheme, every payor, including Plaintiff, that pays for and/or reimburses for the at-issue drugs has been overcharged.

398.   Moreover, the PBMs use this false price to misrepresent the amount of "savings" they generate for diabetics, payors, and the healthcare system. For example, in January 2016, Express Scripts' president Tim Wentworth stated at the 34th annual JP Morgan Healthcare Conference that Express Scripts "saved our clients more than $3 billion through the Express Scripts National Preferred Formulary."[153]  Likewise, in April 2019, CVS Caremark president Derica Rice stated, "Over the last three years . . . CVS Caremark has helped our clients save more than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the member's out-of-pocket spend."[154]

399.   In making these representations, the PBMs fail to disclose that the amount of "savings" they have generated is calculated based on the false list price, which is not paid by any entity in the pharmaceutical pricing chain and which all

---

[153] Surabhi Dangi-Garimella, *PBMs Can Help Bend the Cost Curve: Express Scripts' Tim Wentworth*, AJMC (Jan. 12, 2016), https://www.ajmc.com/view/pbms-can-help-bend-the-cost-curve-express-scripts-tim-wentworth (last visited May 7, 2024).

[154] PR Newswire, *CVS Health PBM Solutions Blunted the Impact of Drug Price Inflation, Helped Reduce Member Cost, and Improved Medication Adherence in 2018* (Apr. 11, 2019), https://www.prnewswire.com/news-releases/cvs-health-pbm-solutions-blunted-the-impact-of-drug-price-inflation-helped-reduce-member-cost-and-improved-medication-adherence-in-2018-300830167.html (last visited May 7, 2024).

Defendants are directly responsible for artificially inflating.

400.   The Insulin Pricing Scheme is a coordinated effort between the Manufacturer and PBM Defendants that each agreed to and participated in, and which created enormous profits for all of Defendants. For example:

a.    The Manufacturers and the PBMs are in constant communication and regularly meet and exchange information to construct and refine the PBM formularies that form and fuel the scheme. As part of these communications, the Manufacturers are directly involved in determining not only where their own diabetes medications are placed on the PBMs' formularies and with what restrictions, but also in determining the same for competing products;

b.    The Manufacturers and the PBMs share confidential and proprietary information with each other in furtherance of the Insulin Pricing Scheme, such as market data gleaned from the PBMs' drug utilization tracking efforts and mail-order pharmacy claims, internal medical efficacy studies, and financial data. Defendants then use this information in coordination to set the false prices for the at-issue medications and to construct their formularies in the manner that is most profitable for both sets of Defendants. The data that is used to further this coordinated scheme is compiled, analyzed, and shared either by departments directly housed within the PBM or by subsidiaries of the PBM, as is the case with OptumRx which utilizes OptumInsight and Optum

Analytics; and

c.     The Manufacturers and the PBMs engage in coordinated outreach programs directly to patients, pharmacies, and prescribing physicians to convince them to switch to the diabetes medications that are more profitable for the PBMs and Manufacturers, even drafting and editing letters in tandem to send out to diabetes patients on behalf of the PBMs' clients. For example, the Grassley-Wyden committee recently released an email in which Eli Lilly discussed paying Defendant UnitedHealth Group and OptumRx additional rebates for every client that was converted to formularies that exclusively preferred Eli Lilly's at-issue drugs, including Humalog. The email continued: "United's leadership committee made one ask of Lilly – that we are highly engaged in the communication/pull through plan. I of course indicated we fully expect to support this massive patient transition [to Eli Lilly's at-issue drugs favored by United] and provider education with the full breadth of Lilly resources. UHC also proactively thanked Lilly for our responsiveness, solution generation and DBU execution." [155]

401.   Rather than using their prodigious bargaining power to lower drug prices as they claim, Defendants used their dominant positions to work together to generate billions of dollars in illicit profits at the expense of payors like Plaintiff.

---

[155] Grassley & Wyden, *supra* note 7.

**F.      The Manufacturers React to Threats of Formulary Exclusion by Increasing Rebates Offered to the PBMs**

402.   Although the PBM Defendants have insisted they had no control over how the Manufacturers price their insulin products, their threats of formulary exclusion illustrate how they used new insulin competitors with lower prices to leverage even higher rebates on the existing insulin drugs.

403.   In the face of formulary exclusion threats based on new entrants in the insulin market, the Manufacturers have willingly met the PBM Defendants' demands for increased rebates in order to retain preferred formulary placement and block competitors. For example, in 2016, Sanofi and Novo Nordisk enhanced their rebate offers at the same time Eli Lilly introduced Basaglar, a follow-on biologic to Lantus. Basaglar is a long-acting insulin and is "[c]linically . . . very similar" to Sanofi's Lantus. Because of its near clinical equivalence, Basaglar posed a competitive threat in the long-acting insulin market. The PBMs threatened to switch to Basaglar because it was priced lower and they expected Eli Lilly to offer larger discounts in response.

404. A 2016 Sanofi memo describes the market dynamic whereby a threatened new market entrant would lead not to lower prices, but to greater rebates:

**Figure 24: Sanofi memo on introduction of Basaglar**

- Lilly is actively engaged with Anthem for 2017 Medicare and commercial business.  Anthem believes they would not have significant challenges moving to Basaglar in 2017 if the WAC price and discounts are in line with what they are thinking (20% lower WAC and discounts >40% )

405.   In an attempt to avoid PBMs switching to Basaglar, Sanofi, and Novo Nordisk increased their rebate bids to respond to Eli Lilly. For example, according to Sanofi internal memoranda, sometime around April 2016, Express Scripts requested bids for its 2017 national commercial formulary and indicated its desire to add only one insulin glargine product to its basal insulin category. Express Scripts communicated to Sanofi that "with the right competitive price, [it] would not have significant challenges moving [from Lantus and Toujeo] to Basaglar" and that Sanofi must enhance its current rebate rate of 42% to maintain access for their basal insulins.

406.   An internal Sanofi memo describes the dynamic where, at "the right competitive price," Express Scripts would not have a challenge moving Basaglar into a preferred position on its formulary:

**Figure 25: Sanofi memo on Basaglar pricing**



Likely Competitive Approach and Response:

- Lilly is actively engaged with ESI for 2017 commercial business.  Pricing has not been confirmed however ESI has informed that the following assumptions pose a threat to Sanofi's glargine franchise:
    - Discounts for Basaglar in the mid 60's have been communicated by ESI to Sanofi. This is likely a starter for ESI to consider excluding Lantus and Toujeo. Modeling assumed 70%.
    - Basaglar WAC will be 15% to 25% less than the WAC price of Lantus.  Sanofi modeling assumed 15%.
- ESI has signaled, with the right competitive price, they would not have significant challenges moving to Basaglar in 2017 despite a follow-on biologic (Basaglar) approval.
- In addition ESI has indicated that Novo must also enhance its current rate to <u>maintain</u> current access for their basal insulin(s).  Novo is likely to enhance its current rebates given recent Tresiba addition to part D formulary.

407.   Rebate contracts confirm that Sanofi increased its offer up to almost 55% off its WAC of $248.51 for Lantus vials and $327.76 for Lantus pens.

408.   For the Manufacturers, the mere threat of exclusion has pressured them to offer substantially greater rebates to maintain formulary position. This is because formulary exclusions are likely to cause significant loss of a manufacturer's market share, leading to lower revenue. On the other hand, being the exclusive therapy on a formulary has the opposite effect, which incentivizes Manufacturers to offer large discounts to acquire or maintain such status. The use of formulary exclusions has thus led to a market dynamic in which Manufacturers offer ever-higher rebates to avoid exclusion, which has led to higher list prices.

409.   For example, before 2013, Sanofi offered an average rebate of 5% on Lantus. However, beginning in 2013, competitors sought to "[d]isplace Lantus in

High Control Plans and Markets…through increased rebates" to capture market share. In response, Sanofi increased its rebate and discount offerings to remain on their formulary. A Sanofi memo further explains this dynamic:

**Figure 26: Sanofi memo on increased rebates for Lantus**



410.   While the PBM Defendants have touted that using formulary exclusions in the insulin therapeutic class was a way to drive down costs for their clients, internal correspondence and memoranda show that increased use of formulary exclusions did exactly the opposite: WAC (list) prices have continued to increase, leading to higher costs for payors and higher prices for patients at the pharmacy counter.

411. For example, in 2013, when Express Scripts threatened to move patients to other diabetes drugs in order to "break even on [the] rebate line" unless Sanofi increased its Medicare Part D rebate offer for Lantus, Sanofi considered increasing its rebate offer from 7.45% to 15% in order to prevent formulary exclusion. Sanofi also faced similar pressure to increase rebates for Express Scripts' commercial contracts. Internal Sanofi memoranda show that "Sanofi was notified by [Express Scripts] that Lantus was positioned to be removed from the formulary effective 2013. . . [and as a result] rebates were re-negotiated." An excerpt from this memo, discussing the threat to Lantus, illustrates that the threats used by Express Scripts to drive up rebates on Sanofi's flagship insulin product Lantus:

**Figure 27: Sanofi presentation on formulary threats to Lantus**



412.   According to internal memoranda, in 2014, Express Scripts and its affiliated businesses managed the prescription drug claims of over 4.6 million people, representing 15% of the total business in the Medicare Part D channel. Rebate agreements confirm Sanofi renegotiated rebates and entered into an agreement to provide up to 10.625% for Lantus, effective January 1, 2014. Rebates were renegotiated again that same year, and Sanofi increased its rebate offer up to 14.625%, effective October 1, 2014.

413.   CVS Caremark and OptumRx used similar formulary exclusion threats to drive up Lantus rebates. Around this same time, other PBMs learned that Sanofi had offered competitive rebates to Express Scripts which caused them to question their rebate status with Lantus. As a result, they too demanded higher rebates and

threatened to exclude Lantus from their formulary to achieve this result.

414.   For example, in 2014, OptumRx threatened to remove Lantus from its commercial formulary. Sanofi offered an enhanced rebate for FY2015 in the 15% range, but OptumRx rejected Sanofi's offer and took steps to remove Lantus from its commercial formulary. Sanofi responded with a last-minute bid of a 45% rebate for Tier 2, which OptumRx countered with 45% for Tier 3. According to Sanofi, OptumRx's counteroffer was "ultimately accepted over access concerns to future products and the need to secure access to patient lives."

415.   Similarly, in 2016, Express Scripts threatened to remove Lantus and Toujeo from its Medicare Part D formulary and requested that Sanofi submit its "best and final offer" or else face formulary exclusion. According to internal memoranda, during negotiations, Express Scripts told Sanofi that it was justified in removing Lantus and Toujeo from its Medicare Part D formulary because it had allowed "quite a few years of price increases" and that Novo Nordisk's rebate offer was more competitive. In response to Express Scripts' threat, Sanofi discussed revising its rebate offer up to 40% with 4% price protection for Lantus and Toujeo.

416.   Although contracts with PBMs included larger and larger rebates, the Manufacturers still expected to remain profitable. For example, on July 28, 2017, one Sanofi official wrote to colleagues after considering their offer to CVS Caremark for placement on the Part D formulary: "After inclusion of additional fees, we are

still profitable up to an 89% rebate." The official included an analysis that assumed "CVS would need to shift 68.9% of [its] glargine volume to Novo to break even (at an assumed 81% rebate offer)." In its analysis, Sanofi compared various negotiation scenarios including a "no contract" scenario, which it determined would be more profitable to the company even with the resulting reduction in sales volume and revenue. One of the deciding factors was optics. As one colleague put bluntly: "How would it look to be removed from the largest Medicare plan?"

417.   As the PBMs expanded the practice of using formulary exclusions to extract greater rebates, Sanofi's counterstrategy was to bundle unrelated products that had been excluded—Lantus and an epinephrine injection called Auvi-Q—to win formulary inclusion for both. (Bundling is a practice where manufacturers offer rebates and discounts for multiple products, but only if certain conditions are met.)

418.   Sanofi faced significant financial pressure across all accounts and sought to include bundling agreements in several of its contracts. While negotiating contracts for the 2015/16 plan year, Express Scripts advised Sanofi that it needed to be far more aggressive with rebate offers to gain access to the PBM's commercial book of business than in past years. Internally, Sanofi officials warned in a memo that "Novo, specifically Levemir, has changed the game with regard to rebates," and that Sanofi would "need to rebate aggressively." A separate presentation describes "[c]ontracts that increase Lantus rebates if Auvi-Q is added to [the] formulary thus

creating a bundled arrangement," and notes that the company had even considered a "triple product bundle" with Toujeo, despite concerns about the arrangements triggering Medicaid best price.

419.   This counterstrategy was not limited to Sanofi. An internal memo shows that Sanofi's competitors were using the same strategy: "Lantus is losing accounts and share within the institutional channel because of aggressive discounting and bundled contract offerings from Novo Nordisk and Lilly."

420.   For example, Novo Nordisk secured contract terms from CVS Caremark's Part D business in 2013 that tied its "exclusive" rebates for insulin to formulary access for its Type 2 diabetes drug Victoza. The exclusive rebates of 57.5% for Novolin, Novolog, and Novolog Mix 70/30 were more than three times higher than the 18% rebate for plans that included two insulin products on their formulary. To qualify for the exclusive rebate, the plans would also need to list Victoza, a GLP- 1 agonist, on their formulary, exclude all competing insulin products, and ensure "existing patients using a [c]ompeting [p]roduct may not be grandfathered."

## G.    Defendants Play Down the Insulin Pricing Scheme and Its Harms

421.   On April 10, 2019, the United States House of Representatives Committee on Energy and Commerce held a hearing on industry practices titled,

"Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."[156]

422.    Representatives from all Defendants testified at the hearing and admitted that the price for insulin had increased exponentially over the past 15 years.[157]

423.    Further, each Defendant conceded that the price that diabetics pay out-of- pocket for insulin is too high. For example:[158]

- Dr. Sumit Dutta, SVP and Chief Medical Officer of OptumRx since 2015, stated, "A lack of meaningful competition allows the [M]anufacturers to set high [list] prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs."

- Thomas Moriarty, General Counsel for CVS admitted "[a] real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans. Over the last several years, prices for insulin have increased nearly 50 percent. And over the last ten years, [list] price of one product, Lantus, rose by 184 percent."

- Mike Mason, Senior Vice President of Eli Lilly when discussing how much diabetics pay out-of-pocket for insulin stated "it's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications . . ."

- Kathleen Tregoning, Executive Vice President External Affairs

---

[156] *Priced Out of a Lifesaving Drug: Getting Answers on the Rising Before the H. Comm. Energy and Commerce Subcomm. on Oversight and Inv.*, 116th Cong. (2019-2020), https://www.congress.gov/event/116th-congress/house-event/109299?s=1&r=3 [hereinafter *Priced out of a Lifesaving Drug*] (last visited on May 7, 2024).

[157] *Id.*

[158] *Id.*

at Sanofi, testified, "Patients are rightfully angry about rising out-of-pocket costs and we all have a responsibility to address a system that is clearly failing   too many people. . . we recognize the need to address the very real challenges of affordability . . . Since 2012, average out-of-pocket costs for Lantus have risen approximately 60 percent for patients . . ."

- Doug Langa, Executive Vice President of Novo Nordisk, stated, "On the issue of affordability . . . I will tell you that at Novo Nordisk we are accountable for the [list] prices of our medicines. We also know that [list] price matters to many, particularly those in high-deductible health plans and those that are uninsured."

424.  Notably, none of the testifying Defendants claimed that the significant increase in the price of insulin was related to competitive factors such as increased production costs or improved clinical benefit.

425.  Instead, Novo Nordisk's President Doug Langa's written testimony for the April 2019 hearing recognized "misaligned incentives" that have led to higher drug costs, including for insulin and explained Novo Nordisk's and PBM Defendant's role in perpetuating the "perverse incentives" of the Insulin Pricing Scheme:

> [T]here is this perverse incentive and misaligned incentives and this encouragement to keep list prices high. And *we've been participating in that system* because the higher the list price, the higher the rebate . . . There is a significant demand for rebates…. *We're spending almost $18 billion a year in rebates*, discount, and fees, *and we have people with insurance with diabetes that don't get the benefit of that*. (emphasis added)[159]

---

[159] *Id.*

426.   Eli Lilly admitted that it raises list prices as a quid pro quo for formulary positions. At the April 2019 Congressional hearing, Mike Mason, Senior Vice President of Eli Lilly testified:[160]

> Seventy-five percent of our list price is paid for rebates and discounts $210 of a vial of Humalog is paid for discounts and rebates      We have to *provide* rebates [to PBMs] in order to provide and compete for that [formulary position] so that people can use our insulin.

In the very next question, Mr. Langa of Novo Nordisk was asked, "[H]ave you ever lowered a list price? His answer, "We have not."[161]

427.   Sanofi's Executive Vice President for External Affairs, Kathleen Tregoning, testified:[162]

> The rebates is [sic] how the system has evolved      I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient.

Her written response to questions for the record acknowledged that "it is clear that payments based on a percentage of list price result in a higher margin [for PBMs] for the higher list price product than for the lower list price product."

428.   The PBM Defendants also conceded at the April 2019 Congressional hearing that they grant preferred, or even exclusive, formulary position because of higher Manufacturer Payments paid by the Manufacturer Defendants.

---

[160] *Id.*
[161] *Id.*
[162] *Id.*

429.   In her responses to questions for the record, Amy Bricker—former President of Express Scripts, a former PCMA board member—confirmed that "manufacturers lowering their list prices" would give patients "greater access to medications;" yet when asked to explain why Express Scripts did not grant an insulin with a lower list price preferred formulary status, answered, "Manufacturers do give higher discounts [i.e., payments] for exclusive [formulary] position . . ." When asked why the PBM would not include both costly and lower-priced insulin medications on its formulary, Ms. Bricker stated plainly, "We'll receive less discount in the event we do that."[163]

430.   As Dr. Dutta, SVP of OptumRx, perversely reasoned, the cheaper list-priced alternative Admelog is not given preference on the formulary because "it would cost the payer more money to do that . . . [b]ecause the list price is not what the payer is paying. They are paying the net price."[164]

431.   But payors do not pay the net price, even when rebates are passed through, because the PBMs receive and retain countless other forms of payments that drive up the gap between the list price and the net price retained by drug manufacturers. By giving preference to drugs with higher list prices based on the illusion of a lower net price, the PBMs are causing health plan payors and members

---

[163] *Id.*
[164] *Id.*

to pay more while the PBMs keep greater profits for themselves. In other words, under the pricing scheme, PBMs and manufacturers can make a drug with a lower list price effectively more expensive for payors and then ostensibly save payors from that artificially-inflated price by giving preference to drugs that had higher list prices to begin with (yielding higher Manufacturer Payments to the PBMs).

432.   On May 10, 2023, the U.S. Senate Committee on Health, Education, Labor, and Pensions held a hearing titled, "The Need to Make Insulin Affordable for All Americans." At this hearing, the CEOs and presidents of the Manufacturer and PBM Defendants doubled down on their testimony from 2019. David Ricks, for example, the Chair and CEO of Eli Lilly, testified that his company raised list prices and agreed to pay ever-increasing rebates to secure formulary placement:

> Getting on formulary is the best way to ensure most people can access our medicines affordably…But that requires manufacturers to pay ever-increasing rebates and fees, which can place upward pressure on medicines' list prices…Last year alone, to ensure our medicines were covered, Lilly paid more than $12 billion in rebates for all our medicines, and $1 billion in fees.

433.   Paul Hudson, the CEO of Sanofi, likewise indicated that PBMs prefer drugs with higher list prices and that the manufacturers have responded accordingly. In discussing a drug Sanofi introduced with a lower list price, Hudson explained: "It just didn't get listed in any way. If price is really the motivator, it would have been listed."

434.   While all Defendants acknowledged before Congress their participation in conduct integral to the Insulin Pricing Scheme, none revealed its inner workings or the connection between their coordination and the economic harm that payors, like Plaintiff, and Beneficiaries were unwittingly suffering. Instead, in an effort to obscure the true reason for precipitous price increases, each Defendant group pointed the finger at the other as the more responsible party.

435.   The PBM Defendants testified to Congress that the Manufacturer Defendants are solely responsible for their list price increases and that the Manufacturer Payments that the PBMs receive are not correlated to rising insulin prices.

436.   To the contrary, the amount the Manufacturers kick back to the PBM Defendants is directly correlated to an increase in list prices—on average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in list price. [165] Reducing or eliminating Manufacturer Payments would lower prices and reduce out-of-pocket expenditures.[166]

437.   Further, in large part because of the increased list prices and related Manufacturer Payments, the PBMs' profit per prescription has grown substantially

---

[165] Neeraj Stood *et al.*, *The Association Between Drug Rebates and List Prices,* USC (Feb. 11, 2020), http://healthpolicy.usc.edu/research/the-association-between-drug-rebates-and-list-prices/ (last visited at May 7, 2024).
[166] *Id.*

over the same period that insulin prices have steadily increased. For example, since 2003 Defendant Express Scripts has seen its profit per prescription increase more than 500% per adjusted prescription.[167]

438.   Yet, the Manufacturers urged upon Congress the fiction that the PBMs were solely to blame for insulin prices because of their demands for rebates in exchange for formulary placement. The Manufacturers claimed their hands were tied and sought to conceal their misconduct by suggesting that they have not profited from rising insulin prices.

439.   Given the Manufacturers' claims that rebates were the sole reason for rising prices, each was asked directly during the Congressional hearing to guarantee it would decrease list prices if rebates were restricted or eliminated. The spokespersons for Eli Lilly, Novo Nordisk, and Sanofi all said only that they would "consider it."

440.   In addition, a 2020 study from the Institute of New Economic Thinking titled, "Profits, Innovation and Financialization in the Insulin Industry," demonstrates that during the time insulin price increases were at their steepest, distributions to the Manufacturers' shareholders in the form of cash dividends and share repurchases totaled $122 billion. In fact, during this time, the Manufacturers

---

[167] David Balto, *How PRMs Make the Drug Price Problem Worse,* HILL (Aug. 31, 2016, 5:51 PM), https://thehill.com/blogs/pundits-blog/healthcare/294025-how-pbms-make-the-drug-price-problem-worse (last visited May 7, 2024).

spent a significantly lower proportion of profits on R&D compared to shareholder payouts. The paper also notes that "[t]he mean price paid by patients for insulin in the United States almost tripled between 2002 and 2013" and that "per-person spending on insulin by patients and insurance plans in the United States doubled between 2012 and 2016, despite only a marginal increase in insulin use." [168]

441.  In January 2021, the Senate Finance Committee (Grassley-Wyden) issued a report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug"[62] that detailed Congress's findings after reviewing more than 100,000 pages of internal company documents from Sanofi, Novo Nordisk, Eli Lilly, CVS Caremark, Express Scripts, OptumRx, and Cigna. The report concluded, among other things:[169]

- The Manufacturer Defendants retain more revenue from insulin than in the 2000s—for example, Eli Lilly has reported a steady increase in Humalog revenue for more than a decade—from $1.5 billion in 2007 to $3 billion in 2018;

- The Manufacturer Defendants have aggressively raised the list price of their insulin products absent significant advances in the efficacy of the drugs; and

- The Manufacturer Defendants only spend a fraction of their revenue related to the at-issue drugs on research and development—Eli Lilly spent $395 million on R&D costs for Humalog, Humulin, and Basaglar between 2014-2018 during which time the company generated $22.4 billion in revenue on

---

[168] Rosie Collington, *Profits, Innovation and Financialization in the Insulin Industry*, INST. FOR NEW ECON. THINKING (Apr. 2020), https://www.ineteconomics.org/research/research-papers/profits-innovation-and-financialization-in-the-insulin-industry (last visited May 7, 2024).
[169] Grassley & Wyden, *supra* note 7.

these drugs.

442.   In fact, despite their finger-pointing before Congress, both the Manufacturers and PBMs are responsible for their concerted efforts to create the Insulin Pricing Scheme.

**H.     All Defendants Profit from the Insulin Pricing Scheme**

443.   Under the Insulin Pricing Scheme, the Manufacturer Defendants pay the PBM Defendants opaque but significant Manufacturer Payments in exchange for formulary placement, which garners the Manufacturers greater revenues and steady profit margins. The PBM Defendants grant national formulary position to at-issue drugs in exchange for large Manufacturer Payments generated by inflated drug prices.

444.   Inflated prices also  earn the Manufacturers hundreds of millions of dollars in tax breaks by basing their deductions for donated insulins on the inflated list prices.

445.   Because of the increased list prices, and related Manufacturer Payments, the PBMs' profit per prescription has grown exponentially during the relevant period as well. A recent study published in the Journal of the American Medical Association concluded that the amount of money that goes to the PBM Defendants for each insulin prescription increased more than 150% from 2014 to 2018. In fact, for transactions in which the PBM Defendants control the PBM and the pharmacy (e.g.,

Caremark-CVS pharmacy), these Defendants were capturing an astonishing 40% of the money spent on each insulin prescription (up from only 25% just four years earlier), even though they do not contribute to the development, manufacture, innovation, or production of the product.[170]

446.   The PBM Defendants profit from the artificially inflated prices created by the Insulin Pricing Scheme in several ways, including: (1) retaining a significant, yet undisclosed, percentage of the Manufacturers Payments, (2) using the inflated list price to generate profits from pharmacies, and (3) relying on the inflated list price to drive up the PBMs' margins through their own mail-order pharmacies.

*The PBMs Pocket a Substantial Share of the Manufacturers' Secret Payments*

447.   The first way in which the PBMs profit from the Insulin Pricing Scheme is by keeping a significant portion of the secret Manufacturer Payments.

448.   The amount that the Manufacturers pay back to the PBMs has increased over time both in real dollars and as a proportion of the ever-increasing list prices.

449.   Historically, contracts between PBMs and payors allowed the PBMs to keep most or all rebates they received, rather than forwarding them to the payor.

450.   Over time, payors secured contract provisions guaranteeing payment to

---

[170] Karen Van Nuys, et al., *Estimation of the Share of Net Expenditures on Insulin Captured by US Manufacturers, Wholesalers, Pharmacy Benefit Managers, Pharmacies, and Health Plans From 2014 to 2018*, JAMA Network (Nov. 5, 2021), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2785932 (last visited May 7, 2024).

them of all or some portion of the rebates paid by the Manufacturers to the PBMs. Critically, however, "rebates" are only one aspect of the total secret Manufacturer Payments, particularly as "rebates" are narrowly defined and qualified by vague exceptions in the PBM Defendants' contracts with payors.

451.  Indeed, as described in the Senate Insulin Report, the PBMs and Manufacturers coordinate to determine the contract options made available to payors: "Contracts between PBMs and manufacturers provide a menu of options from which their health plan clients can choose certain terms and conditions."[171]

452.  The contracts between the PBMs and Manufacturers also "stipulate terms the plans must follow regarding factors such as formulary placement and competition from other drugs in the therapeutic class."[172] Thus, the Manufacturers ultimately played a role in dictating the terms and conditions of the contracts that payors like Plaintiff entered into with PBMs. Of course, the payors were not involved in the coordination or the negotiation of the contracts between the PBMs and Manufacturers, and the PBMs disclosed only the fact that such relationships may exist. But the terms of the contracts, the consideration exchanged between the PBMs and Manufacturers, and the means of reaching these determinations all were—and remain—shrouded in secrecy.

---

[171] Grassley & Wyden, *supra* note 7 at 40.
[172] *Id.* at 44.

453.   The PBM and Manufacturer Defendants thus created a "hide-the-ball" system where payors like Plaintiff are not privy to rebate negotiations or contracts between the Manufacturers and the PBMs. The consideration exchanged between them (and not shared with payors) is continually labeled and relabeled. As more payors moved to contracts that required PBMs to remit some or all of the manufacturer "rebates" through to the payor, the PBMs rechristened Manufacturer Payments to shield them from scrutiny and from their payment obligations.

454.   Payments once called "rebates" now were termed "administrative fees," "volume discounts," "service fees," "inflation fees," or other industry monikers designed to obfuscate the substantial sums being secretly exchanged between the PBM Defendants and the Manufacturers.

455.   These so-called administrative fees typically are based on a percentage of the drug price—as opposed to a flat fee—such that even if the actual "administrative" cost associated with processing two drugs is the same, the "administrative fee" would be correspondingly higher for the higher-priced drug, which again creates (by design) a perverse incentive to give preference to more expensive drugs. Moreover, the PBM Defendants' contracts with payors narrowly define "rebates" by tying them to patient drug utilization. Thus, rebates for formulary placement (which are not tied to patient drug utilization) are characterized as "administrative fees" that are not remitted to payors. Such payments are beyond a

148

payor's contractual audit rights because those rights are limited to "rebate" payments and these "administrative fees" have been carved out from the definition of "rebates."

456.   The opaque nature of these arrangements between the Manufacturers and PBM Defendants also makes it impossible for a given payor to discover, much less assess or confront, conflicts of interest that may affect it or its members. The Senate Insulin Report observed with respect to these arrangements: "Relatively little is publicly known about these financial relationships and the impact they have on insulin costs borne by consumers."[173]

457.   For example, as to the Manufacturer Payments now known as "inflation fees," the PBMs often create a hidden gap between how much the Manufacturers pay them to increase their prices and the amount in "price protection guarantees" that the PBMs agree to pay back to their client payors.

458.   In particular, the Manufacturer Defendants often pay the PBM Defendants "inflation fees" to increase the price of their diabetes medications. The thresholds for these payments are typically set at around 6% to 8%—if the Manufacturer Defendants raise their prices by more than the set percentage during a specified period, they pay the PBM Defendants an additional "inflation fee" (based

---

[173] Grassley & Wyden, *supra* note 7 at 4.

on a percentage of the list prices).

459.  For many of their clients, the PBMs have separate "price protection guarantees" providing that if the overall drug prices for that payor increase by more than a set amount, then the PBMs will remit a portion of the amount to the client.

460.  The PBMs set these "price protection guarantees" at a higher rate than the thresholds that trigger the Manufacturers' "inflation fees," usually around 10%-15%.

461.  Thus, if the Manufacturers increase their list prices more than the 6% (or 8%) inflation fee rate, but less than the 10%-15% client price protection guarantee rate, then the PBMs keep all of these "inflation fee" payments. This is a win-win for the Manufacturers and PBM Defendants—they share and retain the entire benefit of these price increases while the PBM contracts with payors imply that payors are protected from price hikes by their price protection guarantees.

462.  The PBM Defendants also hide the renamed Manufacturer Payments with "rebate aggregators." Rebate aggregators, sometimes referred to as rebate group purchasing organizations ("GPOs"), are entities that negotiate for and collect payments from drug manufacturers, including the Manufacturer Defendants, on behalf of a large group of pharmacy benefit managers (including the PBM Defendants) and different entities that contract for pharmaceutical drugs.

463.   These rebate aggregators are often affiliated with or owned by the PBM Defendants, such as Ascent Health Services (Express Scripts), Coalition for Advanced Pharmacy Services and Emisar Pharma Services (OptumRx), and Zinc (CVS Caremark).

464.   The PBM Defendants carefully guard the revenue streams from their rebate aggregator activities, concealing them through complex contractual relationships and not reporting them separately in their quarterly SEC filings.

465.   Certain rebate-aggregator companies are located offshore, including, for example, in Switzerland (Express Scripts' Ascent Health) and Ireland (Emisar Pharma Services), thereby precluding adequate oversight.

466.   As summarized by the recent Community Oncology Alliance report:[174]

> PBMs have increasingly "delegated" the collection of manufacturer rebates to "rebate aggregators," which are often owned by or affiliated with the PBMs, without seeking authorization from plan sponsors and without telling plan sponsors. . . . Even some of the major PBMs (i.e., the "Big Three" PBMs) sometimes find themselves contracting with other PBMs' rebate aggregators for the collection of manufacturer rebates In both the private sector and with respect to government health care programs, the contracts regarding manufacturer rebates (i.e., contracts between PBMs and rebate aggregators, as well as contracts between PBMs/rebate aggregators and pharmaceutical manufacturers) are not readily available to plan sponsors.

---

[174] Community Oncology Alliance, *supra* note 120.

467.   For example, a 2017 audit conducted by a local governmental entity on Defendant OptumRx related to its PBM activities from 2013 to 2015 concluded that the auditor was unable to verify the percentage of rebates OptumRx remitted to its client payor because OptumRx would not allow the auditor access to its rebate contracts. The audit report explained:

> Optum[Rx] has stated that it engaged the services of an aggregator to manage its rebate activity. Optum[Rx] shared that under this model, they are paid by their aggregator a certain amount per prescription referred. Then, the aggregator, through another entity, seeks rebates from the drug manufacturers, based upon the referred [Payor Client] prescription utilization, and retains any rebate amounts that may be received. Optum[Rx] states that they have paid [Payor Client] all amounts it has received from its aggregator, and that they do not have access to the contracts between the aggregator (and its contractors) and the manufacturer. However, our understanding is that Optum[Rx] has an affiliate relationship with its aggregator.[175]

468.   A footnote in the audit report clarifies that "Optum[Rx] contracted with Coalition for Advanced Pharmacy Services (CAPS), and CAPS in turn contracted with Express Scripts, Inc."[176]

469.   In other words, according to this report, OptumRx contracts with its own affiliate aggregator Coalition for Advanced Pharmacy Services, who then

---

[175] Laura Rogers & Stacey Thomas, BROWARD COUNTY FLORIDA, AUDIT OF PHARMACY BENEFIT MANAGEMENT SERVICES AGREEMENT, No. 18-13 (Dec. 7, 2017), https://www.broward.org/Auditor/Reports/Documents/2017_1212%20Agenda%20Review%20of%20Ph armacy%20Benefit%20Management%20Services%20by%20StoneBridge/2017_1212%20Exh1_OptumRx .pdf (last visited on May 7, 2024).
[176] *Id.*

contracts with OptumRx's co-conspirator Express Scripts, who then contracts with the Manufacturers for rebates related to OptumRx's client's drug utilization. OptumRx then uses this complex relationship to obscure the amount of Manufacturer Payments that are being generated from its client's utilization.

470.   The January 2021 Grassley-Wyden Senate Report summarizing findings of their two-year probe into the Insulin Pricing Scheme contained the following observation on these rebate aggregators:[177]

> [T]he recent partnership between Express Scripts and Prime Therapeutics may serve as a vehicle to avoid increasing legislative and regulatory scrutiny related to administrative fees by channeling such fees through a Swiss-based group purchasing organization (GPO), Ascent Health. While there are several regulatory and legislative efforts underway to prohibit manufacturers from paying administrative fees to PBMs, there is no such effort to change the GPO safe harbor rules. New arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress.

471.   Because the PBMs are able to retain and conceal a majority of the secret Manufacturer Payments that they receive, they are able to make significant  profits on the Insulin Pricing Scheme.

472.   Even when payor clients receive a portion of the Manufacturer Payments from their PBM, the payors are significantly overcharged, given the extent

---

[177] Grassley & Wyden, *supra* note 7.

to which Defendants have deceptively and egregiously inflated the prices of the at-issue drugs.

*The Insulin Pricing Scheme Allows the PBMs to Profit Off Pharmacies*

473.   A second way the PBM Defendants profit off the Insulin Pricing Scheme is by using the Manufacturers' inflated price to derive profit from the pharmacies with whom they contract, including those in Whitfield County.

474.   Each PBM Defendant decides which pharmacies are included in the PBM's network and how much it will reimburse these pharmacies for each drug dispensed.

475.   The PBMs pocket the spread between the amount that the PBMs are paid by their clients for the at-issue drugs (which are based on the prices generated by the Insulin Pricing Scheme) and the amount the PBM reimburses the pharmacy (which often is less). In other words, the PBMs charge a client like Plaintiff more for a drug than the PBM pays the pharmacy and pockets the difference.

476.   The PBMs' industry-funded trade association PCMA, spent $7.8 million on federal lobbying in 2021 and more $6 million through the third quarter of 2022.[75]

477.   The PBMs often disclose the concept of spread pricing to payors, but only in vague terms that require no accountability and are not subject to the payors'

audit rights because the revenue is not defined as a "rebate" in PBM contracts with payors.

478.   This spread pricing, like the secret Manufacturer Payment negotiation, happens behind closed doors. There is no transparency, no commitment from the PBM Defendants to take into account the cost effectiveness of a drug, and no communication to either the payor or the pharmacy to let them know if they are getting a fair deal.

479.   The higher the Manufacturers' list prices, the more money the PBMs make off this spread. At the same time, a Beneficiary's out-of-pocket co-pay or deductible cost often is more than if the client had simply paid cash outside of his or her plan.

480.   The PBM Defendants also use the Insulin Pricing Scheme to profit from pharmacies by charging the pharmacies post-purchase fees, including DIR (Direct or Indirect Remuneration) fees, based on the list prices—and again, the higher the list price for each diabetes medication sold, the more fees the PBMs generate. They also apply "retrospective" discounts so, for example, a payor's (and member's co-pay or deductible) cost may be $100, but the price may be discounted post-purchase between the PBM and the (often self-owned) pharmacy to $90, with the spread going to the PBM.

*The Insulin Pricing Scheme Increases PBM Mail-Order Profits*

481.   Another way PBM Defendants profit from the Insulin Pricing Scheme is through their mail-order pharmacies. The higher the price that PBM Defendants can get customers, such as Plaintiff, to pay for diabetes medications, the higher the profits PBM Defendants realize through their mail-order pharmacies.

482.   Because the PBMs base the price they charge for the at-issue diabetes medications on the Manufacturers' price, the more the Manufacturers inflate their prices, the more money the PBMs make. For example, the PBMs have colluded with the Manufacturers so that the PBMs often know when the Manufacturers are going to raise their prices. The PBMs use this opportunity to purchase a significant amount of the at- issue drugs prior to the price increase, at the lower rate. Then, after the Manufacturers raise their price, the PBMs charge their mail-order customers based on the higher, increased prices and pocket the difference. The PBMs make significant amounts of money on this arbitrage scheme.

483.   The PBM Defendants also charge the Manufacturer Defendants fees related to their mail-order pharmacies, such as pharmacy supplemental discount fees, that are directly tied to the Manufacturers' price. Once again, the higher the price is, the more money the PBMs make on these fees.

484.   In sum, every way in which the PBMs make money on diabetes medications is tied directly to creating higher prices and inducing larger secret Manufacturer Payments. The PBMs are not lowering the price of diabetes medications as they publicly represent—they are making billions of dollars by fueling these skyrocketing prices.

I.     **Plaintiff Purchased At-Issue Drugs Directly from Defendant Express Scripts**

485.   As a government employer, Plaintiff serves its residents by providing public safety, emergency management, and health services, just to name a few of its vital roles. As more federal and state responsibilities are passed on to local government, Plaintiff has a growing list of obligations with a limited budget. Consequently, any significant increase in spending can have a severe detrimental effect on Plaintiff's overall budget and, in turn, negatively impact its ability to provide essential services to the community.

486.   One of the benefits Plaintiff provides its Beneficiaries is paying for a large portion of their pharmaceutical purchases. In this role, Plaintiff spent significant amounts on the at-issue diabetes medications during the relevant period. Because Plaintiff maintains a self-funded plan, it does not rely on a third-party insurer to pay for its insured's medical care, pharmaceutical benefits, or prescription drugs. Rather, Plaintiff directly contracts with, and directly pays, PBMs (and their affiliated

pharmacies) for pharmaceutical benefits and prescription drugs, including the at-issue medications.

487.   Plaintiff is the only named party that pays the full purchase price for the at- issue drugs, and the only named party that has not knowingly participated in the Insulin Pricing Scheme. Neither the PBMs nor the Manufacturers suffer losses from the Insulin Pricing Scheme. As part of purchasing the at-issue drugs from the PBMs, Plaintiff directly pays the PBMs artificially inflated costs resulting from the Insulin Pricing Scheme, including "administrative fees," "inflation fees," "discounts," and more. Because the Defendants control the market for these life-saving drugs, Plaintiff has no choice but to pay these exorbitant, artificially inflated prices directly to the PBM Defendants.

488.   To administer its health plans' pharmaceutical program, Plaintiff relied on Defendant Express Scripts as its administrative agent, for the supposed purposes of limiting its administrative burden and controlling pharmaceutical drugs costs.

489.   Plaintiff relied on Defendant Express Scripts to provide PBM services to its health plans from 2011 to 2019. These PBM services included developing and offering formularies for Plaintiff's prescription plan, constructing and managing Plaintiff's pharmacy network (which included the PBMs' retail and mail-order pharmacies), processing pharmacy claims, and providing mail-order pharmacy services to Plaintiff.

490.   In providing these services, Defendant Express Scripts—in direct coordination with the Manufacturer Defendants and utilizing the false prices generated by the Insulin Pricing Scheme—determined the amounts Plaintiff paid Express Scripts for the at-issue medications. Plaintiff paid Defendant Express Scripts for the at-issue drugs and paid those PBM Defendants to manage pharmacy benefits related to the at-issue drugs.

## J.    Defendants Deceived Plaintiff

491.   At no time has either Defendant group disclosed the Insulin Pricing Scheme or the false list prices produced by it.

*The Manufacturer Defendants Deceived Plaintiff*

492.   At all times during the relevant period, the Manufacturer Defendants knew that the list prices, net prices, and payors' net costs (purchase prices) generated by the Insulin Pricing Scheme were false, excessive, and untethered to any legal, competitive, or fair-market price.

493.   The Manufacturer Defendants knew that these prices did not bear a reasonable relationship to the actual costs incurred or prices realized by Defendants, did not result from transparent or competitive market forces, and were artificially and arbitrarily inflated for the sole purpose of generating profits for Defendants.

494.  The Manufacturer Defendants also knew that payors, including Plaintiff, relied on the false list prices generated by the Insulin Pricing Scheme to pay for the at- issue drugs.

495.  The Manufacturer and PBM Defendants further knew that Plaintiff— like any reasonable consumer and particularly one with fiduciary obligations to Beneficiaries—wanted and expected to pay a price reflecting the lowest fair market value for the drugs.

496.  Despite this knowledge, the Manufacturer Defendants published list prices generated by the Insulin Pricing Scheme throughout the United States and Georgia through publishing compendia, in various promotional and marketing materials distributed by entities downstream in the drug supply chain, and directly to pharmacies, who then used these prices to set the amount that the pharmacies charged for the at-issue drugs.

497.  The Manufacturer Defendants also publish these prices to the PBMs, who then use them to charge diabetics and payors, like Plaintiff, for the at-issue drugs.

498.  By publishing their prices in every U.S. state, including Georgia, the Manufacturer Defendants held each of these prices out as a reasonable price on which to base the prices payors pay for the at-issue drugs.

499.   These representations are false. The Manufacturer Defendants knew that their artificially inflated list prices were not remotely related to their cost, their fair market value in a competitive market, or the net price received for the at-issue drugs.

500.   During the relevant period, the Manufacturer Defendants published prices in every state within the U.S, including in Georgia, in the hundreds of dollars per dose for the same at-issue drugs that would have been profitable at less than $10 per dose.

501.   The Manufacturer Defendants also have publicly represented that they price the at-issue drugs according to each drug's value to the health care system and the need to fund innovation. For example, briefing materials prepared for CEO Dave Ricks as a panelist at the 2017 Forbes Healthcare Summit included "Reactive Key Messages" on pricing that emphasized the significant research and development costs for insulin. During the relevant period, executives from Sanofi and Novo Nordisk also falsely represented that research and development costs were key factors driving the at-issue price increases.[178]

502.   To the contrary, between 2005 and 2018, Eli Lilly spent $680 million on R&D costs related to Humalog while earning $31.35 billion in *net* sales during that

---

[178] Drug Pricing Investigation, H.R. Comm. On Oversight and Reform, 117th Cong. (2021), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/DRUG%20PRICING%20REPORT%20WITH%20APPENDIX.pdf.

same period. In other words, Eli Lilly made more than 46 times its reported R&D costs on Humalog during this portion of the relevant period, i.e., R&D costs amounted to about 2% of *net* sales (whereas R&D costs for pharmaceuticals typically amount to around 20% of *total* revenues). Novo Nordisk has spent triple the amount it spends on R&D on stock buyouts and shareholder dividend payouts in recent years.[179]

503.   In sum, the Manufacturer Defendants affirmatively withheld the truth from Plaintiff and specifically made misrepresentations in furtherance of the Insulin Pricing Scheme and to induce Plaintiff's reliance to purchase the at-issue drugs.

*The PBM Defendants Deceived Plaintiff*

504.   The PBM Defendants ensured that the Manufacturer Defendants' artificially inflated list prices harmed diabetics and payors by selecting high-priced at-issue drugs for preferred formulary placement and by requiring that their contracts with both pharmacies and with payors include such prices as the basis for payment.

505.   The PBM Defendants perpetuate the use of the artificially inflated insulin prices because it allows them to obscure the actual price any entity in the drug pricing chain is paying for the at-issue drugs. This lack of transparency affords Defendants the opportunity to construct and perpetuate the Insulin Pricing Scheme,

---

[179] *Id.*

and to profit therefrom at the expense of Georgia payors, including Plaintiff.

506.   Throughout the relevant time period, the PBMs have purposefully and consistently misrepresented that they negotiate with Manufacturer Defendants and construct formularies for the benefit of payors and patients to lower drug prices of the at- issue drugs and by promoting the health of diabetics. Representative examples include:[180]

- Defendant CVS Caremark has consistently stated in its annual reports that its design and administration of formularies are aimed at reducing the costs and improving the safety, effectiveness and convenience of prescription drugs. CVS Caremark has further stated that it maintains an independent panel of doctors, pharmacists and other medical experts to review and approve the selection of drugs based on safety and efficacy for inclusion on one of Caremark's template formularies and that CVS Caremark's formularies lower the cost of drugs.

- Likewise, Defendant Express Scripts has consistently represented that it works with clients, manufacturers, pharmacists and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain and to improve members' health outcomes.

- Similarly, Defendant OptumRx has consistently stated in its annual reports over the past decade that OptumRx's rebate contracting and formulary management assist customers in achieving a low-cost, high-quality pharmacy benefit. It has consistently claimed that it promotes lower costs by using formulary programs to produce better unit costs, encouraging patients to use drugs that offer improved value and that OptumRx's formularies are selected for health plans based on

---

[180] CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2010-2019); OptumRx, Annual Reports (Form 10-K) (Dec. 31, 2010-2019); Express Scripts, Annual Reports (Form 10-K) (Dec. 31, 2010-2019).

their safety, cost and effectiveness.

507.   In addition to these general misrepresentations, the PBM Defendants have during and throughout the relevant period purposefully and consistently made misrepresentations about the at-issue medications. Representative examples include:

- In a public statement issued in November 2010, CVS Caremark represented that it was focused on diabetes to "help us add value for our PBM clients and improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures."[181]

- In 2010, Andrew Sussman, Chief Medical Officer of CVS Caremark, stated on national television that "CVS is working to develop programs to hold down [diabetes] costs."[182]

- In a public statement issued in November 2012, CVS Caremark represented that formulary decisions related to insulin products "is one way the company helps manage costs for clients."[183]

- In 2016, Glen Stettin, SVP and Chief Innovation Officer at Express Scripts, said in an interview with a national publication that "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease."[85]   Mr. Stettin claimed that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently

[181] CHAIN DRUG REVIEW, *CVS Expands Extracare for Diabetes Products* (May 11, 2010), https://www.chaindrugreview.com/cvs-expands-extracare-for-diabetes-products/ (last visited on May 7, 2024).

[182] CBS NEWS, *Diabetes Epidemic Growing* (June 22, 2010, 11:29 AM), https://www.cbsnews.com/news/diabetes-epidemic-growing/ (last visited May 7, 2024).

[183] Jon Kamp & Peter Loftus, *CVS' PBM Business Names Drugs It Plans to Block Next Year*, WSJ (Nov. 8, 2012), https://www.wsj.com/articles/SB10001424127887324439804578107040729812454 (last visited May 7, 2024).

the costliest class of traditional prescription drugs."[184]

- In a 2018 Healthline interview, Mark Merritt, President of the PBM trade association PCMA represented that: "[Through their formulary construction], PBMs are putting pressure on drug companies to reduce insulin prices."[185]

- CVS Caremark's Chief Policy and External Affairs Officer claimed in the April 2019 hearings that CVS Caremark "has taken a number of steps to address the impact of insulin price increases. We negotiate the best possible discounts off the manufacturers' price on behalf of employers, unions, government programs, and beneficiaries that we serve."[186]

- Sumit Dutta, SVP and Chief Medical Officer of OptumRx, testified to Congress that for "insulin products . . . we negotiate with brand manufacturers to obtain significant discounts off list prices on behalf of our customers."[187]

- The PCMA's website acknowledges the insulin market is consolidated, hindering competition and limiting alternatives, leading to higher list prices on new and existing brand insulins, but then misleadingly claims that "PBMs work to lower insulin costs."[188]

508.    The PBM Defendants not only falsely represent that they

negotiate with the Manufacturer Defendants to lower the price of the at-issue

---

[184] Angela Mueller, *Express Scripts Launches Program to Control Diabetes Costs,* St. Louis Bus. J. (Aug. 31, 2016), https://www.bizjournals.com/stlouis/news/2016/08/31/express-scripts-launches-program-to-control.html (last visited May 7, 2024).

[185] Dave Muoio, *Insulin Prices: Are PBMs and Insurers Doing Their Part?*, POPULATION HEALTH LEARNING NETWORK (Dec. 2016), https://www.hmpgloballearningnetwork.com/site/frmc/article/insulin-prices-are-pbms-and-insurers-doing-their-part (last visited May 7, 2024).

[186] *Priced Out of a Lifesaving Drug, supra* note 127.

[187] *Id.*

[188] PCMA, *PCMA on National Diabetes Month: PBMs Lowering Insulin Costs, Providing Support to Patients* (Nov. 16, 2020), https://www.pcmanet.org/pcma-on-national-diabetes-month-pbms-lowering-insulin-costs-providing-support-to-patients/(last visited May 7, 2024); VISANTE, *Insulins: Managing Costs with Increasing Manufacturer Prices* (Aug. 2020), https://www.pcmanet.org/wp-content/uploads/2020/08/PCMA_Visante-Insulins-Prices-and-Costs-.pdf (last visited May 7, 2024).

diabetes medications for *payors*, but also for diabetic *patients* as well.

Representative examples include:

- Express Scripts' code of conduct, effective beginning in 2015, states: "At Express Scripts we're dedicated to keeping our promises to *patients and* clients . . . This commitment defines our culture, and all our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable."[189] (emphasis added)

- Amy Bricker—former President of Express Scripts and PCMA board member—testified to Congress in April 2019: "At Express Scripts we negotiate lower drug prices with drug companies on behalf of our clients, *generating savings that are returned to patients* in the form of lower premiums and reduced out-of-pocket costs."[190] (emphasis added)

- OptumRx CEO John Prince testified to the Senate: "We *reduce the costs of prescription drugs* [and] we are leading the way to ensure that *those* discounts *directly benefit consumers* ...OptumRx's pharmacy care services business is *achieving better health outcomes for patients*, *lowering costs* for the system, and *improving the healthcare experience for consumers*. . . .OptumRx negotiates better prices with drug manufacturers *for our customers and for consumers*.[191] (emphasis added)

- In its 2017 Drug Report, CVS Caremark stated that the goal of its pharmacy benefit plans is to ensure "that the cost of a drug is aligned with the value it delivers in terms of patient outcomes...in 2018, we are doing even more to help keep drugs affordable with our new Savings Patients Money initiative."[192]

---

[189] Express Scripts, *Code of Conduct* at 4, https://www.express-scripts.com/aboutus/codeconduct/ExpressScriptsCodeOfConduct.pdf (last visited May 7, 2024).
[190] *Priced Out of a Lifesaving Drug*, *supra* note 127.
[191] Grassley & Wyden, supra note 7—Hearing Transcript at 175, https://www.finance.senate.gov/imo/media/doc/435631.pdf (last visited May 7, 2024).
[192] CVS HEALTH, *2017 Drug Trend Report* (Apr. 5, 2018), https://s2.q4cdn.com/447711729/files/doc_downloads/company_documents/2017-drug-trend-report.pdf (last visited May 7, 2024).

- The PCMA website touts PBMs as "the only entity in the prescription drug supply and payment chain dedicated to reducing drug costs" and (contradicting the PBM representatives' Congressional testimony), that "when new manufacturers enter the market at a lower list price, PBMs use the competition to drive costs down."[193]

509.    Not only have the PBM Defendants intentionally misrepresented that they use their market power to save payors money, but they have specifically and falsely disavowed that their conduct drives prices higher. Representative examples include:

- On an Express Scripts' earnings call in February 2017, CEO Tim Wentworth stated: "Drugmakers set prices, and we exist to bring those prices down."[194]

- Larry Merlo, head of CVS Caremark sounded a similar refrain in February 2017: "Any suggestion that PBMs are causing prices to rise is simply erroneous."[195]

- In 2017, Express Scripts' Wentworth went on CBS News to argue that PBMs play no role in rising drug prices, stating that PBMs work to "negotiate with drug companies to get the prices down."[196]

- When asked by Congress if PBM-negotiated rebates and discounts were causing the insulin price to increase,

---

[193] PCMA, *PBMs Reduce Insulin Costs: PBMs are working to improve the lives of patients living with diabetes and their families,* https://www.pcmanet.org/insulin-managing-costs-with- increasing-manufacturer-prices/ (last visited May 7, 2024).
[194] Samantha Liss, *Express Scripts CEO Addresses Drug Pricing 'Misinformation',* ST. LOUIS POST-DISPATCH (Feb. 17, 2017), https://www.stltoday.com/business/local/express-scripts-ceo-addresses-drug-pricing-misinformation/article_8c65cf2a-96ef-5575-8b5c-95601ac51840.html (last visited May 7, 2024).
[195] Lynn R. Webster, *Who Is To Blame For Skyrocketing Drug Prices?*, THE HILL (July 27, 2017, 11:40 AM), https://thehill.com/blogs/pundits-blog/healthcare/344115-who-is-to-blame-for-skyrocketing-drug-prices (last visited May 7, 2024).
[196] CBS NEWS, *Express Scripts CEO Tim Wentworth Defends Role of Pbms in Drug Prices* (Feb 7, 2017), https://www.cbsnews.com/news/express-scripts-tim-wentworth-pbm-rising-drug-prices-mylan-epipen-heather-bresh/ (last visited May 7, 2024).

OptumRx's Sumit Dutta answered, "we can't see a correlation when rebates raise list prices."[197]

- In 2019, when testifying Congress on the rising price of insulins, Amy Bricker—then with Express Scripts—testified, "I have no idea why the prices [for insulin] are so high, none of it is the fault of rebates."[198]

510.   All of the PBM Defendants' public statements regarding insulin pricing have been consistent with the misrepresentations above (and those detailed below). None has contradicted those misrepresentations and none has revealed the Insulin Pricing Scheme.

511.   Although Plaintiff's employees responsible for managing Plaintiff's health plans were not following the various Congressional hearings when they occurred and were not exposed to all of the misrepresentations detailed above (or all of those detailed below), all public pronouncements by Defendants were consistent with those misrepresentations.

512.   Throughout the relevant period, the PBM Defendants have consistently and repeatedly represented that: (1) their interests are aligned with their payor clients; (2) they work to lower the price of the at-issue drugs and, in doing so, achieve substantial savings for diabetics and payors; and (3) that monies they receive from manufacturers and their formulary choices are for the benefit of payors and diabetics.

---

[197] *Priced Out of a Lifesaving Drug*, *supra* note 127.
[198] *Id.*

513.   The PBM Defendants understand that payors like Plaintiff rely on the PBMs to achieve the lowest prices for the at-issue drugs and to construct formularies designed to improve access to medications. Plaintiff did so.

514.   Throughout the relevant period, the PBM Defendants also falsely claimed they are transparent about the Manufacturer Payments and that the amounts remit (or not) to payors. In fact, the PBM Defendants' disclosures of their ties to the Manufacturer Defendants were vague and equivocal. Their manner of defining "rebates" in payor contracts was illusory and subject to indeterminate conditions and exceptions. The PBM Defendants thereby facilitated and obtained secret Manufacturer Payments far above and beyond the amount of "rebates" remitted to payors.

515.   The PBM Defendants' internal processes and accounting were and are abstruse and opaque, allowing them to overtly mislead the public and payors like Plaintiff.

516.   In 2011, for example, OptumRx's President stated: "We want our clients to fully understand our pricing structure . . . [e]very day we strive to show our commitment to our clients, and one element of that commitment is to be open and honest about our pricing structure."[199]

---

[199] Fierce Pharma, *Prescription Solutions by OptumRx Receives 4th Consecutive TIPPS Certification for Pharmacy Benefits Transparency Standards* (Sept. 13, 2011),

517.   In a 2017 CBS News interview, Express Scripts' CEO represented, among other things, that Express Scripts was "absolutely transparent" about the Manufacturer Payments they receive and that payors "know exactly how the dollars flow" with respect to these Manufacturer Payments.[200]

518.   When testifying before the Senate Finance Committee, CVS Executive Vice President Derica Rice stated, "[A]s it pertains to transparency overall, we at CVS Caremark are very supportive. We provide full visibility to our clients of all our contracts and the discounts that we negotiate on their behalf      And transparency—today we report and fully disclose not only to our clients, but to CMS [Medicare]."[201]

519.   Testifying at the same hearing, Steve Miller of Cigna (Express Scripts) claimed "we are a really strong proponent for transparency for those who pay for health care. So the patient should know exactly what they are going to pay. Our plan sponsors should know exactly what is in their contract."[202]

520.   John Prince of OptumRx chimed in, "Senator, if our discounts were publicly available, it would hurt our ability to negotiate effectively. Our discounts

---

https://www.fiercepharma.com/pharma/prescription-solutions-by-optumrx-receives-4th-consecutive-tippssm-certification-for.

[200] CBS NEWS, *Express Scripts CEO Tim Wentworth Defends Role of Pbms in Drug Prices* (Feb 7, 2017), https://www.cbsnews.com/news/express-scripts-tim-wentworth-pbm-rising-drug-prices-mylan-epipen-heather-bresh/ (last visited May 7, 2024).

[201] Grassley & Wyden, supra note 7—Hearing Transcript at 28, 32, https://www.finance.senate.gov/imo/media/doc/ 435631.pdf (last visited May 7, 2024).

[202] *Id.* At 32.

are transparent to our clients."[203]

521.  When testifying before Congress in April 2019, Amy Bricker, then a Senior Vice President of Defendant Express Scripts, touted transparency with payors and echoed Mr. Prince's need for confidentiality around discounts:[204]

> Ms. Bricker. The rebate system is 100 percent transparent to the plan sponsors and the customers that we service. To the people that hire us, employers of America, the government, health plans, what we negotiate for them is transparent to them. . . The reason I'm able to get the discounts that I can from the manufacturer is because it's confidential [to the public].
>
> Mr. Sarbanes. Yeah, because it's a secret. What about if we made it completely transparent? Who would be for that?
>
> Ms. Bricker. Absolutely not . . . [i]t will hurt the consumer..…
>
> Mr. Sarbanes: I don't buy it.
>
> Ms. Bricker: Prices will be held high.

522.  During the relevant period—as seen above—PBM Defendants represented to Plaintiff that they constructed formularies and negotiated with the Manufacturer Defendants for the benefit of payors and patients to maximize drug cost savings while promoting the health of diabetics.

523.  Throughout the relevant period, the PBMs consistently made similar misrepresentations directly to Georgia payors, including Whitfield County, through

---

[203] *Id.*

[204] *Priced Out of a Lifesaving Drug*, *supra* note 127.

bid proposals, member communications, invoices, formulary change notifications, and through extensive direct-to-consumer pull through efforts engaged in with the Manufacturers.

524. These representations were false—the Manufacturer and PBM Defendants in fact coordinated to publish the false prices and to construct the PBM formularies, causing the price of the at-issue drugs to skyrocket. For example:

a.    In 2018, the U.S. spent $28 billion (USD) on insulin compared with $484 million in Canada. The average American insulin user spent $3490 on insulin in 2018 compared with $725 among Canadians.[205]

b.    Diabetics who receive their medications from federal programs that do not utilize PBMs also pay significantly less. In December 2020, the United States House of Representatives Committee on Oversight and Reform issued a Drug Pricing Investigation Report finding that federal health care programs that negotiate directly with the Manufacturers (such as the Department of Veterans Affairs), and thus are outside the PBM Defendants' scheme, paid $16.7 billion less from 2011 through 2017 for the at-issue drugs than the Medicare Part D program, which relies on the PBM Defendants to set their at-issue drug

---

[205] Tyler Schneider *et al.*, *Comparisons of Insulin Spending and Price Between Canada and the United States,* MAYO CLINIC PROCEEDINGS (Mar. 1, 2022), https://www.mayoclinicproceedings.org/article/S0025-6196(21)00883-1/fulltext#relatedArticles (last visited on May 7, 2024).

prices.[206]

525.    Defendants knew their representations were false when they made them and coordinated to affirmatively withhold the truth from payors, including Plaintiff.

526.    Defendants concealed the falsity of their representations by closely guarding their pricing negotiations, structures, agreements, sales figures, and the flow of money and other consideration between them.

527.    The Defendants have never revealed the full amount of any drug-specific Manufacturer Payments exchanged between them. Despite the claims of transparency to Plaintiff and to the public and despite Plaintiff's contracts with Express Scripts, Plaintiff does not know, and cannot learn, of the full extent of the Manufacturer Payments and other agreements between PBMs and the Manufacturer Defendants.

528.    The PBM Defendants do not disclose the terms of the agreements they make with the Manufacturers or the Manufacturer Payments they receive. Nor do they disclose the details related to their agreements (formal or otherwise) with pharmacies. All of these revenue streams are beyond the scope of the payors' contractual audit rights.

---

[206] Fraiser Kansteiner, *Lawmakers blast pharma for 'outrageous' prices and 'anticompetitive conduct' in culmination of 3-year probe,* FiercePharma (Dec 10, 2021 10:19am) https://www.fiercepharma.com/pharma/house-oversight-committee-blasts-pharma-for-outrageous-prices-and-anticompetitive-conduct (last visited May 7, 2024).

529.   Further, although PBMs negotiate drug-specific rebates with Manufacturers, the PBM rebate payments to payor clients and summaries of such payments are in the aggregate, rather than on a drug-by-drug basis. It is impossible for payors like Plaintiff to tease out drug-specific rebates, much less the other undisclosed Manufacturer Payments. This allowed the PBM Defendants to hide the large Manufacturer Payments that they receive for the at-issue diabetes medications.

530.   The PBM Defendants have gone so far as to sue governmental entities to block the release of details on their pricing agreements with the Manufacturers and pharmacies.[207]

531.   Even when audited by payors, the PBM Defendants routinely refuse to disclose their agreements with the Manufacturers and pharmacies by relying on overly broad confidential agreements and claims of trade secrets and by erecting other unnecessary roadblocks and restrictions.

532.   Diabetic beneficiaries of the Plaintiff's health plans have no choice but to pay prices flowing from Defendants' inflated list prices because Beneficiaries need these medications to survive and the Manufacturer Defendants make virtually all diabetes medications available in the United States. The list prices generated by the

---

[207] Catherine Candisky, *CVS Sues State to Block Release of Report On Its Drug Pricing*, THE COLUMBUS DISPATCH (July 16, 2018), https://www.dispatch.com/story/news/politics/state/2018/07/16/cvs-sues-state-to-block/11496453007/ (last visited May 7, 2024).

Defendants' coordinated efforts directly impact out-of-pocket costs at the point of sale.

533.   In sum, the entire insulin pricing structure created by the Defendants—from the false prices to the Manufacturers' misrepresentations related to the reasons behind the prices, to the inclusion of the false prices in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBMs' representations that they work to lower prices and promote the health of diabetics—is unconscionable, deceptive, and immensely lucrative.

534.   Plaintiff did not know, because the Defendants affirmatively concealed, (1) that the Manufacturers and PBMs coordinated to create the PBM formularies in exchange for money and other consideration; (2) that the list prices were falsely inflated; (3) that the list prices were manipulated to satisfy PBM profit demands; (4) that the list prices and net costs (purchase prices) paid by Plaintiff bore no relationship to the fair market value of the drugs themselves or the services rendered by the PBMs in coordinating their pricing; or (5) that the entire insulin pricing structure Defendants created was false.

### K.    The Insulin Pricing Scheme Has Damaged Plaintiff

535.   Plaintiff provides health and pharmacy benefits to its Beneficiaries, including employees, retirees, and their dependents.

536.   One of the benefits that Plaintiff offers its Beneficiaries through its employee health plans is payment of a significant portion of the Beneficiaries' prescription drug purchases.

537.   Plaintiff has for years interacted with and/or engaged in business with the PBM Defendants concerning pharmacy services and the at-issue diabetes medications.

538.   From 2011 to 2019, Plaintiff had a PBM service agreement in place with Defendant Express Scripts.

539.   At all of these points in time, Plaintiff was unaware of the Insulin Pricing Scheme.

540.   Plaintiff relied on Defendants' statements and material omissions made in furtherance of the Insulin Pricing Scheme.

541.   Plaintiff relied on Defendants' misrepresentations in paying for the at-issue diabetes medications at prices that would have been lower but for the Insulin Pricing Scheme.

542.   During the relevant period, Plaintiff has spent millions of dollars on the at-issue diabetes medications.

543.   Defendant Express Scripts failed to adhere to principles of good faith and fair dealing in carrying out its PBM contracts with Plaintiff. Its relationship with

Plaintiff was and is inherently unbalanced and its contracts adhesive. Express Scripts has had superior bargaining power and superior knowledge of its relationships with the Manufacturer Defendants, including those that ultimately dictate the drug costs Plaintiff incurred. Although Defendants were supplying a vital service of a quasi-public nature, they both exploited their superior positions to mislead Plaintiff and thwart its expectations, all at great expense to Plaintiff.

544. The Defendants' misrepresentations, omissions, and misconduct—including and as manifested in the Insulin Pricing Scheme—directly and proximately caused economic damage to Plaintiff as a payor/purchaser of Defendants' at-issue medications.

545. A substantial proportion of the money Plaintiff spent on diabetes medications is attributable to Defendants' inflated prices, which did not arise from competitive market forces but, instead, arise directly from the Insulin Pricing Scheme.

546. Because of Defendants' success in concealing the Insulin Pricing Scheme through act and omission, no payor, including Plaintiff, knew, should have known, or could have known during the relevant period that the prices for the at-issue diabetes medications were (and remain) artificially inflated due to the Defendants' scheme.

547.  As a result, despite receiving some rebates and incurring drug costs based on discounts off list prices, Plaintiff has unknowingly overpaid for the Manufacturer Defendants' diabetes medications, which would have cost less but for the Insulin Pricing Scheme.

548.  In short, the Insulin Pricing Scheme has directly and proximately caused Plaintiff to substantially overpay for diabetes medications.

549.  Because Defendants continue to generate exorbitant, unfair, and deceptive prices for the at-issue drugs through the Insulin Pricing Scheme, the harm to Plaintiff is ongoing.

**L.   Defendants' Recent Efforts in Response to Rising Insulin Prices**

550.  In reaction to mounting political and public outcry, Defendants have taken action both on Capitol Hill and in the public relations space.

551.  First, in response to public criticism, Defendants have increased their spending to spread their influence in Washington D.C.

552.  For example, in recent years Novo Nordisk's political action committee ("PAC") has doubled its spending on federal campaign donations and lobbying efforts. In 2017 alone, Novo Nordisk spent $3.2 million lobbying Congress and federal agencies, its biggest ever investment in directly influencing U.S. policymakers. Eli Lilly and Sanofi also have contributed millions of dollars through

their PACs in recent years.[208]

553.  Second, Defendants have recently begun publicizing programs ostensibly aimed at lowering the cost of insulins.

554.  These affordability measures fail to address the structural issues that caused the price hikes. Rather, these are public relations measures that do not solve the problem.

555.  For example, in March 2019, Defendant Eli Lilly announced that it would produce an authorized generic version of Humalog, "Insulin Lispro," and promised that it would "work with supply chain partners to make [the authorized generic] available in pharmacies as quickly as possible."[209]

556.  However, in the months after Eli Lilly's announcement, reports raised questions about the availability of "Insulin Lispro" in local pharmacies.

557.  Following this the staff of the Offices of U.S. Senators Elizabeth Warren and Richard Blumenthal prepared a report examining the availability of this drug. The investigative report, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, concluded that Eli Lilly's lower-priced, authorized

---

[208] Jay Hancock, *et al.*, *Novo Nordisk Chastised for Hiking Insulin Prices, Makes a Textbook Response: More Lobbying*, PHILA. INQUIRER (Apr. 30, 2018), https://www.inquirer.com/philly/business/novo-nordisk-insulin-lobbying-prices-20180430.html  (last visited May 7, 2024).
[209] Eli Lilly, *Eli Lilly to Introduce Lower-Priced Insulin,* (March 4, 2019), https://investor.lilly.com/news-releases/news-release-details/lilly-introduce-lower-priced-insulin (last visited May 7, 2024).

generic insulin is widely unavailable in pharmacies across the country, and that the company has not taken meaningful steps to increase insulin accessibility and affordability.[210]

558.   Eli Lilly did lower the price of Lispro by 40% effective January 1, 2022; but it is not included in any of the PBM Defendants' formularies as of January 2023.

559.   In 2019, Novo Nordisk partnered with Walmart to offer ReliOn brand insulins for a discounted price at Walmart. However, experts have warned that the Walmart/Novo Nordisk insulins are not substitutes for most diabetics' regular insulins and should only be used in an emergency or when traveling. In particular, for many diabetics, especially Type 1 diabetics, these insulins can be dangerous. In any event, ReliOn is not included in any of the PBM Defendants' formularies as of January 2023.

560.   Thus, Defendants' "lower priced" insulin campaigns have not addressed the problem and the PBMs continue to exclude drugs with lower list prices despite their assurances of cost-savings for payors and Beneficiaries. Plaintiff continues to suffer great harm as a result of the Insulin Pricing Scheme.

561.   Most recently, the Manufacturers announced they will reduce the prices

---

[210] Sen. Elizabeth Warren & Sen. Richard Blumenthal, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, (Dec. 2019), https://www.fdanews.com/ext/resources/files/2019/12-16-19-InaccessibleInsulinreport.pdf?1576536304.

of certain insulin and analog drugs with Price Cuts set to take effect in late 2023 and 2024. As explained above however, these Price Cuts are insufficient and will not mitigate Plaintiff's past damages or prevent further losses moving forward.

## V.   TOLLING OF THE STATUTES OF LIMITATIONS

562.   Plaintiff has diligently pursued and investigated its claims. Through no fault of its own, Plaintiff did not learn and—given Defendants coordinated, successful efforts to mislead Plaintiff—could not until recently have learned the factual bases for its claims or the injuries suffered therefrom. Consequently, the following tolling doctrines apply.

## A.    Discovery Rule

563.   Plaintiff was not aware of the Insulin Pricing Scheme until shortly before filing this Complaint. Plaintiff was unaware that it was economically injured and unaware that any economic injury was wrongfully caused. Nor did Plaintiff possess sufficient information concerning the injury complained of here, or its cause, to put Plaintiff or any reasonable person on notice that actionable conduct might have occurred.

564.   The PBM and Manufacturer Defendants refused to disclose the actual prices of diabetes medications realized by Defendants or the details of the Defendants' negotiations and payments between each other or their pricing structures and agreements—Defendants labeled these trade secrets, shrouded them

in confidentiality agreements, and circumscribed payor audit rights to protect them.

565.   Each Defendant group affirmatively and fraudulently blamed the other for the price increases described herein, both during their Congressional testimonies and through the media. All disavowed wrongdoing and falsely claimed that their dealings with payors like Plaintiff were honest and transparent.

566.   Plaintiff did not discover and could not have discovered until shortly before filing this Complaint facts sufficient to cause it or any reasonable person to suspect that Defendants were engaged in the Insulin Pricing Scheme or that Plaintiff had suffered economic injury as a result of any or all Defendants' wrongdoing. Given Defendants' individual and coordinated efforts to obscure and conceal their misconduct, earlier diligent inquiry would not have disclosed the true facts had Plaintiff been aware of any cause to undertake such an inquiry.

567.   Even today, lack of transparency in the pricing of diabetes medications and the arrangements, relationships, and agreements between and among the Manufacturer Defendants and the PBM Defendants, i.e., the Insulin Pricing Scheme, continue to obscure the full extent of Defendants' unlawful conduct from Plaintiff and the general public.

568.   For these reasons, the applicable statutes of limitations have been tolled by operation of the discovery rule with respect to claims identified herein.

## B.   Fraudulent Concealment

569.   Through the acts, omissions, and representations alleged throughout this Complaint, Defendants individually and through their conspiracy fraudulently concealed the fact of Plaintiff's economic injury and its cause.

570.   Defendants cannot rely upon any statute-of-limitations defense because they purposefully concealed the Insulin Pricing Scheme, their generation of false list prices, and the fact that the prices for the at-issue diabetes medications were artificially inflated. The Defendants deliberately concealed their behavior and active role in the Insulin Pricing Scheme and other unlawful conduct.

571.   Defendants' acts, omissions and representations were calculated to lull and induce payors, including Plaintiff, into forbearing legal action or any inquiry that might lead to legal action. Defendants' acts, omissions, and representations were intended to and in fact did prevent Plaintiff from discovering operative facts supporting its claims.

572.   Defendants knowingly and fraudulently concealed the facts alleged herein. Defendants knew of the wrongful acts set forth above, had information pertinent to their discovery, and concealed them from the public. As a result of Defendants' conduct, Plaintiff did not know, and could not have known through the exercise of reasonable diligence, of the existence or scope of the Insulin Pricing Scheme or of Plaintiff's causes of action.

573.   Defendants continually and secretly engaged in the Insulin Pricing Scheme. Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct. As a result of the above, Plaintiff was unable to obtain vital information bearing on its claims absent any fault or lack of diligence on its part.

574.   As alleged herein, and among other things, Defendants affirmatively concealed: (a) that the Manufacturers and PBMs coordinated to create the PBM formularies in exchange for money and other consideration; (b) that the list prices were falsely inflated and manipulated; (c) that the list prices and net costs (purchase prices) paid by payors and patients bore no relationship to the fair market value of the drugs themselves or the services rendered by the PBMs in coordinating their pricing; (d) that the at-issue insulin drugs were selected for inclusion or preferred status on the formularies based on higher prices (and greater potential revenues for Defendants) rather than because of cost-effectiveness or because they were beneficial to payors' Beneficiaries; (e) the exchange of various payments and pricing agreements between the Manufacturers and PBMs; or (f) that the entire insulin pricing structure Defendants created was false.

575.   As alleged more fully herein, the PBM Defendants have blocked drug pricing transparency efforts.

576. As alleged more fully herein, the Manufacturer Defendants have testified to Congress that they were not responsible for skyrocketing insulin prices, claiming that they had no control over the pricing, blaming the PBM Defendants for the high prices, and suggesting that they have not profited from astronomical insulin prices.

577. Meanwhile, the PBM Defendants testified to Congress that the Manufacturer Defendants were solely responsible for the list price increases and that the payments that the PBMs receive from the Manufacturer Defendants are unrelated to rising insulin prices.

578. As alleged herein, the PBM Defendants concealed the Insulin Pricing Scheme through vague and manipulable definitions of terms in their contracts, including by hiding the fees that the Manufacturer Defendants paid to the PBM Defendants and which the PBM Defendants retained and did not pass along to payors as Rebates.

579. The PBM Defendants also concealed payments they received from the Manufacturer Defendants through their affiliated rebate aggregators, hiding them in complex contractual relationships—often with other Defendants—and not reporting them on their quarterly SEC filings.

580.   Defendants coordinated to affirmatively withhold the truth about the Insulin Pricing Scheme from payors, including Plaintiff, patients, and the public and concealed the falsity of representations made to payors, including Plaintiff, by closely guarding their pricing negotiations, structures, agreements, sales figures, and the flow of money and other consideration between them.

581.   Plaintiff did not know, and could not reasonably have discovered, the full extent of agreements between the PBM Defendants and the Manufacturer Defendants or payments the Manufacturer Defendants made to the PBMs because Defendants actively concealed these agreements and payments.

582.   Despite the claims of transparency made to payors, including Plaintiff, and to the public, Defendants have never revealed the full amount of drug-specific payments they have exchanged or received. Payors, including Plaintiff, and patients reasonably relied on Defendants' claims of transparency.

583.   Defendants intended that their actions and omissions would be relied upon by the public, to include payors and patients. Plaintiff did not know, and did not have the means to know, the truth due to Defendants' actions and omissions.

584. Payors, including Plaintiff, and patients reasonably relied on Defendants' affirmative statements to Congress and the public, and in contracts between PBMs and their clients, that Defendants were working to lower insulin

prices and provide payors with cost savings.

585.  The purposes of the statute of limitations are satisfied because Defendants cannot claim any prejudice due to an alleged late filing where the Plaintiff filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendants knowingly concealed.

586.  In light of the information set forth above, it is clear that Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein.

587.  Accordingly, all applicable statutes of limitation have been tolled.

C.    **Equitable Estoppel & Equitable Tolling**

588.  Defendants were under a continuous duty to disclose to Plaintiff the true character, quality, and nature of the prices upon which payments for diabetes medications were based, and the true nature of the services being provided—all of which would be and are now material to Plaintiff.

589.  Instead of disclosing these facts, Defendants knowingly misrepresented and concealed them with a reasonable expectation that Plaintiff would act upon the misrepresentations and omissions.

590.  Being unaware of the true facts, being unaware of the economic harm it was suffering, and having no cause to inquire further, Plaintiff did indeed rely in good

faith to its detriment on Defendants' misrepresentations and omissions.

591.   In short, through Defendants' acts, omissions, and representations as alleged throughout this Complaint, Defendants knowingly misrepresented and concealed material facts with the expectation that Plaintiff would act upon them and would be misled thereby, which Plaintiff did in good faith and to its detriment.

592.   Accordingly, Defendants are equitably estopped from relying on any statutes of limitations in defense of this action and all statutes of limitations have been equitably tolled.

**D.   Continuing Violations**

593.   Defendants' acts, omissions, and misrepresentations alleged throughout this Complaint have continued to the present day.

594.   Defendants' systematic misconduct constitutes a continuous, unbroken violation of the law that has caused, and continues to cause, continuous economic harm to Plaintiff.

595.   Had Defendants at any time ceased their wrongful conduct, further injury would have been avoided

596.   Accordingly, all applicable statutes of limitations are tolled.

## VI.   CLAIMS FOR RELIEF
### Count One

### Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1962(c)
(Against All Defendants)

597.   Plaintiff re-alleges and incorporates by reference all of the allegations in the preceding paragraphs 1-596.

598.   Plaintiff brings this count against all Defendants for violations of 18 U.S.C. § 1962(c).

599.   Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark are (1) culpable "persons" who (2) willfully and knowingly (3) committed and conspired to commit two or more acts of mail and wire fraud (4) through a "pattern" of racketeering activity that (5) involves an "association in fact" enterprise, (6) the results of which had an effect on interstate commerce.

A.   **Defendants Are Culpable "Persons" Under RICO**

600.   Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark, separately, are "persons" as that term is defined in 18 U.S.C. § 1961(3) because each is capable of holding a legal or beneficial interest in property.

189

601.   Each one of Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark are separate entities and "persons" that are distinct from the RICO enterprises alleged below.

**B.     The Manufacturer–PBM RICO Enterprises**

602.   For the purposes of this claim, the RICO enterprises are nine separate associations-in-fact each consisting of one of each of the PBM Defendants and one of each of the Manufacturer Defendants, including those entities' directors, employees, and agents: They are the Eli-Lilly-CVS Caremark Enterprise; the Eli Lilly-Express Scripts Enterprise; the Eli Lilly-OptumRx Enterprise;the Sanofi-CVS Caremark Enterprise; the Sanfoi-OptumRx Enterprise; the Sanofi-Express Scripts Enterprise; the Novo Nordisk-Express Scripts Enterprise; the Novo Nordisk-Optum Rx Enterprise; and the Novo Nordisk-CVS Caremark Enterprise.

603.   These association-in-fact enterprises are collectively referred to herein as the "Manufacturer–PBM Enterprises."

604.  Each Manufacturer–PBM Enterprise is a separate, ongoing, and continuing business organization consisting of corporations and individuals associated for the common purpose of manufacturing, selling, and facilitating the purchase of the Manufacturer Defendants' products, including the at-issue drugs. For example:

a.      Each of the three Eli Lilly enterprises associates for the common purpose of

manufacturing, selling, distributing, and facilitating the purchase of Eli Lilly medications including Prozac, Cymbalta, and Zyprexa, as well as the at-issue Eli Lilly insulin and insulin-analog medications (Trulicity, Humulin N, Humulin R, Humalog, and Basaglar), which are Eli Lilly's primary source of revenue.

b. Each of the three Novo Nordisk enterprises associates for the common purpose of manufacturing, selling, distributing, and facilitating the purchase of Novo Nordisk medications for the treatment of obesity, hemophilia, and hormone imbalance, as well as the at-issue Novo Nordisk insulin and insulin-analog medications (Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic), which account for more than three-quarters of Novo Nordisk's revenue.

c. Each of the three Sanofi enterprises associates for the common purpose of manufacturing, selling, distributing, and facilitating the purchase of Sanofi medications including Ambien, Plavix, and Dupixent, as well as the at-issue Sanofi insulin and insulin-analog medications (Lantus, Toujeo, Apidra, and Soliqua).

605. Each Manufacturer–PBM Enterprise engaged in the shared purpose of exchanging false list prices and secret Manufacturer Payments for preferred formulary positions for the at-issue drugs in order to control the market for diabetes

medications and profit off diabetics and payors, including the Plaintiff.

606.   The members of each enterprise are bound by contractual relationships, financial ties, and the ongoing coordination of activities.

607.   There also is a common communication network by which the members of each enterprise share information and meet on a regular basis. These communications include, but are not limited to, communications relating to the use of false list prices for the at-issue diabetes medications and the regular flow of Manufacturer Payments from each Manufacturer Defendant to each PBM Defendant in exchange for formulary placement.

608.   Each Manufacturer–PBM Enterprise functions as continuing but separate unit separate and apart from the pattern of racketeering activity in which it engages. Each Manufacturer–PBM Enterprise, for example, engages in the manufacture, distribution and sale of medications and other products other than the at-issue insulin and insulin- analog medications. Additionally, each Manufacturer engages in conduct other than mail and wire fraud in furtherance of the Insulin Pricing Scheme.

609.   At all relevant times, each of the Manufacturer–PBM Enterprises was operated and conducted for unlawful purposes by each Manufacturer Defendant and PBM Defendant, namely, carrying out the Insulin Pricing Scheme.

610.   Each Manufacturer–PBM Enterprise derived secret profits from these activities that were greater than those any one of the Manufacturer Defendants or PBMs could obtain absent their misrepresentations regarding their non-transparent pricing schemes.

611.   The Manufacturer-PBM Enterprises resulted in benefits for the Defendants that could not have been achieved absent the enterprises. For example, the Manufacturer Defendants achieved formulary access without real price reductions by raising list prices and paying kickbacks to the PBM Defendants. The PBM Defendants likewise could not have obtained inflated rebates, administrative fees, and other payments without colluding with the Manufacturers to raise list prices. In other words, each Manufacturer-PBM Enterprise engaged in a scheme to corrupt the insulin market by artificially inflating list prices in exchange for preferred formulary placement.

612.   To accomplish this common purpose, each Manufacturer Defendant periodically and systematically inflated the prices of the at-issue drugs and then secretly paid a significant, yet undisclosed, portion of this inflated price back to Express Scripts, CVS Caremark, and OptumRx in the form of Manufacturer Payments.

613.   Each Manufacturer–PBM Enterprise did so willfully and with knowledge that Plaintiff paid for the at-issue drugs at prices directly based on the

false list prices.

614.   Each Manufacturer–PBM Enterprise's inflation of the list prices and secret Manufacturer Payments was a quid pro quo exchange for preferred formulary placement.

615.   Each Manufacturer–PBM Enterprise concealed from Plaintiff that these false prices and secret Manufacturer Payments resulted in each Manufacturer gaining formulary access without requiring significant price reductions and resulted in higher profits for the PBM Defendants, whose earnings increase the more inflated the price is and the more payment it receives from each Manufacturer Defendant.

616.   Each Manufacturer–PBM Enterprise also shares a common purpose of perpetuating the use of the false list prices for the at-issue drugs as the basis for the price that payors, including the Plaintiff, and diabetics pay for diabetes medications.

617.   The Manufacturer Defendants would not be able to offer large pricing spreads to the PBM Defendants in exchange for favorable formulary positions without the use of the false list prices as the basis for the price paid by diabetics and payors, including the Plaintiff, for the at-issue drugs.

618.   The PBM Defendants share this common purpose because nearly all the revenue and profit generated from the at-issue drugs is tied to the false inflated prices generated by the Insulin Pricing Scheme. Without diabetics and payors,

including the Plaintiff, paying for diabetes medications based on the inflated list prices, their profits from the Insulin Pricing Scheme would decrease.

619.   As a result, CVS Caremark, OptumRx, and Express Scripts have, with the knowing and willful participation and assistance of each Manufacturer Defendant, engaged in hidden profit-making schemes falling into four general categories: (1) garnering undisclosed Manufacturer Payments from each Manufacturer Defendant that CVS Caremark, OptumRx, and Express Scripts retain to a large extent; (2) generating substantial profits from pharmacies because of the falsely inflated prices; (3) generating profits on the diabetes medications sold through CVS Caremark's OptumRx's, and Express Scripts' own mail-order and retail pharmacies; and (4) keeping secret discounts each Manufacturer Defendant provides in association with CVS Caremark's OptumRx's, and Express Script's mail-order and retail operations.

620.   At all relevant times, each PBM Defendant and each Manufacturer Defendant has been aware of its respective Manufacturer–PBM Enterprise's conduct, has been a knowing and willing participant in and coordinator of that conduct and has reaped profits from that conduct.

621.   Neither the PBM Defendants nor any of the Manufacturer Defendants alone could have accomplished the purposes of the Manufacturer–PBM Enterprises without the other entities.

C.  **The Enterprises Misrepresent and Fail to Disclose Material Facts in Furtherance of the Insulin Pricing Scheme**

622. Each Manufacturer–PBM Enterprise knowingly made material misrepresentations to the public and the Plaintiff in furtherance of the Insulin Pricing Scheme, including publishing artificially inflated prices for insulin on published indices and representing that:

a.  the false list prices for the at-issue diabetes medications were reasonably related to the actual prices realized by Defendants and were a reasonable and fair basis on which to base the price Plaintiff paid for these drugs;

b.  each Manufacturer priced its at-issue drugs according to each drug's value to the healthcare system and the need to fund innovation;

c.  the Manufacturer Payments paid back to the PBM Defendants for each at-issue drug were for Plaintiff's benefit;

d.  all "rebates" and discounts negotiated by the PBM Defendants with the Manufacturer Defendants were remitted to Plaintiff;

e.  the "rebates" negotiated by the members of each enterprise saved Plaintiff money;

f.  each Manufacturer Defendant and PBM Defendant were transparent with Plaintiff regarding the Manufacturer Payments and the PBMs did not retain any funds associated prescription drug rebates or the margin between guaranteed reimbursement rates and the actual amount paid to the pharmacies;

196

and

g.    The PBM Defendants constructed formularies in a manner that lowered the price of the at-issue drugs and promoted the health and safety of diabetics.

623.  Each false list price published by the Manufacturer Defendants constituted a material misrepresentation to Plaintiff and the public, in that each purported to be a fair market price for the medication at issue, and each failed to disclose the fraudulent spread between the list price and the net price of the medication or the basis therefor.

624.  At all times relevant to this Complaint, each Manufacturer–PBM Enterprise knew the above-described representations to be false.

625.  At all times relevant to this Complaint, each Manufacturer–PBM Enterprise intentionally made these representations for the purpose of inducing Plaintiff into paying artificially inflated prices for diabetes medications.

626.  Plaintiff relied on the material misrepresentations and omissions made by each Manufacturer–PBM Enterprise in paying prices for the at-issue diabetes medications based upon the false prices generated by Insulin Pricing Scheme.

627.  Additionally, each PBM–Manufacturer Enterprise relied on the list prices negotiated and published by the other PBM–Manufacturer enterprises in setting their own list prices and determining the value of the kickbacks paid to the

PBMs. Plaintiff was injured by the inflated prices that arose as a result.

628.   Defendant Express Scripts convinced Plaintiff to pay prices for the at-issue drugs based on the false list price by using the misrepresentations listed above to convince Plaintiff that they had secured lower prices when, in fact, they did the opposite, all while concealing the Insulin Pricing Scheme.

629.   Without these misrepresentations and each RICO Defendant's failure to disclose the Insulin Pricing Scheme, each Manufacturer–PBM Enterprise could not have achieved its common purpose, as Plaintiff would not have been willing to pay these false list prices.

D.   **Defendants' Use of the U.S. Mails and Interstate Wire Facilities**

630.   Each of the Manufacturer–PBM Enterprises engaged in and affected interstate commerce because each engaged in the following activities across state boundaries: the sale, purchase and/or administration of diabetes medications; the setting and publishing of the prices of these drugs; and/or the transmission of pricing information of diabetes medications; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission of diabetes medications through mail- order and retail pharmacies; and/or the transmission and/or receipt of invoices, statements, and payments related to the use or administration of diabetes medications; and/or the negotiations and transmissions of contracts related to the pricing of and payment for diabetes medications.

631.   Each Manufacturer–PBM Enterprise participated in the administration of diabetes medications to millions of individuals located throughout the United States, including in Whitfield County and elsewhere in this District.

632.   Each Manufacturer Defendant's and PBM Defendant's illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information and products and funds through the U.S. mails and interstate wire facilities.

633.   The nature and pervasiveness of the Insulin Pricing Scheme, which included each Manufacturer Defendant's and PBM Defendant's corporate headquarters operations, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with each other and with pharmacies, physicians, payors, and diabetics in Whitfield County and throughout Georgia.

634.   Each Manufacturer–PBM Enterprise's use of the U.S. mails and interstate wire facilities to perpetrate the Insulin Pricing Scheme involved thousands of communications including:

a.     marketing materials about the published prices for diabetes medications, which each Manufacturer Defendant sent to the PBM Defendants located across the country, in Whitfield County, and throughout Georgia;

b.    written and oral representations of the false list prices of diabetes medications that each Manufacturer Defendant and PBM Defendant made at least annually and, in many cases, several times during a single year to the public;

c.    thousands of written and oral communications discussing, negotiating, and confirming the placement of each Manufacturer Defendant's diabetes medications on PBM Defendant's formularies;

d.    written and oral representations made by each Manufacturer Defendant regarding information or incentives paid back to each PBM Defendant for each diabetes medication sold and/or to conceal these incentives or the Insulin Pricing Scheme;

e.    written communications made by each Manufacturer Defendant, including checks, relating to Manufacturer Payments paid to the PBM Defendants to persuade them to advocate the at-issue diabetes medications;

f.    written and oral communications with U.S. government agencies that misrepresented what the published prices were or that were intended to deter investigations into the true nature of the published prices or to forestall changes to reimbursement based on something other than published prices;

g.    written and oral communications with payors, including the Plaintiff, regarding the price of diabetes medications;

h.    written and oral communications to the Plaintiff, including marketing and

solitation material sent by the PBM Defendants regarding the existence, amount, or purpose of payments made by each Manufacturer Defendant to each PBM for the diabetes medications described herein and the purpose of PBM Defendant's formularies;

i.    transmission of published prices to third parties and payors, including the Plaintiff; and

j.    receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities—the wrongful proceeds of the Insulin Pricing Scheme.

635.   Although Plaintiff pleads the dates of certain communications in allegations incorporated into this Count, it cannot allege the precise dates of others without access to books and records within each RICO Defendant's exclusive custody and control. Indeed, an essential part of the successful operation of the Insulin Pricing Scheme depended upon secrecy, and each Manufacturer Defendant and PBM Defendant took deliberate steps to conceal its wrongdoing.

E.    **Conduct of the Manufacturer–PBM Enterprises' Affairs**

636.   Each Manufacturer Defendant and PBM Defendant participates in the operation and management of Manufacturer–PBM Enterprises with which it is associated and, in violation of Section 1962(c) of RICO, and conducts or participates in the conduct of the affairs of those association-in-fact RICO enterprises, directly

or indirectly. Such participation is carried out in the following ways:

a.    Each Manufacturer Defendant directly controls the secret Manufacturer Payments it provides to the PBM Defendants for its diabetes medications.

b.    Each PBM Defendant directly manages and controls its drug formularies and the placement of the at-issue diabetes medications on those formularies.

c.    Each PBM Defendant intentionally selects higher-priced diabetes medications for formulary placement and exclude lower priced ones in order to generate larger profits and they coordinate with the Manufacturer Defendants to increase the availability and use of higher-priced medications because they are more profitable for both groups of Defendants.

d.    Each Manufacturer Defendant directly controls the publication of the false list prices generated by the Insulin Pricing Scheme.

e.    Each Manufacturer Defendant directly controls the creation and distribution of marketing, sales and other materials used to inform the PBM Defendants of the profit potential from its diabetes medications.

f.    Each PBM Defendant directly controls the creation and distribution of marketing, sales and other materials used to inform payors and the public of the benefits and cost-saving potential of each PBM Defendant's formularies and negotiations with the Manufacturers.

g.    Each PBM Defendant directs and controls each enterprise's direct

relationships with payors such as the Plaintiff by negotiating the terms of and executing the contracts that govern those relationships.

h.   Each PBM Defendant directs and controls each enterprise's Insulin Pricing Scheme by hiding, obfuscating, and laundering Manufacturer Payments through their affiliated entities in order to retain a large and undisclosed proportion of the Manufacturer Payments to the detriment of payors, including Plaintiff.

i.   Each PBM Defendant distributes through the U.S. mail and interstate wire facilities, promotional and other materials that claim the Manufacturer Payments paid from each Manufacturer Defendant to each PBM Defendant saves Plaintiff and other payors money on the at-issue drugs.

j.   Each Manufacturer Defendant represented to the Plaintiff—by publishing and promoting false list prices without stating that these published prices differed substantially from the prices realized by each Manufacturer Defendant and each PBM Defendant—that the published prices of diabetes medications reflected or approximated the actual price realized by Defendants and resulted from transparent and competitive, fair market forces.

## F.   Defendants' Pattern of Racketeering Activity

637.   Each Manufacturer Defendant and each PBM Defendant has conducted  and participated in the affairs of their respective Manufacturer–PBM

Enterprises through a pattern of racketeering activity, including acts that are unlawful under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

638.   Each Manufacturer Defendant's and each PBM Defendant's pattern of racketeering involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of the Insulin Pricing Scheme. Each of these mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which each Manufacturer Defendant and each PBM Defendant intended to defraud Plaintiff. By intentionally and falsely inflating the list prices, by misrepresenting the purpose behind both the Manufacturer Payments made from each Manufacturer Defendant to each PBM Defendant and the PBM Defendants' formulary construction, and by subsequently failing to disclose such practices to Plaintiff, each Manufacturer Defendant and each PBM Defendant engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

639. Each Manufacturer Defendant's and each PBM Defendant's racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive Plaintiff.

640.   Each separate use of the U.S. mails and/or interstate wire facilities employed by each Manufacturer Defendant and each PBM Defendant was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff.

641.   Each Manufacturer Defendant and each PBM Defendant engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer–PBM Enterprises with which each of them is and was associated in fact.

G.   **The RICO Defendants' Motive**

642.   Each Manufacturer Defendant's and PBM Defendant's motive in creating and operating the Insulin Pricing Scheme and conducting the affairs of the Manufacturer–PBM Enterprises described herein was to control the market for diabetes medications and falsely obtain sales of and profits from diabetes medications.

643.   The Insulin Pricing Scheme was designed to, and did, encourage others, including payors such as the Plaintiff, to advocate the use of each Manufacturer Defendant's products and to pay for those diabetes medications based on a falsely inflated price. Each Manufacturer Defendant used the Insulin Pricing Scheme to obtain formulary placement to sell more of its drugs without cutting into its profits. The PBM Defendants used the Insulin Pricing Scheme to falsely inflate the price

payors such as the Plaintiff paid for diabetes medications in order to profit off the Insulin Pricing Scheme, as discussed above.

**H.    The Manufacturer–PBM Enterprises' Insulin Pricing Scheme Injured Plaintiff**

644.   Each Manufacturer–PBM Enterprise's violations of federal law and pattern of racketeering activity have directly and proximately caused the Plaintiff to be injured in its business or property.

645.   The prices Plaintiff pays for the at-issue drugs are tied directly to the false list prices generated by the Insulin Pricing Scheme.

646.   No other intermediary in the supply chain has control over or is responsible for the list prices on which nearly all Plaintiff's payments are based other than the Manufacturer–PBM Defendant Enterprises.

647.   Defendants collectively set the prices Plaintiff paid for the at-issue drugs.

648.   During the relevant period, Defendant Express Scripts provided PBM services to the Plaintiff and benefited therefrom.

649.   During the relevant period, the Plaintiff paid Express Scripts directly for the at-issue drugs.

650.   Each Manufacturer–PBM Enterprise controlled and participated in the Insulin Pricing Scheme that was directly responsible for the false list prices upon

which the price Plaintiff paid was based.

651.   Plaintiff thus was damaged by the scheme. But for the misrepresentations and false prices created by the Insulin Pricing Scheme that each Manufacturer–PBM Enterprise employed, Plaintiff would have paid less for the medications.

652.   Because the Insulin Pricing Scheme resulted in payors and consumers paying supracompetitive prices for the at-issue medications, the scheme could not have continued without each Manufacturer-PBM Enterprise's participation. In other words, if one of the Manufacturer-PBM Enterprises had opted not to participate in the scheme—and not inflated its list prices—the other enterprises could not have continued to overcharge their own clients. Each enterprise's participation in the scheme—and execution of its own pattern of racketeering activity—was essential to the overall scheme's survival and a direct cause of Plaintiff's injuries.

653.   While Defendants' scheme injured an enormous number of payors and plan members, Plaintiff's damages are separate and distinct from those of any other victim that was harmed by the Manufacturer–PBM Defendant Enterprises' Insulin Pricing Scheme.

654.  By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, Defendants are jointly and severally liable

to the Plaintiff for three times the damages that were sustained, plus the costs of bringing this action, including reasonable attorneys' fees.

655.  By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(a) of RICO, the Plaintiff seeks injunctive relief against each Manufacturer and PBM Defendant for their fraudulent reporting of their prices and their continuing acts to affirmatively misrepresent and/or conceal and suppress material facts concerning their false and inflated prices for diabetes medications, plus the costs of bringing this suit, including reasonable attorneys' fees.

656.  Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. Plaintiff continues to purchase the at-issue diabetes medications. Plaintiff will continue to pay based on the Defendants' false list prices. This continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. The Plaintiff seeks injunctive relief, including an injunction against each Manufacturer and PBM Defendant, to prevent them from affirmatively misrepresenting and/or concealing and suppressing material facts concerning their conduct in furtherance of the Insulin Pricing Scheme.

**Count Two**
**Violations of RICO, 18 U.S.C. § 1962(d) By Conspiring**
**to Violate 18 U.S.C. § 1962(c)**
(Against All Defendants)

657.   Plaintiff re-alleges and incorporates herein by reference all foregoing and subsequent fact allegations, including ¶¶ 1-656.

658.   Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

659.   Defendants have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in the Insulin Pricing Scheme.

660.   As set forth in detail above, as well as in the Civil Conspiracy count below, Defendants each knowingly agreed to facilitate the Insulin Pricing Scheme and each has engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy. Specifically, Defendants agreed to and did inflate the prices of the at-issue drugs in lockstep to achieve an unlawful purpose; Defendants agreed to and did make false or misleading statements or material omissions regarding the reasons for these price increases, the purpose of the Manufacturer Payments exchanged between Defendants and the PBMs' formulary construction; and PBMs agreed to and did, in concert, request and receive larger

Manufacturer Payments and higher prices in exchange for formulary placement.

661.  The nature of the above-described Defendant co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

662.  Defendants have engaged and continue to engage in the commission of overt acts, including the following unlawful racketeering predicate acts:

a.      multiple instances of mail fraud in violations of 18 U.S.C. § 1341;

b.      multiple instances of wire fraud in violations of 18 U.S.C. § 1343; and

c.      multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

663.  Defendants' conspiracy to violate the above federal laws and the effects thereof detailed above are continuing and will continue. Plaintiff has been injured in its property by reason of these violations: Plaintiff has paid more for the at-issue drugs than it would have but for Defendants' conspiracy to violate 18 U.S.C. § 1962(c).

664.  By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiff for three times the damages this District has

sustained, plus the cost of this action, including reasonable attorneys' fees.

## Count Three
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO")
### O.C.G.A. § 16-14-4(a)
(Against All Defendants)

665.  Plaintiff re-alleges and incorporates herein by reference all foregoing and subsequent fact allegations, including ¶¶ 1-664.

666.  Plaintiff brings this claim against all Defendants for violations of O.C.G.A. § 16-14-4(a).

667.  Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark are (1) culpable "persons" who (2) willfully and knowingly (3) through a "pattern" of racketeering activity (4) acquired and maintained personal property, i.e. money, of Plaintiff.

668.  Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark are "persons" as that term is defined in O.C.G.A. §16-1-3(12) because each is a public or private corporation.

669.  Each of the Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark are separate entities and "persons" that are distinct from the RICO enterprises alleged below.

670.  The misconduct of Defendants Eli Lilly, Novo Nordisk, Sanofi, and

Express Scripts, OptumRx, and CVS Caremark as described in ¶¶ 602-656, which are all incorporated by reference herein, constitutes a pattern of racketeering activity as identified by O.C.G.A. 16-14-3(5)(c) which defines racketeering activity as the same conduct defined as racketeering activity under 18 U.S.C. §1961(1) which includes mail fraud, wire fraud, and unlawful activity under 18 U.S.C. §1952.

671.   Each Manufacturer Defendant's and PBM Defendant's pattern of racketeering involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of the Insulin Pricing Scheme. Each of these mailings and wire transmissions constitutes a "racketeering activity" within the meaning of O.C.G.A. 16-14-3(5)(c), in which each Manufacturer Defendant and PBM Defendant intended to defraud Plaintiff.

672.   By intentionally and falsely inflating the list prices, by misrepresenting the purpose behind both the Manufacturer Payments made from each Manufacturer Defendant to each PBM Defendant and the PBM Defendants' formulary construction, and by subsequently failing to disclose such practices to Plaintiff, each Manufacturer Defendant and PBM Defendant engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

673.   Each violation of Georgia RICO by Manufacturer Defendants and PBM Defendants through a pattern of racketeering activity have directly and proximately caused the Plaintiff to be injured in its business or property by Plaintiff giving money

to PBM Defendants and Manufacturer Defendants based on false list prices.

674.   During the relevant period, Defendant Express Scripts provided PBM services to Plaintiff and benefited therefrom by Plaintiff paying Express Scripts directly for the at-issue drugs.

675.   The prices Plaintiff paid for the at-issue drugs are tied directly to the false list prices generated by the Insulin Pricing Scheme which the Manufacturer Defendants and PBM Defendants collectively set.

676.   Plaintiff thus was damaged by the Defendants' scheme. But for the misrepresentations and false prices created by the Insulin Pricing Scheme that each Manufacturer Defendant and PBM Defendant employed, Plaintiff would have paid less money for the medications.

677.   While the Defendants' scheme injured an enormous number of payors, Plaintiff's damages are separate and distinct from those of any other victim harmed by the Manufacturer Defendants' and PBM Defendants' Insulin Pricing Scheme.

678.   By virtue of these violations of O.C.G.A. § 16-14-4(a), under the provisions of O.C.G.A. § 16-14-6(c), Defendants are jointly and severally liable to the Plaintiff for three times the damages that were sustained, plus the costs of bringing this action, including reasonable attorney's fees.

679.   By virtue of these violations of O.C.G.A. § 16-14-4(a), under the

provisions of O.C.G.A. §16-14-6(a), Plaintiff seeks injunctive relief against each Manufacturer Defendant and PBM Defendant for their fraudulent reporting of their prices and their continuing acts to affirmatively misrepresent and/or conceal and suppress material facts concerning their false and inflated prices for diabetes medications, plus the costs of bringing this suit, including reasonable attorney's fees.

680.   Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. Plaintiff continues to purchase the at-issue diabetes medications. Plaintiff will continue to pay based on the Defendants' false list prices. This continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. The Plaintiff seeks injunctive relief, including an injunction against each Manufacturer Defendant and PBM Defendant, to prevent them from affirmatively misrepresenting and/or concealing and suppressing material facts concerning their conduct in furtherance of the Insulin Pricing Scheme.

## Count Four
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO")
### O.C.G.A. § 16-14-4(b)
(Against All Defendants)

681.   Plaintiff re-alleges and incorporates herein by reference all foregoing and subsequent fact allegations, including ¶¶ 1-680.

682.   Plaintiff brings this claim against all Defendants for violations of

O.C.G.A. § 16-14-4(a).

683.  Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark are (1) culpable "persons" who (2) willfully and knowingly (3) committed and conspired to commit two or more acts of mail and wire fraud (4) through a "pattern" of racketeering activity that (5) involves an "association in fact" enterprise.

684.  Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark are "persons" as that term is defined in O.C.G.A. §16-1-3(12) because each is a public or private corporation.

685.  Each of the Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark are separate entities and "persons" that are distinct from the RICO enterprises alleged below.

686.  The actions of Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark as described in ¶¶ 602-656, which are all incorporated by reference herein, created an "association in fact" enterprise with a common purpose to perpetuate false list prices for the at-issue drugs and derive profits from these activities that were greater than what any of the Defendants would have obtained absent their misrepresentations.

687.  The misconduct of Defendants Eli Lilly, Novo Nordisk, Sanofi,

Express Scripts, OptumRx, and CVS Caremark as described in ¶¶ 602-656, which are all incorporated by reference herein, constitutes a pattern of racketeering activity as identified by O.C.G.A. 16-14-3(5)(c) which defines racketeering activity as the same conduct defined as racketeering activity under 18 U.S.C. §1961(1) which includes mail fraud, wire fraud, and unlawful activity under 18 U.S.C. §1952.

688.   Each Manufacturer Defendant's and PBM Defendant's pattern of racketeering involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of the Insulin Pricing Scheme. Each of these mailings and wire transmissions constitutes a "racketeering activity" within the meaning of O.C.G.A. 16-14-3(5)(c), in which each Manufacturer Defendant and PBM Defendant intended to defraud Plaintiff.

689.   By intentionally and falsely inflating the list prices, by misrepresenting the purpose behind both the Manufacturer Payments made from each Manufacturer Defendant to each PBM Defendant and the PBM Defendant's formulary construction, and by subsequently failing to disclose such practices to Plaintiff, each Manufacturer Defendant and PBM Defendant engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

690.   Each violation of Georgia RICO by Manufacturer Defendants and PBM Defendants through a pattern of racketeering activity have directly and proximately caused the Plaintiff to be injured in its business or property by Plaintiff giving money

to PBM Defendants and Manufacturer Defendants based on false list prices.

691.   During the relevant period, Defendant Express Scripts provided PBM services to Plaintiff and benefited therefrom by Plaintiff paying Express Scripts directly for the at-issue drugs.

692.   The prices Plaintiff paid for the at-issue drugs are tied directly to the false list prices generated by the Insulin Pricing Scheme which the Manufacturer Defendants and PBM Defendants collectively set.

693.   Plaintiff thus was damaged by the Defendants' scheme. But for the misrepresentations and false prices created by the Insulin Pricing Scheme that each Manufacturer Defendant and PBM Defendant employed, Plaintiff would have paid less money for the medications.

694.   While the Defendants' scheme injured an enormous number of payors, Plaintiff's damages are separate and distinct from those of any other victim harmed by the Manufacturer Defendants' and PBM Defendants' Insulin Pricing Scheme.

695.   By virtue of these violations of O.C.G.A. § 16-14-4(a), under the provisions of O.C.G.A. § 16-14-6(c), Defendants are jointly and severally liable to the Plaintiff for three times the damages that were sustained, plus the costs of bringing this action, including reasonable attorney's fees.

696.   By virtue of these violations of O.C.G.A. § 16-14-4(a), under the

provisions of O.C.G.A. §16-14-6(a), Plaintiff seeks injunctive relief against each Manufacturer and PBM Defendant for their fraudulent reporting of their prices and their continuing acts to affirmatively misrepresent and/or conceal and suppress material facts concerning their false and inflated prices for diabetes medications, plus the costs of bringing this suit, including reasonable attorney's fees.

697.   Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. Plaintiff continues to purchase the at-issue diabetes medications. Plaintiff will continue to pay based on the Defendants' false list prices. This continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. The Plaintiff seeks injunctive relief, including an injunction against each Manufacturer and PBM Defendant, to prevent them from affirmatively misrepresenting and/or concealing and suppressing material facts concerning their conduct in furtherance of the Insulin Pricing Scheme.

## Count Five
### Violations of Georgia RICO, §16-14-4(c) By Conspiring to Violate §16-14-4(a) and O.C.G.A. §16-14-4(b)
(Against All Defendants)

698.   Plaintiff re-alleges and incorporates herein by reference all foregoing and subsequent fact allegations, including ¶¶ 1-697.

699.   O.C.G.A. §16-14-4(c) of RICO provides that it "shall be unlawful for

any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section."

700.   Defendants have violated O.C.G.A. §16-14-4(c) by agreeing and conspiring to violate O.C.G.A. §16-14-4(a) and O.C.G.A. §16-14-4 (b). The object of this conspiracy has been and is to conduct or participate in the Insulin Pricing Scheme.

701.   As set forth in detail above, as well as in the Civil Conspiracy count below, Defendants each knowingly agreed and conspired to facilitate the Insulin Pricing Scheme and each has engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy. Specifically, Defendants agreed to and did inflate the prices of the at-issue drugs in lockstep to achieve an unlawful purpose; Defendants agreed to and did make false or misleading statements or material omissions regarding the reasons for these price increases, the purpose of the Manufacturer Payments exchanged between Defendants and the PBMs' formulary construction; PBMs agreed to and did, in concert, request and receive larger Manufacturer Payments and higher prices in exchange for formulary placement; and Defendant Express Scripts and the Manufacturer Defendants acquired money from Plaintiff based on Express Scripts' material misrepresentations.

702.   Defendants have engaged and continue to engage in the commission of overt acts, including the following unlawful racketeering predicate acts defined

under O.C.G.A. §16-13-3(5)(C) and 18 U.S.C.§1961(1):

a.      multiple instances of mail fraud in violations of 18 U.S.C. § 1341;

b.      multiple instances of wire fraud in violations of 18 U.S.C. § 1343; and

c.      multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

703.   Defendants' conspiracy to violate Georgia RICO and the effects thereof detailed above are continuing and will continue. Plaintiff has been injured in its property by reason of these violations: Plaintiff has paid more for the at-issue drugs than it would have but for Defendants' conspiracy to violate O.C.G.A. 16-14-4(a) and O.C.G.A. §16-14-4(b).

704.   By virtue of these violations of O.C.G.A. §16-14-49(c), Defendants are jointly and severally liable to Plaintiff for three times the damages Whitfield County has sustained, plus the cost of this action, including reasonable attorneys' fees.

**Count Six**
**Violation of Georgia's Uniform Deceptive Trade Practices Act**
**("Georgia Deceptive Trade Practices Act")**
(Against Defendants Eli Lilly, Novo Nordisk, Sanofi,
and Express Scripts)

705.   Plaintiff re-alleges and incorporates herein by reference all foregoing and subsequent fact allegations, including ¶¶ 1-704.

706.   Plaintiff brings this claim against Defendants Eli Lilly, Novo Nordisk, Sanofi, and Defendant Express Scripts (as defined in ¶ 160). All are referred to

220

collectively throughout Count Six as "Defendants." Eli Lilly, Novo Nordisk and Sanofi are referred to throughout Count Six as "Manufacturer Defendants."

707.   Defendants are "persons" as defined by O.C.G.A. §10-1-371(5).

708.   Plaintiff is a "person" as defined by O.C.G.A. §10-1-371(5).

709.   Defendants' misconduct as described throughout this Complaint, collectively and as individuals, constitutes deceptive trade practices as defined in O.C.G.A.10-1-372.

710.   Defendants are independently liable for their own misconduct in violation of the Georgia Deceptive Trade Practices Act and are liable for their collective efforts in furtherance of the Insulin Pricing Scheme. Using a complex structure of interdependent entities, Defendants confuse and mislead consumers about each Defendant's respective role in an attempt to evade liability for the unfair and deceptive scheme as a whole, and for the acts and omissions of the enterprise's interdependent participants.

711.   Defendants' misconduct in violation of the Deceptive Trade Practices Act includes the creation and implementation of the Insulin Pricing Scheme, which included:

a.     The Manufacturer Defendants published prices for the at-issue drugs and, in doing so, held these prices out as the actual prices for these drugs despite

knowing these prices were artificially inflated and untethered from the cost of the drugs or the price the Manufacturers were paid for them—all with Defendant Express Scripts' knowledge, consent, and cooperation.

b. The Manufacturer Defendants misrepresented and actively concealed the true reasons why they set and raised list prices—the truth being that it was to increase revenues and profits and to offer higher prices and larger Manufacturer Payments to Defendant Express Scripts—all with Defendant Express Scripts' knowledge, consent, and cooperation.

c. Defendant Express Scripts furthered the scheme by using the artificially inflated list prices to determine the inflated prices paid by payors, including Plaintiff and Plaintiff's Beneficiaries—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

d. Defendant Express Scripts represented to payors, including Plaintiff, and to the public that it worked to generate savings with respect to the at-issue drugs and to promote the health of diabetics. Instead, directly counter to these representations, Defendant Express Scripts' drove up the prices of the at-issue drugs and damaged payors, including Plaintiff, by demanding ever-increasing Manufacturer Payments that, in turn, increased what otherwise would have been the retail prices for the at-issue drugs—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

e.   Defendant Express Scripts has hidden, obfuscated, and laundered these Manufacturer Payments through their affiliated entities in order to retain a large and undisclosed proportion of the Manufacturer Payments to the detriment of payors, including Plaintiff.

f.   Defendant Express Scripts intentionally selected higher-priced diabetes medications for formulary placement and excluded lower priced ones in order to generate larger profits and coordinated with the Manufacturer Defendants to increase the availability and use of higher priced medications because they are more profitable for both groups of Defendants.

g.   Defendant Express Scripts misled its payors, including Plaintiff, as to the true nature of value of the services they provided and reaped illicit profits exponentially greater than the fair market value of the services they purported to provide—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

h.   Defendant Express Scripts owed a duty to disclose the true facts to their payor clients, including Plaintiff, but intentionally chose instead to conceal them, both to further the Insulin Pricing Scheme and to conceal it from payors, including Plaintiff—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

712.   By together carrying out and concealing the Insulin Pricing Scheme, as

described herein, Defendants engaged in deceptive trade practices under the Deceptive Trade Practices Act, including, but not limited to:

a.   representing that goods or services have characteristics and benefits that they do not have, O.C.G.A. §10-1-372(a)(5);

b.   representing that services are of a particular standard, quality or grade, if they are another, O.C.G.A. §10-1-372(a)(7);

c.   advertising goods and services with the intent not to sell them as advertised, O.C.G.A. §10-1-372(a)(9); and

d.   making false and misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions, O.C.G.A. §10-1-372(a)(11):

- A characteristic of every commodity in the Georgia economy is its price, which is represented by every seller to every buyer that the product being sold is being sold at a legal, competitive, and fair market value.

- The Manufacturer Defendants reported and published artificially inflated list prices for each at-issue drug and, in doing so, represented that the reported prices were reasonably related to the net prices for the at-issue drugs and otherwise reflected the fair market value for the drugs—all with Defendant Express Scripts' knowledge, consent, and cooperation.

- Defendant Express Scripts misrepresented to payors and the public that their formularies and the portion of the Manufacturer Payments they disclosed have the characteristic and benefit of lowering the price of the at-issue drugs and promoting diabetics' health when, in fact, the opposite is true.

- Defendant Express Scripts utilized the artificially inflated price—which they are directly responsible for inflating and

which they know is untethered from the actual price—to make false and misleading statements regarding the amount of savings the PBMs generate for payors and the public.

- Defendants made false and misleading representations of fact that the prices for the at-issue diabetes medications were legal, competitive, and fair market value prices.

- At no point did the Defendants reveal that the prices for the at-issue drugs were not legal, competitive or at fair market value—rather, they coordinated to overtly mislead the public and payors, including Plaintiff, and undertook a concerted effort to conceal the truth.

- At no point did these Defendants disclose that the prices associated with the at-issue drugs were generated by the Insulin Pricing Scheme—rather, they overtly misled the public and payors, including Plaintiff, and undertook a concerted effort to conceal the truth.

- At least once a year for each year during the relevant period, Defendants reported and published false prices for each at-issue drug and in doing so represented that the list prices were the actual, legal and fair prices for these drugs and resulted from competitive market forces when they knew that was not true.

- In addition, by granting the at-issue drugs preferred formulary position— formulary positions that Defendant Express Scripts represents are reserved for reasonably priced drugs and that are meant to promote cost savings and the health of diabetics— Defendant Express Scripts knowingly and purposefully utilized the false prices that were generated by the Insulin Pricing Scheme—all with the Manufacturer Defendants knowledge, consent, and cooperation.

- By granting the at-issue diabetes medications preferred formulary positions, Defendant Express Scripts ensured that prices generated by the Insulin Pricing Scheme would harm Plaintiff—all with the Manufacturer Defendants knowledge, consent, and cooperation.

- Defendant Express Scripts also misrepresented that its

formularies promoted the cost- savings to Plaintiff.

- Defendants' representations are false and Defendants knew they were false when they were made. Defendants knew that the prices they reported and utilized are artificially inflated for the purpose of maximizing revenues and profits pursuant to the Insulin Pricing Scheme.

- These Defendants not only knew that Defendant Express Scripts' formulary construction fueled the precipitous price increases that damaged Plaintiff's financial well-being, but coordinated in ways that made such harm inevitable—all for the sole purpose of generating more revenues and profits for both groups of Defendants.

- Defendants affirmatively withheld this truth from Plaintiff, even though these Defendants knew that the Plaintiff's intention was to pay the lowest possible price for diabetes medications and expectation was to pay a legal, competitive price that resulted from transparent market forces.

- Defendants made false and misleading misrepresentations of fact related to the Manufacturer Payments and the negotiations that occurred between Defendant Express Scripts and the Manufacturer Defendants.

- Defendant Express Scripts knowingly made false and misleading statements concerning the reasons for, existence of, and amount of price reductions by misrepresenting that the Manufacturer Payments lower the overall price of diabetes medications and reduce payor costs while promoting the health of diabetics.

- These representations were false and Defendants knew they were false when they were made. Defendant Express Scripts knew that the Manufacturer Payments were not reducing the overall price of diabetes medications but rather are an integral part of the secret Insulin Pricing Scheme and are responsible for the inflated prices.

- Defendant Express Scripts owed a duty to disclose the true facts to their payor clients, including Plaintiff, but intentionally

226

chose instead to conceal them, both to further the Insulin Pricing Scheme and to conceal it from payors, including Plaintiff—all with the intent of misrepresenting the characteristics and benefits of their services and the existence and nature of purported price reductions they obtained for payors, including Plaintiff. All of this was done with the Manufacturer Defendants' knowledge, consent, and cooperation.

- Defendants continue to make these misrepresentations and to publish prices generated by the Insulin Pricing scheme, and Plaintiff continues to purchase diabetes medications at inflated prices.

713. Defendants' deceptive acts and practices were intended to deceive, actually deceived, and had the tendency to deceive payors, including Plaintiff.

714. Defendants' deception was material in that it was likely to influence (and did influence) the purchasing decisions of payors, including Plaintiff.

715. Defendants' deceptive acts and practices—including their concealment and suppression of material facts—were carried out with the intent that Plaintiff, among others, would rely upon them in the course of trade or commerce, which Plaintiff reasonably did, proximately causing actual economic damage to Plaintiff.

716. Defendants' deceptive acts and practices were carried out knowingly and in willful, wanton, and reckless disregard for the economic and physical well-being of others. Defendants' deceptive acts and practices are reprehensible not only for their impact upon Plaintiff and other payors, but because they posed a grave risk of physical harm to others who are not parties to this lawsuit.

717.   The acts and practices alleged herein are ongoing, repeated, and affect the public interest.

718.   Accordingly, Plaintiff seeks actual economic damages, punitive damages, injunctive relief, attorneys' fees, costs of this action, all appropriate penalties and fees, and any other relief to which Plaintiff may be entitled.

<u>**Count Seven**</u>
<u>**Common Law Fraud**</u>
(Against Defendants Eli Lilly, Novo Nordisk, Sanofi, and Express Scripts)

719.   Plaintiff re-alleges and incorporates herein by reference each of the allegations from paragraphs 1-718.

720.   Defendant Express Scripts (as defined in ¶ 160) and the Manufacturer Defendants affirmatively misrepresented, omitted, or concealed and suppressed material facts concerning, among other things:

a.     the true cost and price of the at-issue drugs;

b.     the inflated and fraudulent nature of the list prices set and charged by Defendants for the at-issue drugs;

c.     the existence, amount, flow, and purposes of discounts and rebates offered or negotiated by Defendants for the at-issue medications; and

d.     the role that Defendants played in the price paid for the at-issue, including marketing materials and other public statements stating that Defendants decrease the price of prescription drugs for consumers.

228

721.   These Defendants' false representations and omissions were material to Plaintiff.

722.   Defendants knew that their representations and omissions were false and misleading. They knew, for example, that the list prices for the at-issue drugs were excessive, inflated, and untethered to any competitive market price. They knew that these list prices were artificially inflated to fund kickbacks for the PBMs in exchange for preferred formulary placement.

723.   These Defendants intended that Plaintiffs would rely on their misrepresentations and omissions. Through their scheme, Defendant Express Scripts leveraged formulary control for ever-increasing Manufacturer Payments while the Manufacturer Defendants maintained or increased their profit margins or sales volume as preferred formulary members. Defendants intended to profit at the expense of payors like Plaintiff.

724.   Plaintiff reasonably relied on these Defendants' deception, and these Defendants intended that they would so rely. Plaintiff had no way of discerning that these Defendants were, in fact, deceiving it because they possessed exclusive knowledge regarding the nature of diabetes drug pricing; intentionally concealed the foregoing from Plaintiff and the public; and made incomplete or false representations about the pricing of the at-issue drugs and their role in that pricing, while purposefully withholding material facts from Plaintiff that contradicted these representations.

725.   Plaintiff relied on these Defendants' false list prices. Because of the Insulin Pricing Scheme, list prices have skyrocketed and the spread between list price and net price has ballooned in turn. Plaintiff is injured by this list and net price divergence. Through the scheme, these Defendants have forced payors, including Plaintiff, to pay not just for the drugs, but also for undisclosed kickbacks that are paid to PBMs.

726.   These Defendants took steps to ensure that their employees and co-conspirators did not reveal the details of the Insulin Pricing Scheme to Plaintiff.

727.   These Defendants owed Plaintiff a duty to disclose, truthfully, all facts concerning the true costs of the at-issue medications and the inflated and fraudulent nature of their pricing; the existence, amount, flow, and purpose of rebates and discounts negotiated for those products; and the role that Defendants played in increasing the price of the at-issue drugs.

728.   These Defendants possessed superior knowledge of essential facts about the at-issue drugs and their prices. That information was peculiarly and exclusively in their control and not available to payors, including Plaintiff. In light of their misleading or incomplete representations, these Defendants also had an obligation to disclose facts related to the Insulin Pricing Scheme.

729.   These Defendants hatched their deceptive schemes and knew that Plaintiff

did not know (and could not reasonably discover) that they sought to artificially inflate the price of the insulin medications. These Defendants not only concealed all the facts concerning the true cost of the at-issue medications but went further to make affirmative misrepresentations in marketing materials and other communications that these Defendants worked to lower the ultimate cost of prescription medications. These Defendants engaged in this fraudulent concealment at the expense of Plaintiff.

730.   Plaintiff was not aware of the concealed and misrepresented material facts referenced above, and it would not have acted as it did, had it known the truth.

731.   As a direct and proximate result of these Defendants' fraudulent scheme, Plaintiff sustained damages, including but not limited to paying excessive and inflated prices for the at-issue medications.

732.   These Defendants valued their profits over the trust, health, and safety of Plaintiff Whitfield County and diabetics across the country. These Defendants repeatedly misrepresented the price of the at-issue drugs.

733.   These Defendants' actions, misrepresentations, and omissions demonstrate callous disregard for not only the rule of law but also public health. Indeed, as a direct result of these Defendants' actions, access to live-saving diabetes medications has been limited, denied, or forgone.

734.   Defendant Express Scripts and the Manufacturer Defendants are liable to

Plaintiff for damages in an amount to be proven at trial. Moreover, because these Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiff and for the purpose of enriching themselves to the public's detriment, Defendants' conduct warrants punitive damages in an amount to be determined at trial.

**Count Eight**
**Civil Conspiracy**
(Against all Defendants)

735.   Plaintiff re-alleges and incorporates by reference all foregoing and subsequent fact allegations, including ¶¶ 1-734.

736.   Defendants' conduct described throughout this Complaint as comprising and implementing the Insulin Pricing Scheme constituted a combination of two or more persons created and carried out for an unlawful purpose or a lawful purpose by unlawful means, further to which one or all Defendants committed an overt tortious or unlawful act.

737.   Each and every Defendant knowingly and maliciously participated in the creation and implementation of the Insulin Pricing Scheme.

738.   Each and every Defendant planned, assisted, and encouraged the Insulin Pricing Scheme.

739.   Defendants aided and abetted one another to violate federal laws and the Georgia Deceptive Trade Practices Act, as alleged herein.

740.  Each Defendant agreed to carry out and carried out overt acts in furtherance of the Insulin Pricing Scheme that artificially inflated the price of diabetes medications to Plaintiff's detriment.

741.  Each PBM Defendant made a conscious commitment to participate in the Insulin Pricing Scheme.

742.  The Manufacturer Defendants agreed with each other and PBM Defendants to intentionally raise their diabetes medication prices and then pay back a significant portion of those prices to the PBMs.

743.  In exchange for Manufacturer Defendants' inflating their prices and making large secret payments, the PBM Defendants agreed to and did grant preferred formulary status to the Manufacturer Defendants' diabetes medications.

744.  Each Defendant shares a common purpose of perpetuating the Insulin Pricing Scheme and neither the PBM Defendants nor the Manufacturer Defendants alone could have accomplished the Insulin Pricing Scheme without their co-conspirators.

745.  The PBM Defendants need the Manufacturer Defendants to inflate the list price of their diabetes medications and to make secret payments back to the PBM Defendants in order for the PBM Defendants to profit off the Insulin Pricing Scheme.

746.  The Manufacturer Defendants need the PBM Defendants to grant

certain   diabetes medications preferred formulary placement in order to maintain

access to payors and diabetics whose purchase of the at-issue drugs generated

unearned and unwarranted revenue for all Defendants.

747.   As discussed throughout this Complaint, the Insulin Pricing Scheme

resulted from explicit agreements, direct coordination, constant communication and

exchange of information between the PBMs and the Manufacturers.

748.   In addition to the preceding direct evidence of an agreement,

Defendants' conspiracy is also demonstrated by the following indirect evidence that

infers Defendants conspired to engage in fraudulent conduct:

a.      Defendants refuse to disclose the details of their pricing structures, agreements

        and sales figures in order maintain the secrecy of the Insulin Pricing Scheme;

b.      Numerous ongoing government investigations, hearings, and inquiries have

        targeted the Insulin Pricing Scheme and the collusion between the

        Manufacturer and PBM Defendants, including:

        • civil investigative demands to the Manufacturers from the
          States of California, Florida, Minnesota, and Washington
          relating to the pricing of their insulin products and their
          relationships with the PBM Defendants;

        • letters from numerous senators and representatives in
          recent years to the Justice Department and the Federal
          Trade Commission asking them to investigate potential
          collusion among Defendants;

        • 2019 hearings before the House Oversight and Reform

Committee on industry practices; and

- the Senate Finance Committee's recent two-year probe into the Insulin Pricing Scheme and the conspiracy between the Manufacturers and the PBMs, resulting in the Grassley-Wyden report, first published in 2021.

c.    The astronomical rise in the price of the at-issue drugs coincides with PBM

Defendants' rise within the pharmaceutical pricing system starting in 2003.

749.   Plaintiff was damaged and continues to be damaged by the conspiracy

when it overpaid for the diabetes medications as result of Defendants' unlawful

actions.

## **Count Nine**

### **Unjust Enrichment**
(Against Defendants Eli Lilly, Novo Nordisk, Sanofi, and Express Scripts)

750.   Plaintiff re-alleges and incorporates herein by reference all foregoing

fact allegations, including ¶¶ 1-749.

751.   Plaintiff brings this claim against Defendants Eli Lilly, Novo Nordisk,

Sanofi, and Defendant Express Scripts (as defined collectively in ¶ 160). All are

referred to collectively throughout Count Nine as "Defendants."

752.   This claim is alleged in the alternative to Plaintiff's claims for legal

relief.

753.   It is a fundamental principle of fairness and justice that a person should

not be unjustly enriched at the expense of another.

754.   A person should not be unjustly enriched at the expense of another even if that person's conduct is not tortious.

755.   Plaintiff conferred a benefit upon Defendants by purchasing the at-issue insulins at artificially and illegally inflated prices as established by the Insulin Pricing Scheme.

756.   Defendants jointly and severally deceived Plaintiff and have received a financial windfall from the Insulin Pricing Scheme at Plaintiff's expense.

757.   Plaintiff unknowingly conferred this benefit upon Defendants to Plaintiff's financial detriment.

758.   Defendants, jointly and severally, wrongfully secured and retained a benefit in the form of amounts paid for diabetes medications, unearned fees and other payments collected based on the market forces and prices generated by the Insulin Pricing Scheme, and revenues that would not have been realized but for the Insulin Pricing Scheme.

759.   Defendants, jointly and severally, wrongfully secured and retained a benefit in the form of revenues and profits to which they were not entitled, which did not represent the fair market value of the goods or services they offered, and which were obtained at Plaintiff's expense.

760.   Defendants, jointly and severally, wrongfully secured and retained a

benefit in the form of drug monies paid at prices that would not have existed but for the Defendants' misconduct.

761.   Defendants were aware of the benefit, voluntarily accepted it, and retained and appreciated the benefit, to which they were not entitled, all at Plaintiff's expense.

762.   Any Defendant's retention of any portion of any benefit obtained by way of the Insulin Pricing Scheme is unjust and inequitable regardless of the Insulin Pricing Scheme's legality.

763.   Each and every Defendant's retention of any portion of the benefit violates the fundamental principles of justice, equity, and good conscience. Even absent Plaintiff's ability to prove the elements of any other claim, it would be unfair, unjust, and inequitable for any Defendant to retain any portion of the benefit.

764.   Even absent legal wrongdoing by any or all Defendants, Plaintiff has a better claim to the benefit than any and all Defendants.

765.   The benefit retained is in an amount not less than the difference between the reasonable or fair market value of the at-issue drugs for which Plaintiff paid and the actual value of the at-issue drugs these Defendants delivered and, as to Defendant Express Scripts, the reasonable or fair market value of the services for which Plaintiff paid and the actual value of services rendered with respect to the at-issue drugs.

766.   Defendants should not be permitted to retain the benefit conferred upon them by Plaintiff and restitution is appropriate to prevent the unjust enrichment.

767.   Accordingly, Plaintiff seeks disgorgement of the benefit and restitution, rescission, or such other relief as will restore to Plaintiff that to which it is entitled.

## VII.  MOTION FOR INJUNCTION

768.   Plaintiff re-alleges and incorporates herein by reference all foregoing fact allegations, including ¶¶ 1-767.

769.   By Defendants' violations of RICO, Georgia RICO the Georgia Deceptive Trade Practices Act, and the common law, Plaintiff has suffered, and will continue to suffer, immediate and irreparable injury, loss, and damage, as discussed herein.

770.   The ongoing and threatened injury to Plaintiff and its Beneficiaries outweighs the harm that an injunction might cause Defendants.

771.   As a direct and proximate result of the conduct of the Defendants in committing the above and foregoing acts, Plaintiff moves this Court for injunctive relief against the Defendants pursuant to the Georgia Deceptive Trade Practices Act (O.C.G.A. §10-1-373); Georgia RICO (O.C.G.A. §16-14-6(a)); and 18 U.S.C. § 1964(a), thereby enjoining Defendants from committing future violations of the Georgia Deceptive Practices Act, Georgia RICO, and Federal RICO.

772.   An injunction is consistent with the public interest because it will protect the health and economic interests of Plaintiff and the integrity of the Georgia marketplace.

### VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Whitfield County, Georgia, prays for entry of judgment against the Defendants for all the relief requested herein and to which the Plaintiff may otherwise be entitled, specifically including, but without limitation, to-wit:

A.     A determination that Defendants have violated Federal RICO; have violated Georgia RICO, have violated the Georgia Deceptive Trade Practices Act, have been unjustly enriched, and have engaged in a civil conspiracy;

B.     Judgment in favor of Plaintiff and against the Defendants for damages in excess of the minimum jurisdictional requirements of this Honorable Court, in a specific amount to be proven at trial;

C.     Injunctive relief in accordance with the Georgia Deceptive Trade Practices Act (O.C.G.A. §10-1-373); Georgia RICO (O.C.G.A. §16-14-6(a)); and 18 U.S.C. § 1964(a), to the effect that Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be enjoined and restrained from in any manner continuing, maintaining or renewing the

conduct, contract, conspiracy or combination alleged herein in violation of Georgia law and Federal RICO, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

D.    That Plaintiff:

      i.  be awarded treble damages pursuant to 18 U.S.C. §1964(c) and O.C.G.A. §16-14-6(c);

      ii.  be awarded restitution, damages, disgorgement, penalties, and all other legal and equitable relief to which Plaintiff may be entitled;

      iii.  be awarded punitive damages because Defendants knowingly, willfully, wantonly, and intentionally harmed the health, well-being, and financial interests of Plaintiff and its Beneficiaries;

      iv.  be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

      v.  recover its costs of this action, including its reasonable attorneys' fees, as provided by law and pursuant to 18 U.S.C. §1964(c), O.C.G.A. §§16-14-6(c) and 10-1-373(b); and

      vi.  be awarded such other further relief as the case may require and the Court may deem just and proper under the circumstances.

## IX.  JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 2nd day of August, 2024.

*/s/Robert K. Finnell*
Robert K. Finnell
bob@finnellfirm.com
Georgia Bar No. 261575
The Finnell Firm
1 West Fourth Avenue
Suite 200
Rome, GA 30162-0063
Phone: (706) 235-7272

*/s/J. Anderson Davis*
J. Anderson Davis
adavis@davislucascarter.com
Georgia Bar No. 211077
Davis Lucas Carter LLP
210 E 2nd Avenue Suite 301
Rome, GA 30161

*/s/Robert H. Smalley*
Robert H. Smalley
rsmalley@mccamylaw.com
Georgia Bar No. 653405
Meg Deitz Parker
mparker@mccamylaw.com
Georgia Bar No. 759651
McCamy, Phillips, Tuggle, &
Fordham
P.O. Box 1105
Dalton, GA 30720-1105